**Nos. 22-2333 and 22-2334**

# In the
# United States Court of Appeals
## for the Seventh Circuit

LEINANI DESLANDES and STEPHANIE TURNER,
on behalf of herself and all others similarly situated,

*Plaintiffs-Appellants,*

v.

McDONALD'S USA, LLC, et al.,

*Defendants-Appellees.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division, Nos. 1:17-cv-04857 & 1:19-cv-05524.
The Honorable **Jorge L. Alonso**, Judge Presiding.

## BRIEF AND APPENDIX OF PLAINTIFFS-APPELLANTS
## LEINANI DESLANDES and STEPHANIE TURNER

DEAN M. HARVEY
ANNE B. SHAVER
LIN Y. CHAN
LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, California 94111-3339
(415) 956-1000

JESSICA A. MOLDOVAN
LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013-1413
(212) 355-9500

DEREK Y. BRANDT
LEIGH M. PERICA
CONNOR P. LEMIRE
McCUNE LAW GROUP, McCUNE
WRIGHT AREVALO VERCOSKI KUSEL
WECK BRANDT APC
231 North Main Street, Suite 20
Edwardsville, Illinois 62025
(618) 307-6116

DANA R. VOGEL
McCUNE LAW GROUP, McCUNE
WRIGHT AREVALO VERCOSKI KUSEL
WECK BRANDT APC
18565 Jamboree Road, Suite 550
Irvine, California 92612
(714) 909-2326

*Counsel for Plaintiffs-Appellants*

 

Save As    Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: <u>22-2333 and 22-2334</u>

Short Caption: <u>Deslandes, et al. v. McDonald's USA, LLC, et al.</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☑    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

<u>Leinani Deslandes and Stephanie Turner</u>

_____

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

<u>Lieff Cabraser Heimann & Bernstein, LLP; McCune Wright Arevalo, LLP; Scott & Scott, LLP</u>

_____

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        <u>N/A</u>

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        <u>N/A</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

<u>N/A</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

<u>N/A</u>

---

Attorney's Signature: <u>/s/ Dean M. Harvey</u>    Date: <u>August 9, 2022</u>

Attorney's Printed Name: <u>Dean M. Harvey</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☑   No ☐

Address: <u>Lieff Cabraser Heimann & Bernstein, LLP</u>

        <u>275 Battery St., 29th Floor, San Francisco, CA 94111</u>

Phone Number: <u>415-956-1000</u>    Fax Number: <u>415-956-1008</u>

E-Mail Address: <u>dharvey@lchb.com</u>

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>22-2333 and 22-2334</u>

Short Caption: <u>Deslandes, et al. v. McDonald's USA, LLC, et al.</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    [✓]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    <u>Leinani Deslandes and Stephanie Turner</u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    <u>Lieff Cabraser Heimann & Bernstein, LLP; McCune Wright Arevalo, LLP; Scott & Scott, LLP</u>

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        <u>N/A</u>

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        <u>N/A</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    <u>N/A</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    <u>N/A</u>

Attorney's Signature: <u>/s/ Anne B. Shaver</u>    Date: <u>August 9, 2022</u>

Attorney's Printed Name: <u>Anne B. Shaver</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes [✓]  No [ ]

Address:  <u>Lieff Cabraser Heimann & Bernstein, LLP</u>

    <u>275 Battery St., 29th Floor, San Francisco, CA 94111</u>

Phone Number: <u>415-956-1000</u>    Fax Number: <u>415-956-1008</u>

E-Mail Address: <u>ashaver@lchb.com</u>

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>22-2333 and 22-2334</u>

Short Caption: <u>Deslandes, et al. v. McDonald's USA, LLC, et al.</u>

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☑    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

<u>Leinani Deslandes and Stephanie Turner</u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

<u>Lieff Cabraser Heimann & Bernstein, LLP; McCune Wright Arevalo, LLP; Scott & Scott, LLP</u>

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

<u>N/A</u>

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

<u>N/A</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

<u>N/A</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

<u>N/A</u>

Attorney's Signature: <u>/s/ Lin Y. Chan</u>    Date: <u>August 12, 2022</u>

Attorney's Printed Name:  <u>Lin Y. Chan</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☑  No ☐

Address:  <u>Lieff Cabraser Heimann & Bernstein, LLP</u>

<u>275 Battery St., 29th Floor, San Francisco, CA 94111</u>

Phone Number: <u>415-956-1000</u>    Fax Number: <u>415-956-1008</u>

E-Mail Address: <u>lchan@lchb.com</u>

rev. 12/19 AK

Save As     Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>22-2333 and 22-2334</u>

Short Caption: <u>Deslandes, et al. v. McDonald's USA, LLC, et al.</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

     ☑    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

<u>Leinani Deslandes and Stephanie Turner</u>

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

<u>Lieff Cabraser Heimann & Bernstein, LLP; McCune Wright Arevalo, LLP; Scott & Scott, LLP</u>

(3)     If the party, amicus or intervenor is a corporation:

    i)     Identify all its parent corporations, if any; and

         <u>N/A</u>

    ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

         <u>N/A</u>

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

<u>N/A</u>

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

<u>N/A</u>

Attorney's Signature: <u>/s/ Jessica A. Moldovan</u>      Date: <u>August 9, 2022</u>

Attorney's Printed Name: <u>Jessica A. Moldovan</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☑   **No** ☐

Address: <u>Lieff Cabraser Heimann & Bernstein, LLP</u>

       <u>250 Hudson St., 8th Floor, New York, N.Y. 10013</u>

Phone Number: <u>212-355-9500</u>      Fax Number: <u>212-355-9592</u>

E-Mail Address: <u>jmoldovan@lchb.com</u>

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>22-2333 and 22-2334</u>

Short Caption: <u>Deslandes, et al. v. McDonalds USA, LLC, et al</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☑    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
<u>Leinani Deslandes and Stephanie Turner</u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
<u>McCune Wright Arevalo, LLP; Lieff Cabraser Heimann & Bernstein, LLP; Scott & Scott LLP</u>

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        <u>N/A</u>

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        <u>N/A</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    <u>N/A</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    <u>N/A</u>

Attorney's Signature: <u>/s/ Derek Y. Brandt</u>    Date: <u>August 5, 2022</u>

Attorney's Printed Name: <u>Derek Y. Brandt</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☑    **No** ☐

Address: <u>McCune Wright Arevalo, LLP</u>

    <u>231 N. Main Street, Suite 20, Edwardsville, IL 62025</u>

Phone Number: <u>618-307-6116</u>    Fax Number: <u>618-307-6161</u>

E-Mail Address: <u>dyb@mccunewright.com</u>

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: <u>22-2333 and 22-233</u>

Short Caption: <u>Deslandes, et al. v. McDonald's USA, LLC, et al.</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

>    ✔   **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    <u>Leinani Deslandes and Stephanie Turner</u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    <u>Lieff Cabraser Heimann & Bernstein, LLP; McCune Wright Arevalo, LLP; Scott & Scott, LLP</u>

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        <u>N/A</u>

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        <u>N/A</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    <u>N/A</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    <u>N/A</u>

Attorney's Signature: <u>/s/Leigh M. Perica</u>    Date: <u>August 15, 2022</u>

Attorney's Printed Name: <u>Leigh M. Perica</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes ✔  No ☐

Address: <u>McCune Wright Arevalo, LLP</u>

    <u>231 North Main Street, Suite 20, Edwardsville, IL 62025</u>

Phone Number: <u>(618) 307-6116</u>    Fax Number: <u>(618) 307-6161</u>

E-Mail Address: <u>LMP@mccunewright.com</u>

rev. 12/19 AK

Save As    Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: <u>22-2333 and 22-233</u>

Short Caption: <u>Deslandes, et al. v. McDonald's USA, LLC, et al.</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☑    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    Leinani Deslandes and Stephanie Turner

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Lieff Cabraser Heimann & Bernstein, LLP; McCune Wright Arevalo, LLP; Scott & Scott, LLP

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: <u>/s/Leigh M. Perica</u>    Date: <u>August 15, 2022</u>

Attorney's Printed Name:  <u>Leigh M. Perica</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☑  No ☐

Address:  <u>McCune Wright Arevalo, LLP</u>

    <u>231 North Main Street, Suite 20, Edwardsville, IL 62025</u>

Phone Number: <u>(618) 307-6116</u>    Fax Number:  <u>(618) 307-6161</u>

E-Mail Address: <u>LMP@mccunewright.com</u>

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Save As    Clear Form

Appellate Court No: <u>22-2333 and 22-2334</u>

Short Caption: <u>Leinani Deslandes v. McDonald's USA, LLC, et al.</u>

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ✓    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    Leinani Deslandes and Stephanie Turner

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    McCune Wright Arevalo, LLP; Lieff Cabraser Heimann & Bernstein, LLP; Scott & Scott, LLP

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: /s/ Dana R. Vogel    Date: August 16, 2022

Attorney's Printed Name: Dana R. Vogel

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ✓    No☐

Address: McCune Wright Arevalo, LLP

Phone Number: _____    Fax Number: _____

E-Mail Address: drv@mccunewright.com

rev. 12/19 AK

# TABLE OF CONTENTS

**Page**

CIRCUIT RULE 26.1 DISCLOSURE STATEMENTS ........................................................ i

JURISDICTIONAL STATEMENT ........................................................................ 1

STATEMENT OF THE ISSUE ........................................................................... 2

STATEMENT OF THE CASE ............................................................................ 2

I.      LEGAL BACKGROUND ...................................................................... 3

II.     FACTUAL BACKGROUND .................................................................. 7

        A.      McDonald's Franchise System ..................................................... 7

        B.      McDonald's and Its Franchisees Agreed Not To Compete For Each
                Other's Employees ..................................................................... 9

        C.      The No-Hire Agreement Harmed Competition and Suppressed Pay
                Classwide ................................................................................ 13

III.    PROCEDURAL HISTORY .................................................................. 16

SUMMARY OF ARGUMENT ........................................................................... 19

ARGUMENT ............................................................................................. 21

I.      STANDARDS OF REVIEW ................................................................. 21

II.     THE DISTRICT COURT ERRED IN GRANTING MCDONALD'S
        JUDGMENT ON THE PLEADINGS ....................................................... 22

        A.      The District Court Erroneously Concluded That The No-Hire
                Agreement Was Ancillary ........................................................... 22

        B.      Unless The No-Hire Agreement Was Ancillary To McDonald's
                Franchise System, It Is Conclusively Unlawful Pursuant To the Per
                Se Rule ................................................................................... 25

        C.      Plaintiffs also Satisfy The Quick-Look Test .................................. 27

        D.      Plaintiffs also Satisfy The Rule of Reason ................................... 30

        E.      Plaintiffs Did Not Waive A Legal Theory Under the Rule of Reason ....... 35

**TABLE OF CONTENTS**
**(continued)**

Page

III.  THE DISTRICT COURT ERRED WHEN IT DENIED PARTIAL
      SUMMARY JUDGMENT ON MCDONALD'S AFFIRMATIVE DEFENSE ........ 37

IV.   THE DISTRICT COURT ABUSED ITS DISCRETION WHEN IT DENIED
      CLASS CERTIFICATION ................................................................ 42

      A.   The District Court Misinterpreted *NCAA v. Alston* ..................................... 42

      B.   Legal Standards for Class Certification ........................................................ 44

      C.   Plaintiffs Satisfy the Requirements of Rule 23(a) ........................................ 45

      D.   Common Issues Predominate With Respect to Each Element of
           Plaintiffs' Sherman Act Claim, and to McDonald's Affirmative
           Defense ............................................................................................................ 48

           1.   McDonald's Liability Is A Common Question That Will Be
                Answered With Common Evidence .................................................... 49

           2.   Plaintiffs' Proof of Impact And Damages Are Classwide .............. 50

           3.   Class Certification Should Not Be Denied Out of Concern for
                Uninjured Class Members .................................................................... 54

V.    THE COURT SHOULD REASSIGN THIS CASE ON REMAND ........................ 55

CONCLUSION ........................................................................................................ 57

# TABLE OF AUTHORITIES

**Page**

## Cases

*Advent Elecs., Inc. v. Buckman,*
112 F.3d 267 (7th Cir. 1997) ............................................................ 55

*Agnew v. NCAA,*
683 F.3d 328 (7th Cir. 2012)..................................................... 27, 49

*Always Towing & Recovery, Inc. v. City of Milwaukee,*
2 F.4th 695 (7th Cir. 2021) ............................................................. 35

*Amchem Prods., Inc. v. Windsor,*
521 U.S. 591 (1997) ........................................................................ 48

*Arizona v. Maricopa Cty. Med. Soc.,*
457 U.S. 332 (1982) .......................................................................... 4

*Arrington v. Burger King Worldwide, Inc.,*
47 F.4th 1247 (11th Cir. 2022) ...................................................... 25

*Arwa Chiropractic, P.C. v. Med-Care Diabetic & Med. Supplies, Inc.,*
961 F.3d 942 (7th Cir. 2020)........................................................... 42

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.,*
9 F. 4th 1102 (9th Cir. 2021)...................................................... 5, 25

*Beatrice Foods v. F.T.C.,*
540 F.2d 303 (7th Cir. 1976)........................................................... 33

*Blackburn v. Sweeney,*
53 F.3d 825 (7th Cir. 1995)....................................................... 23, 49

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic,*
65 F.3d 1406 (7th Cir. 1995) ............................................................ 4

*BRC Rubber & Plastics, Inc. v. Cont'l Carbon Co.,*
900 F.3d 529 (7th Cir. 2018)........................................................... 35

*Burton v. Bd. of Regents,*
851 F.3d 690 (7th Cir. 2017)........................................................... 21

*Cal. Dental Ass'n v. F.T.C.,*
526 U.S. 756 (1999) ...................................................... 3, 5, 28, 30

*Cange v. Stotler & Co.,*
913 F.2d 1204 (7th Cir. 1990) ........................................................ 55

## TABLE OF AUTHORITIES
### (continued)

Page

*Cap. Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*,
  996 F.2d 537 (2d Cir. 1993) ................................................ 30

*Carnegie v. Household Int'l, Inc.*,
  376 F.3d 656 (7th Cir. 2004) .............................................. 47

*Chi. Pro. Sports Ltd. P'ship v. Nat'l Basketball Ass'n*,
  754 F. Supp. 1336 (N.D. Ill. 1991),
  *aff'd*, 961 F.2d 667 (7th Cir. 1992) .................................. 5, 6

*Chi. Pro. Sports Ltd. P'ship v. Nat'l Basketball Ass'n*,
  95 F.3d 593 (7th Cir. 1996) ...................................... 7, 39, 43

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) ............................................................ 46

*Cook v. Winfrey*,
  141 F.3d 322 (7th Cir. 1998) .............................................. 55

*Denny's Marina, Inc. v. Renfro Prods., Inc.*,
  8 F.3d 1217 (7th Cir. 1993) .................................................. 3

*Dey v. Colt Constr. & Dev. Co.*,
  28 F.3d 1446 (7th Cir. 1994) .............................................. 57

*F.T.C. v. Ind. Fed'n of Dentists*,
  476 U.S. 447 (1986) ............................................ 6, 7, 30, 31

*F.T.C. v. Super. Ct. Trial Lawyers Ass'n*,
  493 U.S. 411 (1990) ............................................................ 6

*Federated Mut. Ins. Co. v. Coyle Mech. Supply Inc.*,
  983 F.3d 307 (7th Cir. 2020) ........................................ 21, 25

*Fishman v. Estate of Wirtz*,
  807 F.2d 520 (7th Cir. 1986) .............................................. 34

*Fonseca v. Hewlett-Packard Co.*,
  No. 19CV1748-GPC-MSB, 2020 WL 6083448 (S.D. Cal. Feb. 3, 2020) .............................. 25

*Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n.*,
  744 F.2d 588 (7th Cir. 1984) .................................. 4, 5, 27, 38

*Grajales v. P.R. Ports Auth.*,
  682 F.3d 40 (1st Cir. 2012) ................................................ 36

## TABLE OF AUTHORITIES
### (continued)

Page

*Holmes v. Village of Hoffman Estates,*
  511 F.3d 673 (7th Cir. 2007) ................................................... 55

*Ideal Steel Supply Corp. v. Anza,*
  652 F.3d 310 (2d Cir. 2011) .................................................. 36

*In re High-Tech Emp. Antitrust Litig.,*
  856 F. Supp. 2d 1103 (N.D. Cal. 2012).................................. 25

*In re High-Tech Emp. Antitrust Litig.,*
  985 F. Supp. 2d 1167 (N.D. Cal. 2013).................................. 51

*In re Hydrogen Peroxide Antitrust Litig.,*
  552 F.3d 305 (3d Cir. 2008) .................................................. 42

*In re Outpatient Med. Ctr. Emp. Antitrust Litig.,*
  No. 21-CV-00305, 2022 WL 4465929 (N.D. Ill. Sept. 26, 2022) ......................................... 25

*In re Processed Egg Prods. Antitrust Litig.,*
  206 F. Supp. 3d 1033 (E.D. Pa. 2016
  *aff'd*, 962 F.3d 719 (3d Cir. 2020) .......................................... 36

*In re Ry. Indus. Emp. No-Poach Antitrust Litig.,*
  395 F. Supp. 3d 464 (W.D. Pa. 2019) ..................................... 25

*In re Scrap Metal Antitrust Litig.,*
  527 F.3d 517 (6th Cir. 2008).................................................. 45

*In re Sulfuric Acid Antitrust Litig.,*
  703 F.3d 1004 (7th Cir. 2012)................................................ 30

*In re Urethane Antitrust Litig.,*
  768 F.3d 1245 (10th Cir. 2014) ............................................. 45

*In re Vitamins Antitrust Litig.,*
  209 F.R.D. 251 (D.D.C. 2002) ............................................... 49

*Johnson v. Ariz. Hosp. & Healthcare Ass'n,*
  No. 07-1292, 2009 WL 5031334 (D. Ariz. July 14, 2009) .............................. 51, 53

*Kleen Prods. LLC v. Int'l Paper,*
  306 F.R.D. 585 (N.D. Ill. 2015),
  *affirmed sub nom.* 831 F.3d 919 (7th Cir. 2016).................... 45, 49, 50

*Kristofek v. Village of Orland Hills,*
  832 F.3d 785 (7th Cir. 2016) ................................................. 55

# TABLE OF AUTHORITIES
## (continued)

Page

*Law v. Nat'l Collegiate Athletic Ass'n*,
134 F.3d 1010 (10th Cir. 1998).................................................................. 6, 30, 39

*Levine v. Cent. Fla. Med. Affiliates, Inc.*,
72 F.3d 1538 (11th Cir. 1996)...................................................................... 30

*Loeb Indus., Inc. v. Sumitomo Corp.*,
306 F.3d 469 (7th Cir. 2002)....................................................................... 50

*Merenda v. VHS of Mich., Inc.*,
296 F.R.D. 528 (E.D. Mich. 2013)............................................................... 53

*Messner v. Northshore Univ. HealthSystem*,
669 F.3d 802 (7th Cir. 2012)................................................................ passim

*MLB Props., Inc. v. Salvino, Inc.*,
542 F.3d 290 (2d Cir. 2008)........................................................................ 24

*N. Pac. Ry. Co. v. United States*,
356 U.S. 1 (1958) ......................................................................................... 6

*Nat'l Bancard Corp. v. Visa USA Inc.*,
779 F.2d 592 (11th Cir. 1986)..................................................................... 23

*Nat'l Collegiate Athletic Ass'n  v. Alston*,
141 S. Ct. 2141 (2021) .......................................................................... passim

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*,
468 U.S. 85 (1984) ................................................................................ passim

*Nat'l Soc. of Pro. Eng'rs v. United States*,
435 U.S. 679 (1978) ..................................................................................... 5

*Nicholson v. City of Peoria*,
860 F.3d 520 (7th Cir. 2017)....................................................................... 21

*Nitsch v. DreamWorks Animation SKG Inc.*,
315 F.R.D. 270 (N.D. Cal. 2016) ........................................................... 51, 53

*Orson, Inc. v. Miramax Film Corp.*,
79 F.3d 1358 (3d Cir. 1996)........................................................................ 30

*Palmer v. BRG of Ga., Inc.*,
498 U.S. 46 (1990) ...................................................................................... 42

*Photovest Corp. v. Fotomat Corp.*,
606 F.2d 704 (7th Cir. 1979)................................................................. 33, 34

### TABLE OF AUTHORITIES
### (continued)

Page

*Polk Bros., Inc. v. Forest City Enters., Inc.*,
   776 F.2d 185 (7th Cir. 1985)............................................................. 23, 40

*Polygram Holding, Inc. v. F.T.C.*,
   416 F.3d 29 (D.C. Cir. 2005) ................................................................ 23

*Republic Tobacco Co. v. N. Atl. Trading Co.*,
   381 F.3d 717 (7th Cir. 2004).................................................................. 34

*Rohlfing v. Manor Care, Inc.*,
   172 F.R.D. 330 (N.D. Ill. 1997) ............................................................ 45

*Rorrer v. City of Stow*,
   743 F.3d 1025 (6th Cir. 2014) ............................................................... 57

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
   792 F.2d 210 (D.C. Cir. 1986),
   *cert. denied*, 479 U.S. 1033 (1987) ..................................................... 23

*Ryan v. Chemlawn Corp.*,
   935 F2d 129 (7th Cir. 1991) .................................................................. 55

*Seaman v. Duke University*,
   No. 1:15-CV-462, 2018 WL 671239 (M.D.N.C. Feb. 1, 2018)....................... 51, 53

*Suchanek v. Sturm Foods, Inc.*,
   764 F.3d 750 (7th Cir. 2014)................................................................. 50

*Sullivan v. Nat'l Football League*,
   34 F.3d 1091 (1st Cir. 1994) ................................................................ 39

*Toys R Us, Inc. v. F.T.C.*,
   221 F.3d 928 (7th Cir. 2000)................................................................. 38

*Tyson Foods, Inc. v. Bouaphakeo*,
   577 U.S. 442 (2016) ..................................................................... 46, 48

*United States v. Anthem, Inc.*,
   855 F3d 345 (D.C. Cir. 2017) ............................................................... 39

*United States v. Cont'l Can Co.*,
   378 U.S. 441 (1964) ........................................................................... 33

*United States v. eBay, Inc.*,
   968 F. Supp. 2d 1030 (N.D. Cal. 2013)................................................. 25

# TABLE OF AUTHORITIES
## (continued)

Page

*United States v. Phila. Nat'l Bank*,
374 U.S. 321 (1963) ............................................................................... 39

*United States v. Rogers Cartage Co.*,
794 F.3d 854 (7th Cir. 2015) ................................................................. 21

*United States v. Socony-Vacuum Oil Co.*,
310 U.S. 150 (1940) ...................................................................... 4, 39, 40

*United States v. Topco Assocs., Inc.*,
405 U.S. 596 (1972) ............................................................................... 39

*United States v. Vlahos*,
33 F.3d 758 (7th Cir. 1994) ................................................................... 56

*Williams v. Lampe*,
399 F.3d 867 (7th Cir. 2005) ................................................................. 37

**Statutes**

15 U.S.C. § 1 ............................................................................................. 3

28 U.S.C. § 1291 ...................................................................................... 1

28 U.S.C. § 1331 ...................................................................................... 1

28 U.S.C. § 1337 ...................................................................................... 1

28 U.S.C. § 1367 ...................................................................................... 1

**Rules**

Fed. R. App. P. 12.1(b) ........................................................................... 1

Fed. R. Civ. P. 12(d) ............................................................................... 21

Fed. R. Civ. P. 23(a) ............................................................................... 44

Fed. R. Civ. P. 23(b) ........................................................................... 44, 45

Fed. R. Civ. P. 56(a) ........................................................................... 21, 37

Fed. R. Civ. P. 8(a) ................................................................................. 35

**Other Authorities**

15 U.S.C. § 1 ....................................................................................... 1, 2

15 U.S.C. § 15 .......................................................................................... 1

15 U.S.C. § 26 .......................................................................................... 1

**TABLE OF AUTHORITIES**
**(continued)**

Page

15 U.S.C. § 4 ................................................................................................. 1

7 P. Areeda, Antitrust Law ¶ 1511 (1986) .............................................. 6

7AA Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure*
§ 1781 (3d Ed. 2014) ................................................................................. 45

C. Scott Hemphill & Nancy L. Rose, *Mergers that Harm Sellers*,
127 Yale L.J. 2078 (2018) ......................................................................... 39

Herbert J. Hovenkamp, *The Rule of Reason*,
70 Fla. L. Rev. 81 (2018) .......................................................................... 38

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1500 (5th ed. 2022) ........................................................... Passim

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction under 28 U.S.C. §§ 1331 and

1337 for Plaintiffs-Appellants' claims arising under the federal antitrust laws: Sections 1

and 4 of the Sherman Act, 15 U.S.C. §§ 1, 4; and Sections 4 and 16 of the Clayton Act, 15

U.S.C. §§ 15, 26. The district court had supplemental jurisdiction over Plaintiffs' related

state-law claims, 740 ILCS 10/1 *et seq.* and 815 ILCS 505/1 *et seq.*, pursuant to 28 U.S.C.

§ 1367.

This Court has subject matter jurisdiction under 28 U.S.C. § 1291 because these

are appeals from final decisions of the district court.

**Court of Appeals Docket Number 22-2333:** The district court entered final

judgment on June 28, 2022, and Plaintiff-Appellant Deslandes filed her notice of appeal

on July 27, 2022. Pursuant to an order of remand under Federal Rule of Appellate

Procedure 12.1(b) for the limited purpose of correcting the clerical error in its judgments

(Ct. of App. ECF 18), the district court entered a corrected final judgment on August 30,

2022. Ct. of App. ECF 19.

**Court of Appeals Docket Number 22-2334:** The district court entered final

judgment on June 28, 2022, and Plaintiff-Appellant Turner filed her notice of appeal on

July 27, 2022.  Pursuant to an order of remand under Federal Rule of Appellate

Procedure 12.1(b) for the limited purpose of correcting the clerical error in its judgments

(Ct. of App. ECF 17), the district court entered a corrected final judgment on August 30, 2022. Ct. of App. ECF 18.

## STATEMENT OF THE ISSUE

Whether the district court erred when it found that an agreement among McDonald's and its franchisees not to hire each other's employees was ancillary to McDonald's franchise system, accepted McDonald's competitive justifications, and declined to consider evidence that the labor restraint was anticompetitive.

## STATEMENT OF THE CASE

Plaintiffs-Appellants Leinani Deslandes and Stephanie Turner assert individual and representative claims under Section 1 of the Sherman Act, 15 U.S.C. § 1, against Defendants-Appellees McDonald's USA, LLC and McDonald's Corporation (together, "McDonald's"). ECF 32; *Turner*, No. 19-cv-05524, ECF 1.[1]

Plaintiffs challenge a market allocation scheme whereby McDonald's and thousands of its independently-owned franchisees agreed not to hire each other's workers, located at any of over 14,000 locations nationwide, for a period up to six months after a worker left employment with any owner of another McDonald's restaurant (the "No-Hire Agreement"). ECF 270-2 at -844; 270-3 at -884; 270-4 at -233-34.

---

[1] Citations to the record use the following abbreviations: "SA" for the short appendix and "ECF" for the docket entry number in the *Deslandes* district court action, No. 17-04857. Citations to the docket entry in the *Turner* district court action are specifically noted.

Plaintiffs seek to represent a class of McDonald's restaurant workers (the "Class") whose pay was suppressed by the No-Hire Agreement, from June 28, 2013 to July 12, 2018 (the "Class Period"). ECF 268 at 1.

After more than two years of fact and expert discovery, the district court denied class certification, SA-27, granted judgment on the pleadings for McDonald's, SA-55, and denied as moot Plaintiffs' motion for partial summary judgment on McDonald's asserted procompetitive justifications. *Id*. Plaintiffs appeal these orders.

## I.     LEGAL BACKGROUND

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce[.]" 15 U.S.C. § 1. Courts have interpreted Section 1 to prohibit only unreasonable restraints of trade. *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 98 (1984). The focus of the reasonableness inquiry is "the competitive effects of challenged behavior relative to such alternatives as its abandonment or a less restrictive substitute." Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1500 (5th ed. 2022) ("Areeda").

There are three standards for evaluating whether an alleged restraint of trade is unreasonable: the per se rule, the quick-look test, and the rule of reason, although the methods of these three modes of analysis often blend together. *Cal. Dental Ass'n v. F.T.C.*, 526 U.S. 756, 779 (1999). "The nature of the restraint determines which rule will

be applied." *Denny's Marina, Inc. v. Renfro Prods., Inc.*, 8 F.3d 1217, 1220 (7th Cir. 1993). All of these approaches answer the same question: "whether or not the challenged restraint enhances competition." *Cal. Dental*, 526 U.S. at 780 (citations omitted).

"Per se rules are invoked when the surrounding circumstances make the likelihood of anticompetitive conduct so great as to render unjustified further examination of the challenged conduct." *Bd. of Regents*, 468 U.S. at 106. For instance, agreements among competitors to fix prices or allocate markets are subject to per se condemnation. *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 218 (1940); *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1415 (7th Cir. 1995); *Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n.*, 744 F.2d 588, 592 (7th Cir. 1984).

The selection of mode of analysis depends upon the nature of the restraint, not on judicial experience with any particular industry. "[T]he argument that the per se rule must be rejustified for every industry that has not been subject to significant antitrust litigation ignores the rationale for per se rules, which in part is to avoid the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable—an inquiry so often wholly fruitless when undertaken." *Arizona v. Maricopa Cty. Med. Soc.*, 457 U.S. 332, 351 (1982) (quotation omitted).

Nonetheless, before applying per se condemnation, courts may entertain an affirmative defense that the restraint was "ancillary" to a legitimate, pro-competitive collaboration. In order to qualify as ancillary, a defendant must prove that the restraint was "(1) subordinate and collateral to a separate, legitimate transaction, and (2) reasonably necessary to achieving that transaction's procompetitive purpose." *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F. 4th 1102, 1109-11 (9th Cir. 2021). Courts approach such claims with skepticism, and impose a "heavy burden" of evidentiary proof on the defendant. *Bd. of Regents*, 468 U.S. at 113-120 (considering and rejecting claimed competitive justifications). If the fact finder agrees that the defendant has satisfied its heavy burden, then the burden shifts back to the plaintiff to provide evidence that the restraint had anticompetitive effects.

When a restraint does not fall into an established per se category, a plaintiff may still satisfy its initial burden without an "elaborate industry analysis" or proof of market power, pursuant to the quick-look test. *Nat'l Soc. of Pro. Eng'rs v. United States*, 435 U.S. 679, 692 (1978). This approach is used when an "observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect." *Cal. Dental*, 526 U.S. at 770. *See also Bd. of Regents*, 468 U.S. at 109-110 ("We have never required proof of market power in such a case."); *Chi. Pro. Sports Ltd. P'ship v. Nat'l Basketball Ass'n*, 961 F.2d 667, 674-76 (7th Cir. 1992) (applying quick-look analysis and rejecting logic of proffered procompetitive

justifications, without requiring proof of market power); *Gen. Leaseways*, 744 F.2d at 595 ("[I]f the elimination of competition is apparent on a quick look, without undertaking the kind of searching inquiry that would make the case a Rule of Reason case in fact if not in name, the practice is illegal per se.")

When anticompetitive effects are not apparent, then the rule of reason applies, and the plaintiff must provide evidence that the restraint harmed competition. A plaintiff may satisfy this burden by providing direct evidence of "actual detrimental effects," such as an impact on prices. *F.T.C. v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460 (1986) (quoting 7 P. Areeda, Antitrust Law ¶ 1511, p. 429 (1986)). *See also Law v. Nat'l Collegiate Athletic Ass'n*, 134 F.3d 1010, 1019 (10th Cir. 1998). A plaintiff may alternatively use a "surrogate for detrimental effects," such as an inquiry into "market definition and market power[.]" *Ind. Dentists*, 476 U.S. at 460-61 (quoting Areeda, ¶ 1511, p. 429). But when "adverse effects are directly observable . . . [s]urrogates for those effects are not needed." *Chi. Pro. Sports Ltd. P'ship v. Nat'l Basketball Ass'n*, 754 F. Supp. 1336, 1363 (N.D. Ill. 1991), *aff'd*, 961 F.2d 667 (7th Cir. 1992).

If the plaintiff satisfies its initial burden under the per se rule, then liability is conclusively established. *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958). If the plaintiff satisfies its initial burden under either the quick-look test or the rule of reason, then the burden shifts to the defendant to provide evidence that the restraint was reasonably necessary to competitive benefits. *See, e.g., Bd. of Regents*, 468 U.S at 114-120.

A defendant may not justify a restraint on the grounds that it promotes an interest unrelated to competition. *See, e.g., F.T.C. v. Super. Ct. Trial Lawyers Ass'n*, 493 U.S. 411, 423-24 (1990) (desire of public defenders to improve quality of representation by boycotting court-appointed work not valid justification); *Ind. Dentists*, 476 U.S. at 462-64 (1986) (goal of ensuring quality dental care not valid justification). Nor may a defendant justify a restraint on the grounds that it helps reduce costs or boost profits. *Law*, 134 F.3d at 1022 ("cost-cutting by itself is not a valid procompetitive justification"). Further, in a monopsony case like this one, a defendant may not point to lower prices or increased output in the downstream consumer market to justify an agreement "among buyers with power over their suppliers." Areeda ¶ 1504c. For instance, "the ability of McDonald's franchises to coordinate the release of a new hamburger does not imply their ability to agree on wages for counter workers[.]" *Nat'l Collegiate Athletic Ass'n v. Alston*, 141 S. Ct. 2141, 2157 (2021) (quoting *Chi. Pro. Sports Ltd. P'ship v. Nat'l Basketball Ass'n*, 95 F.3d 593, 600 (7th Cir. 1996)).

## II.     FACTUAL BACKGROUND

### A.     McDonald's Franchise System

McDonald's and its franchisees are independent businesses and expressly disavow any joint employer relationship. ECF 270-7 at -101; 270-18 at -992. The Franchise Disclosure Document cautions that franchisees will face competition from McDonald's-owned stores ("McOpCos") as well as other franchisees. ECF 270-7 at -062.

McDonald's "Antitrust Compliance Guide" acknowledges that franchisees "might be viewed as competitors" with each other and with McOpCo's (ECF 270-19 at -700), "include[ing] as competitors for the talent that is critical to the success of the franchise system." ECF 403-1 at Ex.4, p. 648.

While McDonald's workers can leave the McDonald's system altogether and find outside employment, it harms them to be forced to do so. ECF 270-5, ¶¶ 10-28; ECF 270-6, ¶¶ 48-62, 79-103. Prior job experience within the McDonald's system is of the most value to—and can command the highest wage from—another McDonald's restaurant employer. ECF 270-6, ¶¶ 44-62. McDonald's requires that all stores, franchisee or corporate, use the same job classifications and train their workers to perform their duties in the same way, to ensure uniformity in customer experience across the system. ECF 270-6, ¶¶ 10-33; 270-7 through -10; 270-13 at 69:5-70:24; 270-14 at 30:13-16, 57:12-16, 224:1-225:16. The No-Hire Agreement thus prevented workers from moving to the employer that would most value their McDonald's-specific training.

For example, Plaintiff-Appellant Deslandes was denied a "letter of release" to move from a franchisee paying her $12.00/hour to a McOpCo offering 15% more; as a result, she had to move outside the McDonald's system to Hobby Lobby where she earned $10.25/hour. ECF 402-7, Ex. 95 (p. 530).

McDonald's and its franchisees knew they were significant potential competitors for each other's workers. ECF 403, ¶¶ 4, 10. If this were not true, the No-Hire

Agreement would serve no economic purpose because the availability of jobs outside of McDonald's would render it meaningless. ECF 270-5, ¶ 5.

**B.  McDonald's and Its Franchisees Agreed Not To Compete For Each Other's Employees**

During the Class Period, the No-Hire Agreement had two components: the elimination of labor competition by and among franchisees, and McDonald's reciprocation of that restraint in its role as labor competitor.

The first component was set forth in McDonald's standard Franchise Agreement, whereby every franchisee in the McDonald's system agreed that it "shall not employ or seek to employ any person who is at the time employed by McDonald's, any of its subsidiaries, the Licensor, or by any person who is at the time operating a McDonald's restaurant . . . . This paragraph 14 shall not be violated if such person has left the employ of any of the foregoing parties for a period in excess of six months." ECF 270-2 at -844; 270-3 at -884; 270-4 at -233-34. This component of the No-Hire Agreement remained during the Class Period for "political reasons," which former McDonald's Vice President James Kramer confirmed were "objections from the franchisees" to changes that would limit Paragraph 14's scope. ECF 403 ¶ 8.

The second component traces to conduct outside those standard contracts and after they were executed, when McDonald's reciprocated the agreement with private promises that its corporate-owned McOpCo stores would not hire managers from

franchisees, which was expanded in 2015 to also prohibit the hiring of crew. ECF 270-14 at 54:20-55:23; ECF 403 ¶¶ 7, 9-11.

The covert expansion of the No-Hire Agreement in 2015 illustrates the impact of the restraint. In that year, McDonald's decided to modestly raise wages of all McOpCo workers nationwide. ECF 403 ¶ 9. If the district court were correct, and McDonald's and its franchisees collectively did not have market power over their workers, then the franchisees would have been indifferent to wage increases at McOpCos, because competition from employers outside the McDonald's franchise system would determine Class wages.

McDonald's executives and its franchisees well understood the market realities that the district court denied. McDonald's and its franchisees collectively did have market power over their workers, and the degree of competition (or lack thereof) among them had a significant and common impact on worker pay levels throughout the country. Thus, before raising its own worker wages in a common fashion nationwide, McDonald's met privately with the "National Leadership Council" of its franchisee labor competitors, at an invitation-only event at The Venetian Hotel in Las Vegas, to preview and discuss what McDonald's knew would be a very controversial decision. ECF 403, ¶ 9. Instead of being indifferent to McDonald's planned wage increase, franchisees were "upset beyond words" with McDonald's, and scrambled to determine what it would cost to increase pay to their own workers to match. ECF 405, ¶ 3 at p. 48.

-10-

But franchisees did not need to increase worker pay, because McDonald's and its franchisees acted to prevent competition among them. McDonald's agreed to expand its existing covert reciprocation of the hiring restraint to include all workers, even entry-level crew, located within 25 miles of any McDonald's-owned restaurant. ECF 403 ¶ 11. The franchisees did not need to worry about pay pressure on their managers, since McDonald's had long-since reciprocated the restraint with respect to managers, without any geographic limitation. ECF 403 ¶¶ 7, 18. This key component of the No-Hire Agreement—McDonald's secret reciprocation of the hiring restraint—was never set forth in the franchise contracts, and was discussed and agreed upon separately. ECF 270-14 at 54:20-55:23; ECF 403 ¶¶ 7, 9-11. McDonald's never sought to justify this component of the restraint, because McDonald's denies that it ever happened. ECF 416 ¶ 5.

McDonald's and franchisees further agreed that an exception would be allowed only if the worker's current employer first provided a "letter of release" permitting the prospective employer to hire her. ECF 270-36; 270-43 at 32:21-33:2; 270-44 through -57; ECF 270, ¶ 3. The No-Hire Agreement applied to every McDonald's restaurant nationwide: even if an employee wanted to move from one end of the country to the other, she could not work at a separately-owned McDonald's without a letter of release or a McDonald's employment gap of at least six months. ECF 403-3, Ex. 17 at 58:7-15 (p. 250); 403-4, Exs. 49 through 51 (p.253-259); 403-5, Ex. 52 at 232:22-233:16 (p. 60).

The No-Hire Agreement was no mere formality. McDonald's actively enforced it, including by: sending written reminders to franchisees (ECF 270-36; 270-38); reviewing it in meetings between franchisees and their ombudsman (ECF 270-42 at -074); addressing it in a training for prospective franchisees (ECF 270-1 at -077); discussing compliance with franchisees in their annual Business Reviews, which determine whether franchisees are in good standing (ECF 270-40 at -738); and by assisting franchisees with enforcing the Agreement against one another. ECF 270-39 at -342; 270-41; 270-37 at -198. McDonald's also trained its own managers and recruiters to comply with the No-Hire Agreement. 270-43 at 32:21-33:2. Managers refused to even interview franchisee workers without a release (ECF 270-51 through 57), and call logs from McDonald's HR department show over 540 calls from employees regarding "letters of release," and HR's consistent response that employees could not transfer without a release. ECF 270 ¶ 3.

McDonald's ended the No-Hire Agreement nationwide pursuant to a settlement with the Washington State Attorney General. ECF 270-73. McDonald's provided no evidence this hurt its ability to attract new franchisees, maintain franchisee relationships, induce franchisee investment in training or other initiatives, or train workers. To the contrary, McDonald's reports that its franchisees are having record success (ECF 402-7, Ex. 84 at p. 420), and McDonald's corporate witness testified that removing the restraint did not make any difference to its operations. ECF 403-7, Ex. 85

at 64:2-13 (p. 441) ("Q: Do you have any understanding of any economic activity that paragraph 14 was reasonably necessary to accomplish? A: No. No. Not at all. Q: Have you noticed any differences in McDonald's restaurant operations after paragraph 14 has been removed? A: No.").

C.    **The No-Hire Agreement Harmed Competition and Suppressed Pay Classwide**

Appellants retained two qualified expert economists to examine the evidence in this case and opine on whether the No-Hire Agreement impacted Class pay.

First, Dr. Hal Singer is a Senior Fellow at the George Washington Institute of Public Policy and an Adjunct Professor at Georgetown University, McDonough School of Business. He is an expert in antitrust economics. Dr. Singer reviewed academic scholarship regarding employer market power, record evidence about the No-Hire Agreement and its effects, analyzed franchisees' and corporate-owned stores' compensation data, and applied standard econometric techniques to analyze Class members' compensation during and after the alleged conspiracy, controlling for other relevant factors. ECF 270-5.

Dr. Singer found that common evidence and standard statistical methods regularly used in antitrust cases show that the No-Hire Agreement: (1) resulted in substantial and statistically significant harm through wage suppression; and (2) reduced the pay of all or nearly all Class members. ECF 270-5 ¶¶ 40-59, 66-82. Dr.

Singer also measured aggregate Class damages, using standard econometric methods and evidence that is common to the Class. *Id.*, ¶¶ 83-85.

Dr. Singer compared wages paid to McDonald's restaurant workers when the No-Hire Agreement was in effect with wages paid after the Washington AG settlement in July 2018. ECF 403-7, Ex. 88, ¶ 41 (pp. 595-96). He found that employees earned significantly less when the No-Hire Agreement was in place: Franchisee Crew by 6.8%, Franchisee Managers by 2.5%, McOpCo Crew by 3.3% and McOpCo Managers by 4.0%. *Id.*, Tables 3 & 4 (pp. 606 & 609).

Dr. Singer controlled for other factors that influence pay, to rule out that those factors could be the cause, including among other things, the local minimum wage, the local county unemployment rate, and the local county per capita income. *Id.*, ¶ 49. Dr. Singer also tested whether the rise in McDonald's restaurant employee wages after July 2018 could be attributable to a general wage increase among quick-service restaurants at that time, by controlling for local county wages in quick-service restaurants. *Id.*, ¶ 58 & Appendix Tables E8 & E9. After factoring that in, McDonald's worker pay was still suppressed while the No-Hire Agreement was in place compared to after. *Id.*, Table E9, Column 2, Row 3.

Finally, Dr. Singer tested whether other factors could explain the difference in pay between the two time periods, by adding controls for distance to the nearest separately-owned McDonald's restaurant, the population density of the county in

which each store is located, and McDonald's share of all quick-service restaurants within a given county, but none of these variables changed the outcome: McDonald's employees' wages were lower while the No-Hire Agreement was in place, to a substantial and statistically-significant degree. *Id*., ¶ 58.

The variables in Dr. Singer's model explain over 99% of variation in employee pay, and his results are statistically significant at the one percent level, which means that there is a less than a one percent chance that the results would have been observed by chance. *Id*., ¶ 52.

Appellants also retained expert economist Peter Cappelli, Director of the Center for Human Resources at the Wharton School, University of Pennsylvania. His expertise focuses on industrial relations and human resource management, including specifically how employers set worker pay. ECF 270-6 ¶ 1. He found that: (1) Class members receive training that imparts specific skills that are of high value to McDonald's restaurant owners and of limited value to outside employers, such that the No-Hire Agreement would have impacted Class member pay despite the availability of non-McDonald's employment options (ECF 270-6 ¶¶ 48-62); and (2) McDonald's and its franchisees maintain standardized and linked compensation structures that transmitted wage suppression broadly across the Class. ECF 270-6 ¶¶ 104-138.

## III.    PROCEDURAL HISTORY

Plaintiff-Appellant Deslandes filed her amended class action complaint on September 18, 2017, alleging that the No-Hire Agreement was a naked restraint, unnecessary to the legitimate operation of McDonald's franchise system, and not tailored to accomplish any legitimate objective. ECF 32, ¶¶ 1, 92, 102-109.

McDonald's moved to dismiss on the grounds that rule of reason analysis is required, and Deslandes failed to satisfy that legal theory. ECF 35. The district court denied McDonald's motion. SA-1. The district court found that the alleged No-Hire Agreement was a horizontal restraint, because it eliminated competition among McDonald's and its franchisees for workers. SA-10-11. The district court also concluded that "because a no-hire agreement is, in essence, an agreement to divide a market, the Court has no trouble concluding that a naked horizontal no-hire agreement would be a *per se* violation of the antitrust laws." SA-12.

However, the district court did not apply the per se rule because the district court found that the No-Hire Agreement was ancillary to McDonald's franchise system. SA-13-14. Its only justification for this finding was the fact that part of the No-Hire Agreement was set forth in the franchise contracts, *id.*, even though the restraint: "was not necessary to encourage franchisees to sign" and "was [not] output enhancing," SA-13-15.

-16-

The district court also considered and rejected the procompetitive defenses McDonald's asserted. It held that the No-Hire Agreement could not be justified on the basis that it encouraged franchisees to train their employees, including because the restraint was wildly overbroad. "Employers have plenty of other means to encourage their employees to stay without resorting to unlawful market division. Those options include paying higher wages/salaries and contracting directly with each employee to set an employment term." SA-15.

Accordingly, the district court held that Deslandes stated a claim and that the quick-look test was an appropriate legal theory because "[e]ven a person with a rudimentary understanding of economics would understand that if competitors agree not to hire each other's employees, wages for employees will stagnate." SA-14. Despite denying the motion to dismiss, the district court gave Deslandes leave to amend her complaint within 28 days thereafter to "include a claim under the rule of reason." SA-16. Deslandes declined the invitation, because she had already adequately alleged her Sherman Act claim, and she was not required to plead every alternative legal theory she might pursue, before discovery had even commenced.

On August 15, 2019, Plaintiff-Appellant Turner filed her class action complaint, challenging the same No-Hire Agreement. *Turner*, No. 19-cv-05524, ECF 1. Turner's complaint was similar to Deslandes's, and added additional allegations showing that the No-Hire Agreement was not ancillary to McDonald's franchise system. *Id*., ¶ 2.

McDonald's moved to dismiss Turner's complaint on standing and statute of limitations grounds only, which the district court denied. SA-19. The district court consolidated the two actions for discovery purposes. ECF 182.

After more than two years of discovery, Plaintiffs jointly moved for class certification, supported by common evidence: contemporaneous business records, academic scholarship, witness testimony, and expert analysis.

After the parties completed briefing class certification, the Supreme Court issued its opinion in *NCAA v. Alston*, 141 S. Ct. 2141 (2021), in which the Court affirmed judgment for plaintiffs. The district court requested supplemental briefing regarding the impact of *Alston*, which the parties submitted.

The district court denied Plaintiffs' motion for class certification, on the basis that *Alston* required Plaintiffs to satisfy a rule of reason legal theory, but Plaintiffs had "waived" that theory because they did not amend their complaints to specifically address it. SA-52. In addition, the district court accepted the very same defenses and competitive justifications that it previously rejected and that Plaintiffs vigorously disputed: that the No-Hire Agreement encouraged franchisees to train their employees; that reducing competition in the labor market encouraged production in the product market; and that the restraint was somehow vertical in locations without a competing McOpCo. SA-40-43. Further, the district court ignored Plaintiffs' common evidence of anticompetitive effects, insisting that Plaintiffs could not prevail under the rule of

reason without first defining "hundreds or thousands" of geographic markets as small as "a mile or two" wide, and proving unreasonableness separately as to each. SA-46-50.

McDonald's then moved for judgment on the pleadings, or, in the alternative, for summary judgment, and Plaintiffs cross-moved for partial summary judgment on McDonald's asserted procompetitive justifications.

The district court granted McDonald's motion for judgment on the pleadings, and denied as moot the parties' cross-motions for summary judgment. SA-55. In doing so, the district court reached beyond the pleadings and resolved disputed questions of fact, such as whether the No-Hire Agreement was ancillary to McDonald's franchise system, whether the No-Hire Agreement suppressed Class pay, and whether Plaintiffs could satisfy their initial burden of proof. SA-63-66. Similar to its denial of class certification, the district court uncritically accepted McDonald's defenses, and ignored Plaintiffs' evidence and arguments to the contrary. The district court also refused to allow the United States Department of Justice to submit a statement of interest (ECF 452), and made all of the above decisions without once permitting oral argument.

## SUMMARY OF ARGUMENT

Throughout this case, the district court applied erroneous legal standards for determining ancillarity and for assessing McDonald's claimed justifications, which led the district court to incorrectly conclude that Plaintiffs' burden was to satisfy the strictest form of the rule of reason. But under the correct legal standard, no reasonable

factfinder can conclude that the No-Hire Agreement was ancillary to McDonald's franchise system. At best, these are disputed issues of fact.

The district court then compounded its errors by refusing to even consider Plaintiffs' evidence of anticompetitive effects. Plaintiffs submitted substantial evidence that the No-Hire Agreement harmed competition for Class labor and suppressed their pay. The district court ignored it based upon its erroneous conclusion that Plaintiffs had "waived" a rule of reason legal theory. This impermissibly denied Plaintiffs an opportunity to make their case with evidence generated through years of discovery and that was already before the district court.

The district court abused its discretion in denying class certification, because its decision relied upon the same erroneous holdings that only the rule of reason applied, and that Plaintiffs would be prohibited from even attempting to satisfy it. Under any mode of antitrust analysis, common questions of law and fact predominate, and Plaintiffs' Sherman Act claim should be resolved on a class basis.

This Court should reverse the district court's grant of judgment on the pleadings, its denial of Plaintiffs' motion for partial summary judgment on McDonald's affirmative defense, and its denial of class certification. In addition, Plaintiffs respectfully request that the Court direct reassignment on remand.

# ARGUMENT

## I.    STANDARDS OF REVIEW

The Court reviews "a ruling on a motion for judgment on the pleadings de novo, construing the facts in the light most favorable to the non-moving party." *Federated Mut. Ins. Co. v. Coyle Mech. Supply Inc.*, 983 F.3d 307, 313 (7th Cir. 2020).

If a district court considers matters outside the pleadings, it must convert a motion for judgment on the pleadings into a motion for summary judgment, and must deny the motion if "the record discloses the existence of unresolved material fact issues," or if "the parties represent that they would have submitted specific controverted material factual issues to the trial court if they had been given the opportunity." *United States v. Rogers Cartage Co.*, 794 F.3d 854, 861 (7th Cir. 2015) (internal quotation marks and citations omitted). *See also* Fed. R. Civ. P. 12(d). "District courts should not allow motions for judgment on the pleadings to deprive the non-moving party of the opportunity to make its case." *Federated Mut. Ins.*, 983 F.3d at 313.

The Court reviews a ruling on a motion for summary judgment de novo. *Burton v. Bd. of Regents*, 851 F.3d 690, 694 (7th Cir. 2017). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court views all evidence in the light most favorable to the non-moving party. *Nicholson v. City of Peoria*, 860 F.3d 520, 522 (7th Cir. 2017).

This Court reviews a denial of class certification for abuse of discretion. *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012). If "the district court bases its discretionary decision on an erroneous view of the law or a clearly erroneous assessment of the evidence, then it has necessarily abused its discretion." *Id.*

## II.     THE DISTRICT COURT ERRED IN GRANTING MCDONALD'S JUDGMENT ON THE PLEADINGS

### A.     The District Court Erroneously Concluded That The No-Hire Agreement Was Ancillary

The primary basis for the district court's grant of judgment on the pleadings was its incorrect understanding of ancillarity. It applied a legal standard that a restraint is automatically ancillary to a competitive joint activity if part of that restraint is set forth in a contract governing that otherwise lawful joint effort. This fundamental misunderstanding determined not only the outcome of McDonald's motion for judgment on the pleadings, but every other decision that Plaintiffs appeal. "This all-important classification largely determines the course of subsequent legal evaluation of any restraint." Areeda ¶ 1904.

A "restraint does not qualify as 'ancillary' merely because it accompanies some other agreement that is itself lawful." Areeda ¶ 1908b. *See, e.g., Bd. of Regents*, 468 U.S. at 110 (restraint was "naked" even though part of larger contract and collaborative activity); *Blackburn v. Sweeney*, 53 F.3d 825, 827-29 (7th Cir. 1995); *Polygram Holding, Inc. v. F.T.C.*, 416 F.3d 29, 37 (D.C. Cir. 2005) (restraint in joint venture "naked" when it

concerned a product outside the collaboration). Otherwise, any businessperson could shield an anticompetitive restraint merely by placing it within a broader contract.

In order for a restraint to be ancillary, it must be both essential to the overall arrangement, and commensurate with it, meaning that it is no broader than reasonably necessary to accomplish a procompetitive integration. *See Bd. of Regents*, 468 U.S at 119 (A challenged restraint must be "tailored" to a legitimate objective in order to qualify as ancillary); *Polk Bros., Inc. v. Forest City Enters., Inc.*, 776 F.2d 185 (7th Cir. 1985) (applying rule of reason when the restraint was necessary to the economic collaboration); *Blackburn*, 53 F.3d at 827-29 (holding that restraint post-dating transaction is "naked" not "ancillary" because it cannot be necessary to the joint activity, including because of restraint's unreasonable duration); *Law*, 134 F.3d at 1021 ("[T]he only legitimate rationales that we will recognize . . . are those necessary to produce competitive intercollegiate sports."); *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 224 (D.C. Cir. 1986), *cert. denied*, 479 U.S. 1033 (1987) (to be ancillary, "an agreement eliminating competition must be subordinate and collateral to a separate, legitimate transaction. . . . If [the restraint] is so broad that part of the restraint suppresses competition without creating efficiency, the restraint is, to that extent, not ancillary"); *Nat'l Bancard Corp. v. Visa USA Inc.*, 779 F.2d 592, 601 (11th Cir. 1986) (restraint is ancillary only "if it is no greater than reasonably necessary to achieve a legitimate commercial objective (i.e., has a procompetitive purpose), has no substantial

anticompetitive impact, and is no broader than necessary to accomplish its procompetitive goals"); *MLB Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 339 (2d Cir. 2008) (Sotomayor, J., concurring in the judgment) ("[A] restraint that is unnecessary to achieve a joint venture's efficiency-enhancing benefits may not be justified based on those benefits."); Areeda ¶¶ 1908b, 1908c, 1912c2.

On the pleadings, there was no basis to conclude that the No-Hire Agreement was ancillary. To the contrary, Plaintiffs' allegations only point in the opposite direction. Indeed, the district court previously found that, while the overall franchise system was output enhancing in terms of burgers and fries, "[t]hat is not to say that the provision itself was output enhancing." SA-13. "This case, though, is not about competition for the sale of hamburgers to consumers." SA-14. "The very fact that McDonald's has managed to continue signing franchise agreements even after it stopped including the provision in 2017 suggests that the no-hire provision was not necessary to encourage franchisees to sign." SA-13. "Dividing the market does not promote intrabrand competition for employees, it stifles interbrand competition." *Id.* Nor was the No-Hire Agreement reasonably tailored to any conceivable procompetitive justification. SA-15.

Plaintiffs' complaints thus provide no basis to conclude that the No-Hire Agreement was ancillary, particularly when "construing the facts in the light most favorable" to Plaintiffs. *Federated Mut. Ins.*, 983 F.3d at 313.

-24-

**B.    Unless The No-Hire Agreement Was Ancillary To McDonald's Franchise System, It Is Conclusively Unlawful Pursuant To the Per Se Rule**

There is a widespread consensus that an agreement between rival employers not to compete for each other's employees is a per se unlawful market allocation, unless the restraint is ancillary to a legitimate procompetitive collaboration.

Courts in the Third, Seventh, and Ninth Circuits have applied the per se rule to agreements among rival employers not to compete for each other's workers. *See, e.g., In re Outpatient Med. Ctr. Emp. Antitrust Litig.*, No. 21-CV-00305, 2022 WL 4465929, at *10 (N.D. Ill. Sept. 26, 2022) ("It makes no difference that Defendants were dividing employees as opposed to territories, customers, or products."); *Fonseca v. Hewlett-Packard Co.*, No. 19CV1748-GPC-MSB, 2020 WL 6083448, at *9 (S.D. Cal. Feb. 3, 2020) (same); *In re Ry. Indus. Emp. No-Poach Antitrust Litig.*, 395 F. Supp. 3d 464, 480-85 (W.D. Pa. 2019) (same); *United States v. eBay, Inc.*, 968 F. Supp. 2d 1030, 1039 (N.D. Cal. 2013) (same); *In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1122 (N.D. Cal. 2012) (same). *See also Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1110 n.4 (9th Cir. 2021) (finding "considerable merit" to the argument that "the per se rule applies to naked non-solicitation agreements because it is a form of labor-market allocation"). In addition, the Eleventh Circuit recently held that a very similar restraint in the Burger King franchise system is subject to Section 1 scrutiny. *Arrington v. Burger King Worldwide, Inc.*, 47 F.4th 1247, 1256 (11th Cir. 2022) ("the No-Hire Agreement

deprives the marketplace of independent centers of decisionmaking about hiring, and therefore of actual or potential competition.") (cleaned up, quotation omitted).

Antitrust enforcers agree. In 2016, the United States Department of Justice and the Federal Trade Commission published joint antitrust guidance to human resource professionals, explaining: "Naked wage-fixing or no-poaching agreements among employers, whether entered into directly or through a third-party intermediary, are per se illegal under the antitrust laws." Guidance at 3, https://www.justice.gov/atr/file/ 903511/download. The Attorney General of the State of Washington investigated no-poach agreements specifically in the context of franchise systems. The Washington AG confirmed that one-third of the franchise systems it investigated never had such restraints at all—and over 200 other franchisors, like McDonald's, voluntarily removed them after the investigation. ECF 403, ¶¶ 24-25. One exception was Jersey Mike's, who initially refused to remove the restraint, requiring the Washington AG to file suit.[2] The Washington AG challenged the restraint as a per se violation of Washington antitrust law. *See* https://agportals3bucket.s3.amazonaws.com/uploadedfiles/Another/News/ Press_Releases/20181015_Complaint_Filed_Conformed.pdf, ¶¶42-51, 65, 67-70.

---

[2] A year later, Jersey Mike's entered into an Assurance of Discontinuance, removing the restraint nationwide. *See* https://agportal-s3bucket.s3.amazonaws.com/uploadedfiles/ Another/News/ Press_Releases/20190823_JerseyMikes_AOD_SIGNED.pdf.

Antitrust's leading treatise reflects this consensus: "A naked agreement among employers limiting salaries or wages, such as an 'anti-poaching' agreement, is unlawful per se." Areeda ¶ 2012c.

Accordingly, had the district court not erred in finding that the No-Hire Agreement was ancillary, it would have been left with the inevitable and correct conclusion that the restraint was per se unlawful.

### C.    Plaintiffs also Satisfy The Quick-Look Test

After erroneously concluding that the No-Hire Agreement was ancillary to McDonald's franchise system, the district court initially held that the quick-look test would govern Plaintiffs' claim. SA-14.

Under the quick-look test, like the per se rule, Plaintiffs satisfy their initial burden upon proof of the restraint. McDonald's would then have an opportunity to satisfy a "heavy burden of establishing an affirmative defense which competitively justifies [its] apparent deviation from the operations of a free market." *Bd. of Regents*, 468 U.S at 98. *See also Alston*, 141 S. Ct. at 2157 (explaining that its analysis is "fully consistent" with *Board of Regents*); *Agnew v. NCAA*, 683 F.3d 328, 335-36 (7th Cir. 2012) (defendant required to "show that the restraint in question actually has a procompetitive effect on balance").

To avoid condemnation under the quick-look test, McDonald's must show that the No-Hire Agreement was reasonably necessary to legitimate competitive benefits. *See Bd. of Regents,* 468 U.S. at 113-15; *Gen. Leaseways*, 744 F.2d at 595; Areeda ¶ 1908b.

McDonald's heavy burden, moreover, is to show "empirical evidence of procompetitive effects." *Cal. Dental,* 526 U.S. at 775 n.12. McDonald's cannot satisfy its burden with speculation, unmoored by antitrust standards regarding what does or does not count as a legitimate competitive benefit. Rather, McDonald's must prove that the No-Hire Agreement was in fact reasonably necessary to purported competitive benefits, and that the asserted benefits are legitimate under the antitrust laws. *Chi. Pro. Sports*, 961 F.2d at 672-76 (scrutinizing and rejecting claimed benefits such as controlling free-riding); *Law*, 134 F.3d at 1021 (applying quick-look, examining and rejecting procompetitive justifications, because none proved that the restraint was "necessary to produce competitive intercollegiate sports").

At class certification, the district court erred in holding that "defendants have put forth sufficient evidence of pro-competitive effects of the hiring restriction to warrant full rule of reason analysis." SA-38. The district court did not articulate a legal standard to govern its determination of what would or would not be "sufficient evidence of pro-competitive effects." The closest the district court came was the following: "The Court is not suggesting that this evidence is undisputed or that a fact-finder would find it persuasive. The point is merely that in the face of defendants'

significant evidence of procompetitive effects, a full analysis under the rule of reason, rather than a quick look, is necessary." SA-38 n.4.

But Plaintiffs vigorously contested these purported benefits, both as a factual matter (the No-Hire Agreement was unnecessary to any of them) (ECF 403, ¶¶ 26-52), and as a legal matter (a defendant cannot justify a restraint by complaining about competition, or by offsetting harm in the labor market with purported benefits in a downstream product market). The district court erred by uncritically accepting McDonald's justifications, ignoring all contrary evidence and legal argument. ECF 400 at 24-27.

In addition, the district court's crediting of McDonald's justifications at class certification cannot be reconciled with its earlier (correct) conclusion that those same justifications are illegitimate. *Compare*, *e.g.*, SA-40 ("Dr. McCrary opines that the hiring restriction encourages franchisees to train their employees without fear that other outlets will free-ride on this training by hiring away employees trained in the McDonald's way.") *with* SA-15 ("Employers have plenty of other means to encourage their employees to stay without resorting to unlawful market division.").

At best for McDonald's, the question of competitive benefits is an issue for the jury to resolve at trial. The burden would shift back to Plaintiffs only if the jury agrees with McDonald's that the No-Hire Agreement was reasonably necessary to competitive

benefits. However, as explained below in § III., no reasonable factfinder may come to this conclusion, and Plaintiffs are entitled to partial summary judgment on this issue.

**D.    Plaintiffs also Satisfy The Rule of Reason**

Under the full rule of reason, Plaintiffs' burden is to show that the No-Hire Agreement harmed competition, either through a direct showing of economic effects of the agreement, or by a surrogate for that direct evidence: proof of market power in a relevant market. *See* Fact § I., *supra*.

The rule of reason is not a "rote checklist," nor is it "an inflexible substitute for careful analysis." *Alston*, 141 S. Ct. at 2160. The "whole point" of the rule of reason "is to furnish 'an enquiry meet for the case, looking to the circumstances, details, and logic of a restraint[.]'" *Id.* (quoting *Cal. Dental*, 526 U.S. at 781). "Since the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition, proof of actual detrimental effects . . . can obviate the need for inquiry into market power, which is but a surrogate for detrimental effects." *Ind. Dentists*, 476 U.S. at 460-61 (quotation omitted).  *See also In re Sulfuric Acid Antitrust Litig.*, 703 F.3d 1004, 1007 (7th Cir. 2012); *Chi. Pro. Sports*, 754 F. Supp. at 1363; *Law*, 134 F.3d at 1019; *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1367 (3d Cir. 1996); *Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1551 (11th Cir. 1996); *Cap. Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 546 (2d Cir. 1993).

Plaintiffs provided substantial evidence of anticompetitive effects, including by directly observing that the No-Hire Agreement suppressed worker pay nationwide. *See* § II.C., *supra*. Plaintiffs further buttressed their direct proof of detrimental effects with substantial economic scholarship showing that low-wage employers, including those in the fast food sector, possess market power over their employees. ECF 403, ¶¶ 55-56; ECF 270-5, ¶¶ 11-28; ECF 270-6, ¶¶ 79-96. This is not only sufficient to satisfy Plaintiffs' burden under the rule of reason, it is preferable to indirect forms of proof that are only a "surrogate" for the direct evidence Plaintiffs provide. *Ind. Dentists*, 476 U.S. at 460–61.

The district court ignored Plaintiffs' evidence of anticompetitive effects because the district court erroneously found that this evidence assumed and depended upon a single, nationwide geographic market. SA-46 ("The evidence plaintiffs have put forth in an attempt to establish anticompetitive effects *assumes* that plaintiffs sell their labor in one national market[.]") But Plaintiffs' direct evidence of anticompetitive effects (and thereby of market power) relies upon no such assumption, which is one of the strengths of direct evidence. Dr. Singer's statistical analysis does not assume or depend upon a nationwide geographic market. Consistent with standard academic methods, Dr. Singer uses a nationwide dataset and applies local control variables to it, to explore anticompetitive effects as an empirical matter with available relevant data. Dr. Singer determined that wage suppression persists, to a very high degree of statistical

confidence, when controlling for any of the concerns McDonald's asserted or the district court raised, such as competition from other local quick-service restaurants.

In addition, the No-Hire Agreement itself is an admission of market power. *See* Ioana Marinescu & Herbert J. Hovenkamp, *Anticompetitive Mergers in Labor Markets*, 94 Ind. L. J. 1031, 1035 (2019) ("The fact that the two firms found it profitable to enter into this agreement is a strong indicator that (1) the firms were competitors in this particular portion of the labor market and (2) that between the two of them they had enough market power to make the agreement profitable.").

Further, McDonald's own illegitimate justifications assume and thereby admit market power. According to McDonald's own expert, the No-Hire Agreement: made co-conspirators "more confident that [workers] would stay longer"; "discourage[d] [workers] from moving immediately to another employer where that training may be more easily transferred"; resulted in "reduced turnover"; and eliminated concerns "about other franchisees poaching their employees." ECF 302-1, Ex. 2, ¶¶ 284-86 (pp. 364-65). It is simply impossible for a restraint to have the market power to increase employee retention nationwide, but not have the power to suppress those employees' pay.

Even if Plaintiffs were required to make the surrogate showing that McDonald's possessed power in a defined market (and they are not), Plaintiffs made that showing here.

A reasonable jury could find that the No-Hire Agreement created market power in a cognizable market of McDonald's employers for Class member labor. The district court concluded that the relevant market must include non-McDonald's employers, but the possible existence of "a broader [employment] market . . . does not necessarily negative the existence of submarkets[.]" *United States v. Cont'l Can Co.*, 378 U.S. 441, 457-58 (1964). *See also Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704, 713-16 (7th Cir. 1979) (recognizing that drive-thru kiosk photo processing services, as opposed to in-store photo services, were cognizable submarket even though customers sometimes switched between them); *Beatrice Foods v. F.T.C.*, 540 F.2d 303, 308 (7th Cir. 1976) (holding that "the question is not whether [paint] brushers, rollers, aerosols, and sprayers constitute a market, but whether the [fact-finder] could properly find that brushers and rollers alone constitute a line of commerce").

Here, a plethora of "practical indicia," *Photovest*, 606 F.2d at 712, would support a jury finding of a cognizable service market consisting of a discrete group of buyers (thousands of independently-owned McDonald's franchisees and McOpCos) for the services of a discrete group of sellers (hundreds of thousands of workers who received McDonald's training), including: (1) proof that the No-Hire Agreement actually enabled McDonald's employers to hold down wages, *cf. Photovest*, 606 F.2d at 713 (ability to charge distinct prices supported finding of submarket); (2) record and economic evidence that workers with McDonald's-specific training have unique value to

McDonald's employers (ECF 403 ¶¶ 57-67), *Photovest*, 606 F.2d at 712 (relevant factors include "the [service's] peculiar characteristics and uses" and "distinct customers"); and (3) the limited interchangeability of workers in the broader labor market given the high switching costs for both employers (e.g., costs related to recruitment and job-specific training) and employees (e.g., the costs associated with job search, loss of seniority, etc.). ECF 403 ¶¶ 55-56.

Nor does competition from outside employers preclude a finding of a cognizable market limited to workers with McDonald's-specific skills and experience. *See Photovest*, 606 F.2d at 714 ("The law does not require an exclusive class of customers for each relevant submarket."); *Beatrice Foods*, 540 F.2d at 309 ("[T]he fact that [paint] aerosols and other spray equipment are interchangeable with brushes and rollers for some limited end uses does not negative the existence of a separate brush-and-roller market."). The direct evidence of wage suppression that Plaintiffs showed are proof of that.

At most, the parties' disagreement on this issue is a genuine dispute of fact regarding the proper market definition, which would go to the jury if deemed necessary to Plaintiffs' burden. *Fishman v. Estate of Wirtz*, 807 F.2d 520, 531 (7th Cir. 1986); *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 725 (7th Cir. 2004).

### E.     Plaintiffs Did Not Waive A Legal Theory Under the Rule of Reason

The district court erroneously refused to consider Plaintiffs' evidence of anticompetitive effects on the basis that Plaintiffs had "waived" a "claim under the rule of reason" by failing to specifically allege it in the complaint. SA-52.

Plaintiffs satisfied their obligation to plead "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Plaintiffs stated a claim for violation of Section 1 of the Sherman Act, and supported that claim with factual allegations, explaining that they sought to recover suppressed pay caused by an unreasonable restraint of trade among owners of McDonald's restaurants to suppress competition for each other's employees. ECF 32; *Turner*, ECF 1.

First, the per se and rule of reason tests are not different legal claims, but rather different methods of evaluating the same legal claim under Section 1 of the Sherman Act. *See Always Towing & Recovery, Inc. v. City of Milwaukee*, 2 F.4th 695, 704 (7th Cir. 2021) (explaining "the per se, rule of reason, and quick look analyses" "are meant to answer the same question: whether or not the challenged restraint enhances competition") (quotations and citations omitted). "A plaintiff need not plead legal theories," and "when a plaintiff does plead legal theories, it can later alter those theories, and there is no burden on the plaintiff to justify altering its original theory" so long as the factual basis is consistent with the original complaint. *BRC Rubber & Plastics, Inc. v. Cont'l Carbon Co.*, 900 F.3d 529, 540-41 (7th Cir. 2018). Thus, the district court's

characterization of the rule of reason as a separate claim that Plaintiffs somehow waived is incorrect.

Second, after years of discovery, the district court should not grant judgment on the pleadings "if evidence that had already been produced during discovery would fill [any] perceived gaps in the Complaint." *Ideal Steel Supply Corp. v. Anza*, 652 F.3d 310, 324-26 (2d Cir. 2011) (district court erred in dismissing complaint pursuant to Rule 12(c) where discovery addressed shortcoming in pleadings); *Grajales v. P.R. Ports Auth.*, 682 F.3d 40, 46 (1st Cir. 2012) (district court "should hesitate to entertain a Rule 12(c) motion that asserts a complaint's failure to satisfy plausibility requirement" after parties invest substantial resources in discovery). In any event, there is no requirement that Plaintiffs amend their complaints to include the voluminous record, and doing so would serve no purpose, as the underlying Sherman Act claim has remained the same throughout. *See, e.g.*, *In re Processed Egg Prods. Antitrust Litig.*, 206 F. Supp. 3d 1033, 1051-53 (E.D. Pa. 2016) (permitting plaintiffs to pursue a rule of reason legal theory though not alleged in complaint), *aff'd*, 962 F.3d 719 (3d Cir. 2020).

Further, refusing to allow Plaintiffs to prove a claim they adequately alleged would be particularly unjustified here, because the district court did so on the basis of uncritically accepting an affirmative defense that McDonald's never pled. Unlike Plaintiffs, who pled factual allegations in support of their antitrust claim that the No-Hire Agreement was an unreasonable restraint of trade, McDonald's pled nothing to

support or even identify its affirmative defense that the No-Hire Agreement was ancillary to its franchise system or that it benefited competition. *Compare* ECF 32 ¶¶ 102-109 and *Turner*, ECF 1 ¶ 2 *with* ECF 69 at 49-51 and *Turner*, ECF 67 at 42-45. *See also Williams v. Lampe*, 399 F.3d 867, 870-71 (7th Cir. 2005) (failure to plead affirmative defense in answer waives the defense unless leave to amend is granted).

## III.    THE DISTRICT COURT ERRED WHEN IT DENIED PARTIAL SUMMARY JUDGMENT ON MCDONALD'S AFFIRMATIVE DEFENSE

Plaintiffs moved for partial summary judgment on McDonald's affirmative defense that the No-Hire Agreement was ancillary to its franchise system or otherwise reasonably necessary to legitimate procompetitive benefits. The district court denied the motion as moot, in light of its grant of McDonald's motion for judgment on the pleadings. As explained above, that was erroneous.

This Court should reverse the district court's denial of Plaintiffs' motion for partial judgment, because there are no genuine issues regarding McDonald's affirmative defense for the jury to resolve at trial. No reasonable factfinder can conclude that the No-Hire Agreement was ancillary to McDonald's franchise system, or that it was reasonably necessary to any legitimate competitive benefit. Resolving this issue will narrow the issues for trial and facilitate the efficient adjudication of Plaintiffs' Sherman Act claim. *See* Fed. R. Civ. P. 56(a) (party may seek summary judgment on "part" of a "defense").

In support of their motion, Plaintiffs showed that the No-Hire Agreement was unnecessary to the McDonald's system. After the No-Hire Agreement ended, none of the competitive concerns McDonald's asserted in this litigation materialized. Franchisees did not train their employees less. ECF 416 ¶¶ 37-45. Franchisees continued to cooperate with each other in legitimate ways. *Id.* ¶¶ 46-49. The number of franchise-owned locations increased. *Id.* ¶ 50.

Further, McDonald's three primary justifications for the No-Hire Agreement are legally invalid. First, preventing "free riding" on another employer's training investments is inapposite here. A ride is not "free" if a franchisee has to pay for it. *Chi. Pro. Sports*, 961 F.2d at 675 ("What gives this the name free-riding is the lack of charge."); *Gen. Leaseways*, 744 F.2d at 593-94 (free-riding defense rejected in market division scheme between truck leasing companies party to reciprocal repair agreements, where they reimbursed one another for repairs); s*ee also Toys R Us, Inc. v. F.T.C.*, 221 F.3d 928, 933 (7th Cir. 2000).

Here, a franchisee can prevent the threat of free-riding by paying the worker the competitive wage. Thus, market competition itself limits the threat of what McDonald's calls free-riding, just as it does for every employer who invests in training their employees. *See* Herbert J. Hovenkamp, *The Rule of Reason*, 70 Fla. L. Rev. 81, 111 (2018) ("[I]n order for anticompetitive free riding to occur, the free rider must be able to take

advantage of someone else's investment in such a way that the other firm is not capable of pricing it out of the market.").

Second, keeping wages down to increase profits is not a legitimate defense. *See* ECF 403 ¶ 27 (McDonald's argued that the No-Hire Agreement limits "competition for labor" but contending it was justified because it "enabled franchisees to better manage their recruiting and training costs" and purportedly "devote more monies to other employee-related benefits and their capital to other procompetitive projects.") "A proffered efficiency cannot arise from anticompetitive effects." *United States v. Anthem, Inc.*, 855 F3d 345, 369 (D.C. Cir. 2017) (Miller, J., concurring); *see also Socony-Vacuum*, 310 U.S. at 220-21; *Law*, 134 F.3d at 1022; Areeda ¶ 1504; C. Scott Hemphill & Nancy L. Rose, *Mergers that Harm Sellers*, 127 Yale L.J. 2078, 2082 (2018) ("[S]avings achieved through the exercise of increased classical monopsony power . . . are premised on a reduction in competition" and "are not cognizable efficiencies.")

Third, McDonald's alleged benefits in the consumer market (cheaper or more abundant hamburgers) cannot justify demonstrated harm in the labor market (lower wages). "[T]he ability of McDonald's franchises to coordinate the release of a new hamburger does not imply their ability to agree on wages for counter workers[.]" *Alston*, 141 S. Ct. at 2157 (quoting *Chi. Pro. Sports*, 95 F.3d at 600). *See also United States v. Topco Assocs., Inc.*, 405 U.S. 596, 611 (1972) ("If a decision is to be made to sacrifice competition in one portion of the economy for greater competition in another portion

this . . . is a decision that must be made by Congress and not by private forces or by the courts."); *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 370 (1963) (rejecting proposition that "anticompetitive effects in one market could be justified by procompetitive consequences in another"); *Sullivan v. Nat'l Football League*, 34 F.3d 1091, 1112 (1st Cir. 1994) (it is "improper to validate a practice that is decidedly in restraint of trade simply because the practice produces some unrelated benefits to competition in another market"), *cert. denied*, 115 S.Ct. 1252 (1995).

Fourth, McDonald's purported justifications are unavailing for the additional reason that McDonald's supported them by reference to speculation about what McDonald's subjectively intended to accomplish in 1955 when it first introduced Paragraph 14 to its franchise agreements, many decades before the Class period. But good intentions cannot justify an unreasonable restraint of trade. *Socony-Vacuum*, 310 U.S. at 221-22 ("[Congress] has no more allowed genuine or fancied competitive abuses as a legal justification for such schemes than it has the good intentions of the members of the combination. If such a shift is to be made, it must be done by the Congress. Certainly Congress has not left us with any such choice.").

Speculation regarding subjective intentions from 1955 is irrelevant for the additional reason that market realities were very different then as compared to the Class period, and cannot be used to justify the No-Hire Agreement during the Class period. *Compare* ECF 380 ¶¶ 16, 17, 18, 22; ECF 418 ¶¶ 1-2, 34-35 *with* ECF 403 ¶¶ 4,7-18

-40-

8, 33-35, & Ex. 14 at 135:3-5. *See also Alston*, 141 S. Ct. at 2158 ("Whether an antitrust violation exists necessarily depends on a careful analysis of market realities. . . . If those market realities change, so may the legal analysis. When it comes to college sports, there can be little doubt that the market realities have changed significantly since 1984."). This Court's guidance is not to the contrary. For instance, in *Polk Brothers*, 776 F.2d 185, this Court examined justifications for a restraint at the time the restraint was adopted. But no franchise agreement in effect during the Class period was executed in 1955. Every franchise contract required renewal every twenty years. ECF 418 ¶ 1. Thus, the oldest franchise agreement in effect during the Class period was created or renewed in 1993, a time period McDonald's ignored. Further, no franchise contract included McDonald's reciprocation in its market role as a competitor in the labor market, or the methods by which McDonalds and its franchisees enforced and monitored compliance. ECF 403 ¶¶ 6-7.

Finally, even if any of McDonald's asserted justifications were valid (they are not), the No-Hire Agreement was wildly overbroad to address them, and thus legally unavailing. To be ancillary, a restraint must be no broader than reasonably necessary to accomplish a procompetitive integration. § II.A, *supra*. But the Agreement was not bound by time or geography. It applied for the entire duration of every employee's tenure, plus even six months thereafter. It was not limited to some reasonable time sufficient to recoup up-front training costs, and was not limited to the most highly-

trained employees. A reasonable jury could not find that the Agreement was "tailored to serve" McDonald's (invalid) interests. *Bd. of Regents*, 468 U.S. at 119.

## IV. THE DISTRICT COURT ABUSED ITS DISCRETION WHEN IT DENIED CLASS CERTIFICATION

The district court denied class certification on the basis that it found Plaintiffs could not satisfy their burden under the rule of reason. Because its application of the rule of reason was error, the district court abused its discretion and should be reversed. *Messner*, 669 F.2d at 811; *Arwa Chiropractic, P.C. v. Med-Care Diabetic & Med. Supplies, Inc.*, 961 F.3d 942, 949-50 (7th Cir. 2020) (court abuses discretion "when it fails to consider a motion under the proper legal standard"); *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 312 (3d Cir. 2008), as amended (Jan. 16, 2009) (class certification order abuses discretion where it "rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact").

Further, the district court's determination that class counsel were inadequate was also an abuse of discretion.

### A.    The District Court Misinterpreted *NCAA v. Alston*

In its class certification order, the district court's primary reason for applying the rule of reason—and hence denying class certification—was its misinterpretation of *NCAA v. Alston*. SA-36-48; *see also* SA-62-63.

But far from changing the relevant legal standards, *Alston* reaffirmed them, specifically with respect to assessing procompetitive justifications for a suspect restraint

-42-

like the No-Hire Agreement. *Alston* explained that its analysis is "fully consistent" with its decision nearly forty years prior in *Board of Regents*, 468 U.S. 85. 141 S. Ct. at 2157. *Alston* rejected the *defendant's* attempt to use the quick-look test as a means to immunize a suspect restraint despite evidence of its anticompetitive impact, explaining that, "[w]hile *Board of Regents* did not condemn the NCAA's broadcasting restraints as *per se* unlawful, it invoked abbreviated antitrust review as a path to condemnation, not salvation." *Id.* This does not mean that the per se rule and the quick-look test are no longer viable means of condemning obviously anticompetitive restraints; quite the opposite.

*Alston* further explained that McDonald's should not get the benefit of even a quick-look test (rather than the per se rule), even if some unrelated restraints on competition are necessary for its franchise system. The relevant question is whether the *challenged restraint* is "necessary" to that system. 141 S. Ct. at 2157. On this point, the Supreme Court could not have been clearer, in quoting language from a Seventh Circuit opinion: "Just as the ability of McDonald's franchises to coordinate the release of a new hamburger does not imply their ability to agree on wages for counter workers, so the ability of sports teams to agree on a TV contract need not imply an ability to set wages for players." *Id.* (quoting *Chi. Pro. Sports*, 95 F.3d at 600.)

Thus, instead of applying *Alston*, the district court violated it. The district court did precisely what both the Supreme Court and this Court told it not to: it allowed

McDonald's to use its legitimate coordination with its franchisees in the product market to justify an illegitimate market allocation agreement in the labor market.

The court gave two other reasons for applying the rule of reason. First, McDonald's asserted procompetitive justifications, is addressed in § III., *supra*. The other was that some geographies contain only franchisee-owned locations, and the court found that in such areas the No-Hire Agreement was purely vertical. This is incorrect. McDonald's and its franchisees agreed to eliminate actual and potential competition among them nationwide. The character of this restraint does not vary depending upon each location's mix of actual and potential horizontal competition among McDonald's and its franchisees. Market allocations are per se unlawful "regardless of whether the parties split a market within which both do business or [not]." *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49-50 (1990).

### B.     Legal Standards for Class Certification

"To be certified, a proposed class must satisfy the requirements of Federal Rule of Civil Procedure 23(a), as well as one of the three alternatives in Rule 23(b)(3)." *Messner*, 669 F.3d at 811. Under Rule 23(a), certification is appropriate if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). Rule 23(b)(3)

requires that "questions of law or fact common to Class members predominate over any

questions affecting only individual members, and that a class action [be] superior to

other available methods for fairly and efficiently adjudicating the controversy." Fed. R.

Civ. P. 23(b)(3).

### C.     Plaintiffs Satisfy the Requirements of Rule 23(a)

While not expressly so holding, the district court suggested that Plaintiffs failed

to meet two 23(a) factors: commonality and adequacy of class counsel. SA-50-52, n.6.[3]

The question whether an antitrust conspiracy existed is a common question and

also "the prototypical example" of a common question that predominates, "because it is

much more efficient to have a single trial on the alleged conspiracy rather than

thousands of identical trials all alleging identical conspiracies based on identical

evidence." *Kleen Prods. LLC v. Int'l Paper*, 306 F.R.D. 585, 594 (N.D. Ill. 2015), *affirmed sub*

*nom.* 831 F.3d 919 (7th Cir. 2016) (citing 7AA Charles Alan Wright & Arthur R. Miller,

*Federal Practice & Procedure* § 1781 (3d Ed. 2014) ("[W]hether a conspiracy exists is a

common question that is thought to predominate over the other issues in the case and

has the effect of satisfying the prerequisites in Rule 23(b)(3).")). *See also In re Urethane*

*Antitrust Litig.*, 768 F.3d 1245, 1255 (10th Cir. 2014) ("[C]ourts have regarded the

existence of a conspiracy as the overriding issue . . . ."); *In re Scrap Metal Antitrust Litig.*,

---

[3] Since the 2003 amendments to the federal rules, adequacy of counsel has typically been addressed under Rule 23(g). *See* Committee Notes on Rules – 2003 Amendments.

527 F.3d 517, 535 (6th Cir. 2008) ("proof of the conspiracy is a common question that is thought to predominate" in cases alleging antitrust violations); *Rohlfing v. Manor Care, Inc.*, 172 F.R.D. 330, 336–37 (N.D. Ill. 1997) (collecting cases).

      With respect to adequacy, the district court raised no issue with respect to the named Plaintiffs, but suggested that proposed Class counsel were inadequate to represent any certified class. According to the district court's explanation, when it initially held that Plaintiffs had adequately alleged a violation under the quick-look test (SA-1), Plaintiffs nonetheless should have anticipated that the district court would reverse itself (erroneously) three years later by misinterpreting a just-issued Supreme Court precedent, and preemptively amend their complaint to "add a claim under the rule of reason," that was limited to a "small, local class." SA-52. The district court then speculated that the only reason why Plaintiffs' counsel did not do so was because they sought to sacrifice the interests of their clients in order to "take a shot at a nationwide-class jackpot." *Id.*

      These speculative accusations are meritless. First, Plaintiffs never "waived" a "claim under the rule of reason," for the reasons explained above. *See* § II.E.

      Second, Plaintiffs and their counsel concluded throughout this litigation that the strongest liability, impact, and damages theories were those that matched the scope of the challenged nationwide restraint. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) ("Calculations need not be exact, but at the class-certification stage (as at trial), any

model supporting a plaintiff's damages case must be consistent with its liability case, particularly with respect to the alleged anticompetitive effect of the violation.") (citation and quotation omitted). This was true both for the Class as a whole, and for every individual member of the Class. "In many cases, a representative sample is the only practicable means to collect and present relevant data establishing a defendant's liability." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 455 (2016). That is certainly the case here. The fact that Plaintiffs can (indeed, must) rely upon classwide proof to establish their individual claims, is further reason to certify the Class. *Id.*

Third, there is no evidence to suggest that the district court's speculative alternative of Class members filing separate cases asserting a rule of reason theory with respect to each specific location is practical, or that any member of the proposed Class desires it. SA-53. To the contrary, since denying class certification, no Class member has filed a case, class or individual, to pursue the district court's suggested legal theories, or any other. Thus, the "realistic alternative" to a nationwide class is not thousands of individual or class suits limited to specific locations, but "zero" suits. *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) ("But a class action has to be unwieldy indeed before it can be pronounced an inferior alternative—no matter how massive the fraud or other wrongdoing that will go unpunished if class treatment is denied—to no litigation at all.")

Fourth, the district court's accusation is inconsistent with the district court's own findings. In later granting McDonald's judgment on the pleadings, the district court found that amending the complaint to allege a legal theory under the rule of reason would have been "futile," because Plaintiffs could not have been injured due to the presence of competing quick-service restaurants in the same locations as the McDonald's restaurants where Plaintiffs worked. SA-66. That is, the district court impugned the integrity of Plaintiffs' counsel because they, in its view, did not pursue a futile legal theory. (As explained above, these factual conclusions were improper on a motion for judgment on the pleadings, and also incorrect, as they ignored the substantial evidence—including direct evidence—that the presence of other quick-service restaurants did not eliminate the anticompetitive effects of the No-Hire Agreement.)

### D.    Common Issues Predominate With Respect to Each Element of Plaintiffs' Sherman Act Claim, and to McDonald's Affirmative Defense

The "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). Common questions predominate when "the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." *Tyson Foods*, 577 U.S. at 453. Here, Appellants can prove every element of their prima facie case under any mode of antitrust analysis with common evidence. Those elements are: (1) a violation of the antitrust law, (2) injury

resulting from that violation (also called "impact"), and (3) damages. *Messner*, 669 F.3d at 815.

### 1. McDonald's Liability Is A Common Question That Will Be Answered With Common Evidence

As to the first element, common evidence like the memoranda, e-mails, and call records cited in Fact Section I.B. above will prove the existence of the No-Hire Agreement. "[V]irtually all class members would be relying on the same evidence that Plaintiffs have submitted in support of class certification—namely the documents, emails, phone records, and other indirect evidence necessary to prove that Defendants conspired in violation of antitrust laws. This type of alleged conspiracy is the prototypical example of an issue where common questions predominate." *Kleen Prods.*, 306 F.R.D. at 594; *see also In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 264 (D.D.C. 2002) (Allegations of price fixing "will focus on the actions of the defendants, and, as such, proof for these issues will not vary among class members.").

Under the per se rule, the analysis of this element ends once plaintiffs prove the existence of the agreement and that McDonald's joined it, *see Blackburn*, 53 F.3d 825, and accordingly predominance is met. Under the quick look test, McDonald's has an opportunity to prove that the restraint was reasonably necessary to legitimate competitive benefits. *Agnew*, 683 F.3d at 336. Again, predominance is satisfied because McDonald's purported justifications and Appellants' rebuttals thereto are all based on common evidence: witness testimony, contemporaneous business records, and expert

opinion. The same is true under the rule of reason, where common questions would include common proof of anticompetitive effects.

The No-Hire Agreement is either a reasonable restraint of trade or it is not. This is a common question that will be addressed by common evidence, and it will have a common answer for McDonald's and for all members of the Class.

### 2.    Plaintiffs' Proof of Impact And Damages Are Classwide

The "antitrust impact" element of an antitrust claim requires proof of causation that Class members were injured (as distinct from the third element, damages, which quantifies how much they were injured). *Kleen Prods.*, 306 F.R.D. at 594. "[P]laintiff's 'burden at the class certification stage [is] not to prove the element of antitrust impact, but only to demonstrate that the element of antitrust impact is capable of proof at trial through evidence that is common to the class rather than individual to its members.'" *Messner*, 669 F.3d at 818 (citation omitted). Plaintiffs need not prove that all Class members suffered impact from the alleged violation. *Kleen Prods.*, 831 F.3d at 927 (citing *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 750 (7th Cir. 2014)). It is sufficient to show common evidence that "the plaintiff class as a whole has been injured by the defendants' conspiracy." *Rohlfing*, 172 F.R.D. at 337.

To establish predominance with respect to damages, "a plaintiff must produce a reliable method of measuring classwide damages based on common proof." *Kleen Prods.*, 306 F.R.D. at 601. Plaintiffs are "are permitted to use estimates and analysis to

calculate a reasonable approximation of their damages." *Kleen Prods.*, 831 F.3d at 929

(citing *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469 (7th Cir. 2002)).

Appellants' common proof of impact rests in part on expert analysis. First, Dr.

Singer found that common evidence and standard statistical methods show that the No-

Hire Agreement generated substantial anticompetitive effects through wage

suppression, and impacted all or nearly all Class members. Dr. Singer's opinion is

supported by: (1) an overview of economic research demonstrating that employers

exercise significant monopsony power over their employees, and that no-poach

agreements exacerbate that monopsony power; (2) a multivariate regression

establishing that the No-Hire Agreement lowered the wages Class members received;

and (3) two alternative methods of demonstrating common impact to the Class, one

based on predictive modeling and the other based on the existence of a compensation

structure.

Dr. Singer also estimated Class damages, applying standard econometric

methods. Using the wage effect shown in his regression model and the compensation

paid to Class members while the No-Hire Agreement was in effect, Dr. Singer calculates

that Class members lost approximately $910 per Class member per year. ECF 270-5,

¶¶ 83-85. Other courts have held that similar methods for calculating damages in no-

poach cases satisfy predominance. *See Seaman v. Duke University*, No. 1:15-CV-462, 2018

WL 671239, at *6, *8-9 (M.D.N.C. Feb. 1, 2018) (regression analysis to determine

classwide damages satisfied predominance); *In re High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d 1167, 1223-26 (N.D. Cal. 2013) (same); *Johnson v. Ariz. Hosp. & Healthcare Ass'n*, No. 07-1292, 2009 WL 5031334, at *10 (D. Ariz. July 14, 2009) (same); *Nitsch v. DreamWorks Animation SKG Inc.*, 315 F.R.D. 270, 308 (N.D. Cal. 2016) (same). *See also* ECF 268 at 22-29; ECF 344 at 8-12; ECF 270-5; ECF 330-1.

Second, Dr. Cappelli also investigated whether the No-Hire Agreement would have suppressed the compensation of all or nearly all members of the Class. Dr. Cappelli reviewed only common evidence: McDonald's corporate witness testimony, contemporaneous business records, and publicly-available research. He showed how McDonald's training requirements resulted in employees with some general skills that are of some modest value to any employer, but a high quantity of specific skills that are only valuable to other McDonald's employers. ECF 270-6, ¶¶ 44-62. Dr. Cappelli concludes that the existence of this brand-specific training, of value principally to McDonald's restaurants and not transferable or valuable to other restaurant chains or employers, means that the No-Hire Agreement would impact Class Members' wages, notwithstanding that they may seek employment with companies outside the McDonald's system. *Id.*, ¶¶ 60-62. Dr. Cappelli also reviewed the record evidence of the No-Hire Agreement and confirms it restrained competition for restaurant employees. *Id.*, ¶¶ 64-78. Finally, Dr. Cappelli opined that, because all McDonald's restaurants share a common pay structure, the No-Hire Agreement would have caused Class-wide

suppression of wages. *Id.*, ¶¶ 135-138. *See also* ECF 268 at 27-28; ECF 344 at 3-4; ECF 270-6; ECF 330-2.

Dr. Singer's and Dr. Cappelli's methods have been successfully employed and accepted as common proof of impact by courts in no-poach antitrust actions. In *High-Tech Employees*, for example, the plaintiffs alleged that the defendants agreed not to recruit each other's employees with "cold calls," thereby suppressing wages not just for employees who would have received cold calls in the but-for-world, but also for all or nearly all of approximately 64,000 technical employees across seven companies nationwide. 985 F. Supp. 2d at 1193. The court found that the plaintiffs' documentary and expert evidence satisfied predominance because that evidence demonstrated that cold calls put "upward pressure" on the salaries not of just individual employees, but of all employees "who were part of the same salary structure." *Id.* at 1192.

Similarly, in *Seaman*, 2018 WL 671239, at *4-6, *8, the court held that antitrust impact could be proved with common evidence. That evidence included general economic theory that competition would have spurred preemptive salary increases; that pay structures would have transmitted this effect to all class members, not just those who were recruited or received offers; and that a sharing regression analysis showing that the compensation of Class members moved together, suggested a compensation structure. *See also Merenda v. VHS of Mich., Inc.*, 296 F.R.D. 528, 544 (E.D. Mich. 2013) (expert analysis demonstrated predominance in wage suppression case where class

members were part of compensation systems, adjustments to which "affected the compensation of all or almost all individual Class members"); *Johnson*, 2009 WL 5031334, at \*8, \*11 (same); *Nitsch*, 315 F.R.D. at 300 (same).

Using evidence and methods that are common to the Class, Plaintiffs thus demonstrate that all or nearly all Class members were impacted by the No-Hire Agreement, and estimated Class damages.

### 3.    Class Certification Should Not Be Denied Out of Concern for Uninjured Class Members

The district court found in a footnote that the No-Hire Agreement could not have injured "new hires or [] employees within the first few weeks of work." SA-53 n.8. In doing so, the district court ignored Plaintiffs' evidence showing that all or nearly all members of the Class who were subject to the No-Hire Agreement were paid less because of it, including recent hires. *See* Fact § I.C., *supra*.

At most, this concern would lead to certifying a smaller class, not denial of class certification altogether. "Defining a class so as to avoid, on one hand, being over-inclusive and, on the other hand, the fail-safe problem is more of an art than a science. Either problem can and often should be solved by refining the class definition rather than by flatly denying class certification on that basis." *Messner*, 669 F.3d at 825. Here, for instance, a conservative Class could be limited to only those workers most likely to have been harmed by the No-Hire Agreement: managers. Plaintiffs separately

-54-

established impact and damages with respect to managers. *See, e.g.*, ECF 270-5, Table 4 at p. 50, Table 6 at p. 61, Table 7 at p. 70.

## V.     THE COURT SHOULD REASSIGN THIS CASE ON REMAND

Circuit Rule 36 specifies that cases remanded from this Court for a new trial "shall be reassigned" to a new district judge and, even if a trial has not previously been held, the Court "may nevertheless direct" reassignment on remand. In the latter situation, the Court invokes this rule in its discretion "to avoid the operation of bias or mindset which seems likely to have developed from consideration and decision of motions to dismiss or motions for summary judgment and the like." *Cange v. Stotler & Co.*, 913 F.2d 1204, 1208 (7th Cir. 1990).

The Court has frequently invoked Rule 36 in cases where no trial had taken place below. *See, e.g., Ryan v. Chemlawn Corp.*, 935 F2d 129, 132-33 (7th Cir. 1991) (reassigning after reversal of ruling on motion to dismiss); *Cook v. Winfrey*, 141 F.3d 322, 332 (7th Cir. 1998) (same, where ruling "improperly resolved factual issues beyond the scope of the pleadings"); *Advent Elecs., Inc. v. Buckman*, 112 F.3d 267, 275 (7th Cir. 1997) (reassigning after vacating preliminary injunction); *Kristofek v. Village of Orland Hills*, 832 F.3d 785, 800 (7th Cir. 2016) (reassigning after reversal of summary judgment); *Holmes v. Village of Hoffman Estates*, 511 F.3d 673, 688 (7th Cir. 2007) (same, where district court "improperly resolved a number of factual disputes" at summary judgment).

Reassignment is appropriate here, in light of the volume and character of the district court's errors. In addition, the district court exhibited an unusual hostility to Plaintiffs' claim and to Plaintiffs' counsel.

First, at the case management conference following its denial of class certification, the district court made clear it had no intention of further considering its recent about-face on the applicable antitrust liability standard. Any "motion to reconsider" would be "denied outright", and any "motion to amend the claim to add a claim under the rule of reason" would be "denied outright or stricken." ECF 387, Tr. at 5-6.

Second, before the district court ruled on McDonald's motion for judgment on the pleadings, the United States sought leave to file a statement of interest, "setting forth the government's position on the antitrust issues in this case, including the implications of the Supreme Court's decision in *NCAA v. Alston*, 141 S. Ct. 2141 (2021)." ECF 446 at 2. The district court refused to hear from the United States, for reasons only expressed orally during the hearing on the United States' motion for leave. ECF 451. At that hearing, the district court did not permit argument, and explained it would not allow the United States to offer its views on the pending dispositive motions, "based upon principles of separation of power," and because "the case does not touch on political issues or any foreign policy." ECF 452, Tr. at 4.

Third, the district court accused the undersigned of violating their ethical duties to their clients and to the class they sought to represent. SA-52. As explained above, the accusation is without merit. Further, the manner in which the accusation was made provides additional reason to call the district court's impartiality into question. The district court not only levied a meritless and serious accusation, but did so without ever providing Plaintiffs' counsel an opportunity to respond.

These facts counsel in favor of reassigning this action upon remand. *See, e.g., United States v. Vlahos*, 33 F.3d 758, 761-62 (7th Cir. 1994) (reassigning upon remand, after finding "[n]othing in the record" to support the district court's accusations that the U.S. Attorney's office was "ill-prepared" and lacking "the knowledge" needed to go forward with the case); *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1462-63 (7th Cir. 1994) (reassigning after reversal of summary judgment where plaintiff argued that district judge had "already determined" that she was entitled to no relief); *Rorrer v. City of Stow*, 743 F.3d 1025, 1049 (6th Cir. 2014) (holding that the district court's antagonistic statements "indicate[d] that allowing the same district judge to preside . . . would compromise 'the appearance of justice'").

## CONCLUSION

For the aforementioned reasons, this Court should: reverse the district court's grant of judgment on the pleadings; reverse the district court's denial of Plaintiffs'

partial summary judgment regarding McDonald's affirmative defense; reverse the

district court's denial of class certification; and reassign the case upon remand.

Respectfully submitted,

Dated November 2, 2022            /s/  *Dean M. Harvey*

Dean M. Harvey
Anne B. Shaver
Lin Y. Chan
**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, California 94111-3339
Tel: (415) 956-1000
dharvey@lchb.com
ashaver@lchb.com
lchan@lchb.com

Jessica A. Moldovan
**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Tel: (212) 355-9500
jmoldovan@lchb.com

Derek Y. Brandt
Leigh M. Perica
Connor P. Lemire
**MCCUNE LAW GROUP, MCCUNE
WRIGHT AREVALO VERCOSKI KUSEL
WECK BRANDT APC**
231 North Main Street, Suite 20
Edwardsville, Illinois 62025
Tel: (618) 307-6116
dyb@mccunewright.com
lmp@mccunewright.com
cpl@mccunewright.com

Dana R. Vogel
**MCCUNE LAW GROUP, MCCUNE
WRIGHT AREVALO VERCOSKI KUSEL
WECK BRANDT APC**
185656 Jamboree Road, Suite 550
Irvine, California 92612
Tel: (909) 557-1250
drv@mccunewright.com


Attorneys for Individual and Representative
Plaintiffs-Appellants Leinani Deslandes and
Stephanie Turner

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32, because this document contains 13,778 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f).

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 12-point Palatino Linotype style font.

Dated: November 2, 2022

/s/*Dean M. Harvey*
Dean M. Harvey
One of the Attorneys for Appellants

**CIRCUIT RULE 30(d) STATEMENT**

Pursuant to Circuit Rule 30(d), counsel certifies that all materials required by

Circuit Rule 30(a) and (b) are included in the Appendix.

/s/*Dean M. Harvey*
Dean M. Harvey

**CERTIFICATE OF SERVICE**

I hereby certify that on November 2, 2022, the Brief and Appendix of Appellants

was filed with the Clerk of the Court for the United States Court of Appeals for the

Seventh Circuit by using the appellate CM/ECF system. I certify that all participants in

the case are registered CM/ECF users and that service will be accomplished by the

appellate CM/ECF system.


/s/*Dean M. Harvey*
Dean M. Harvey

# APPENDIX

# TABLE OF CONTENTS TO APPENDIX

Memorandum Opinion and Order filed June 25, 2018, Doc. 53 ............................. A-1

Order denying Defendants' Motion to Dismiss filed on April 24, 2020, Doc. 64 ................................................................................................. A-19

Order denying Plaintiff's Move for Certification filed July 28, 2021, Doc. 372 ............................................................................................... A-27

Memorandum Opinion and order filed June 28, 2022, Doc. 453 ......................... A-55

Amended Judgment (*Leinani Deslandes*) filed August 30, 2022, Doc. 470 .......... A-68

Amended Judgment (*Stephanie Turner*) filed August 30, 2022, Doc. 104 ........... A-69

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LEINANI DESLANDES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 17 C 4857 |
| | ) | |
| v. | ) | |
| | ) | Judge Jorge L. Alonso |
| McDONALD'S USA, LLC, | ) | |
| McDONALD'S CORPORATION, and | ) | |
| DOES 1 through 10, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

After a no-hire agreement prevented plaintiff from obtaining a position with a rival

employer, plaintiff Leinani Deslandes ("Deslandes") filed suit asserting, among other things, that

defendants' no-hire agreement violates the Sherman Antitrust Act, 15 U.S.C. § 1.  Defendants

McDonald's USA, LLC and McDonald's Corporation move to dismiss.  For the reasons set forth

below, the Court grants in part and denies in part defendants' motion to dismiss [34].

**I.      BACKGROUND**

Plaintiff's story is one of employment success:  she started as an entry-level crew

member paid $7.00 per hour at a McDonald's franchise and worked her way up into

management.  When she applied for a better-paying position with a competing McDonald's

restaurant, she was foiled by a no-hire agreement which forbid the competing McDonald's

restaurant to hire both current employees of other McDonald's restaurants and anyone who had

worked for a competing McDonald's restaurant in the last six months.  Given that most

individuals in the low-skill employment market do not have the luxury of being unemployed by

choice for six months, the no-hire provision effectively prevented competing McDonald's

A-1

franchises (as well as the company-owned stores) from competing for experienced, low-skill

employees.  The following facts are from plaintiff's complaint and are taken as true.

      Defendant McDonald's USA, LLC is a wholly-owned subsidiary of defendant

McDonald's Corporation.  Plaintiff generally refers to them collectively as "McDonald's."  The

ubiquitous purveyor of hamburgers serves 68,000,000 customers per day from some 36,000

outlets around the world.  According to plaintiff's complaint, nearly two million people work for

McDonald's or its franchisees.

      Many McDonald's-brand restaurants are owned and operated by McDonald's Operating

Companies ("McOpCos"), which are direct or indirect subsidiaries of McDonald's Corporation.

McDonald's also franchises McDonald's-brand restaurants.  Thus, many McDonald's-brand

restaurants are independently owned and operated by franchisees.  McDonald's receives revenue

from the franchisees in the form of rent, royalties and fees.

      McDonald's restaurants compete with one another.  Franchisees are not granted exclusive

rights or territories and are specifically warned that they may face competition from other

franchisees, new franchisees and restaurants owned by McOpCos.  Thus, restaurants owned by

McOpCos compete directly with McDonald's franchisees (who, in turn, compete with each

other) to sell hamburgers and fries to customers.

      When franchising restaurants, McDonald's enters a standard franchise agreement with its

franchisees.[1]  Because the agreement is standard, franchisees know the basic contents of each

other's agreements.  Generally, each franchise agreement lasts for twenty years.  In addition to a

franchise fee, franchisees agree to pay McDonald's a percentage of gross revenue.  McDonald's

---

[1] Plaintiff alleges that McDonald's Corporation is the franchisor for franchise agreements signed
before 2005 and that McDonald's USA, LLC is the franchisor for franchise agreements signed
from 2005 to the present.

has an incentive to promote revenue growth in its franchisees' restaurants and encourages competition between franchisees for food sales.

Under the standard franchise agreement, each franchisee is an independent business responsible for the operation of its particular McDonald's-brand restaurant. Under the agreement, franchisees are required to purchase supplies from approved suppliers. They can, however, seek approval of new suppliers, and they negotiate directly with the suppliers as to purchasing terms, such as price.

Franchisees, as independent business owners, are also responsible for the day-to-day operations of their respective restaurants and for, among other things, employment matters. Franchisees make their own decisions with respect to hiring, firing, wages and promotions. The standard franchise agreement specifically states that franchisees are not agents of McDonald's and that McDonald's is not a joint employer with respect to the franchisees' employees.

Although franchisees make most of their employment decisions independently, their hiring decisions are restricted in one respect by the standard franchise agreement. The standard agreement that was used until some point in 2017 contained a no-hire provision. Specifically, the relevant provision stated:

> *Interference With Employment Relations of Others.* During the term of this Franchise, Franchisee shall not employ or seek to employ any person who is at the time employed by McDonald's, any of its subsidiaries, or by any person who is at the time operating a McDonald's restaurant or otherwise induce, directly or indirectly, such person to leave such employment. This paragraph [] shall not be violated if such person has left the employ of any of the foregoing parties for a period in excess of six (6) months.

(Am. Complt. ¶ 87). Although McDonald's stopped including the no-hire provision in new franchise agreements at some point in 2017, the provision remains in the franchise agreements

3

A-3

applicable to some 13,000 currently-operating McDonald's-brand restaurants. McDonald's has applied the same restraint to hiring by the McOpCos.

Franchisees ignore the no-hire provision at their peril. A breach of the no-hire provision gives McDonald's the right not to consent to a transfer of the franchise. With repeated breaches, McDonald's has the right to terminate the franchise. Plaintiff alleges that the provision promoted collusion among franchisees, because each knew the other had signed an agreement with the same provision. Plaintiff alleges that the no-hire provision is against each franchisee's individual interest, because it denies each franchisee opportunities to hire the best employees. Plaintiff also alleges that, so long as the other franchisees also refrain from poaching employees, the no-hire provision helps franchisees keep costs low by allowing them to pay below-market wages to their own employees.

Although franchisees are generally responsible for their own employment decisions (so far as they do not violate the no-hire agreement, anyway), many McDonald's-brand restaurants are staffed in similar ways. Many stores have managers with varying titles, such as swing manager, assistant manager and store manager. Assistant and store managers are responsible for such tasks as payroll processing, time-sheet updating, tracking supplies and orders and training entry-level employees. McDonald's requires franchisees to enroll present and future managers in training programs at McDonald's training centers. The cost of the training is borne by the franchisees.

A McDonald's franchise in Florida ("Bam-B") first hired plaintiff in 2009. Plaintiff started as an entry-level employee earning $7.00 per hour, and, within three months, plaintiff had earned a promotion to shift manager, with a wage bump to $10.00 per hour. By 2011, plaintiff was a Department Manager for Guest Services, earning $12.00 per hour. At that point, plaintiff

began coursework to become eligible for a position as General Manager.  Plaintiff's employer

enrolled her in a week-long training course at McDonald's Hamburger University.  The training

was scheduled to take place in April 2015, but plaintiff's supervisors canceled her training when

they learned plaintiff was pregnant.[2]

Fed up, plaintiff decided to put her skills to work elsewhere.  Plaintiff found an opening

for a position similar to hers at a nearby McDonald's restaurant.  The restaurant was owned and

operated by a McOpCo, which was a subsidiary of defendant McDonald's USA, LLC and which

was subject to the no-hire provision.  The positon at the McOpCo restaurant offered a wage of

$13.75 per hour to start, with an expected bump to $14.75 after a 90-day probationary period.

Plaintiff applied online and received a call from the store manager, who told plaintiff she would

like to hire her.  Plaintiff told the store manager that she worked for Bam-B.  The next day,

plaintiff received a call from a McDonald's corporate employee who told plaintiff the restaurant

could neither interview nor hire her unless she was "released" by Bam-B to work for the

McOpCo restaurant.

When plaintiff arrived at work the next day, she asked Bam-B to release her to work for

the McOpCo restaurant.  Bam-B said no, because plaintiff was "too valuable."  Plaintiff

continued to work for Bam-B for several months, but, ultimately, she took an entry-level job

with Hobby Lobby for less money, $10.25 per hour.  Plaintiff alleges that some of the skills she

developed as a manager of a McDonald's outlet were not transferable to management positions

at employers outside of the McDonald's brand, so she had to start over at the bottom elsewhere.

Based on these allegations, plaintiff asserts that defendants violated § 1 of the Sherman

Antitrust Act.  Plaintiff alleges that defendants and their franchisees engaged in concerted

---

[2] Bam-B, plaintiff's former employer, is not a defendant in this action, and plaintiff has not
asserted a claim for discrimination.

activity to restrict competition among them for employees, thereby lowering their employment

costs and limiting the employees' ability to earn higher wages. Plaintiff also asserts that the

alleged conduct violates the Illinois Antitrust Act and the Illinois Consumer Fraud and Deceptive

Trade Practices Act. Defendants move to dismiss.

## II.    STANDARD ON A MOTION TO DISMISS

The Court may dismiss a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil

Procedure if the plaintiff fails "to state a claim upon which relief can be granted." Fed.R.Civ.P.

12(b)(6). Under the notice-pleading requirements of the Federal Rules of Civil Procedure, a

complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon

which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v.

Gibson*, 355 U.S. 41, 47 (1957)). A complaint need not provide detailed factual allegations, but

mere conclusions and a "formulaic recitation of the elements of a cause of action" will not

suffice. *Twombly*, 550 U.S. at 555. To survive a motion to dismiss, a claim must be plausible.

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Allegations that are as consistent with lawful conduct as

they are with unlawful conduct are not sufficient; rather, plaintiffs must include allegations that

"nudg[e] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

In considering a motion to dismiss, the Court accepts as true the factual allegations in the

complaint and draws permissible inferences in favor of the plaintiff. *Boucher v. Finance Syst. of

Green Bay, Inc.*, 880 F.3d 362, 365 (7th Cir. 2018). Conclusory allegations "are not entitled to

be assumed true," nor are legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 680 & 681 (2009)

(noting that a "legal conclusion" was "not entitled to the assumption of truth[;]" and rejecting, as

conclusory, allegations that "'petitioners 'knew of, condoned, and willfully and maliciously

agreed to subject [him]' to harsh conditions of confinement"). The notice-pleading rule "does

A-6

not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."

*Iqbal*, 556 U.S. at 678-679.

## III.     DISCUSSION

### A.     Plaintiff's Sherman Act claim

Plaintiff seeks relief under § 4 of the Clayton Act, 15 U.S.C. § 15, which provides a

private right of action for treble damages to any person "injured in his business or property by

reason of anything forbidden in the antitrust laws[.]"  15 U.S.C. § 15.

The antitrust laws protect market competition, which usually, though not always, means

the goal is enhancing output and reducing price.  *See Arizona v. Maricopa Cty. Med. Soc.*, 457

U.S. 332, 348 (1982) ("The *per se* rule 'is grounded on faith in price competition as a market

force'") (citations omitted); *Leegin Creative Leather Products v. PSKS, Inc.*, 551 U.S. 877, 895

(2007) ("the antitrust laws are designed primarily to protect interbrand competition, from which

lower prices can later result").  Accordingly, a plaintiff must allege antitrust injury, an injury

attributable to "an anti-competitive aspect of the practice under scrutiny[.]"  *Atlantic Richfield*

*Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990).  This case involves a restraint affecting

competition in the supply of an input (labor) for a final product.  Usually a cheaper input means a

cheaper final price—something the antitrust laws traditionally prefer.  Nonetheless, defendants

do not dispute (nor could they) that plaintiff has alleged antitrust injury in this case, just like

other suppliers do when they allege a restraint in a supply market.  *Eichorn v. AT&T Corp.*, 248

F.3d 131, 142 (3d Cir. 2001) (employees challenging no-hire agreement had antitrust standing to

sue); *Roman v. Cessna Aircraft Co.*, 55 F.3d 542, 545 (10th Cir. 1995) (employee had antitrust

standing to challenge agreement between employers not to hire each other's employees); Phillip

E. Areeda & Herbert Hovencamp, *Antitrust Law:  An Analysis of Antitrust Principles and Their*

A-7

*Application*, ¶352a (3rd and 4th Editions, 2018 Cum. Supp. 2010-2017) ("Employees may

challenge antitrust violations that are premised on restraining the employment market . . .

Standing for employees thus parallels that for 'suppliers' generally[.]"); *Doe v. Arizona Hosp.*

*and Healthcare Ass'n*, Case No. CV 07-1292, 2009 WL 1423378 at *3 (D. Ariz. March 19,

2009) ("Price-fixing agreements among buyers, like those among sellers, are prohibited by the

Sherman Act, even where the damages caused by the agreement is to sellers and not

consumers."); *cf. Mandeville Island Farms v. American Chrystal Sugar Co.*, 334 U.S. 219 (1948)

(sugar beet suppliers had antitrust claim for price-fixing against sugar beet refiners).

Section 1 of the Sherman Antitrust Act prohibits "[e]very contract, combination in the

form of trust or otherwise, or conspiracy, in restraint of trade or commerce . . . " 15 U.S.C. § 1.

This language has long been interpreted to "outlaw only *unreasonable* restraints" of trade.  *State*

*Oil Co. v. Khan*, 522 U.S. 3, 10 (1997).  Some restraints are deemed so anti-competitive (and,

thus, unreasonable) that they are illegal *per se*, while other restraints, which may have

procompetitive effects, are judged under the rule of reason (or its subset:  the quick look).

As the Supreme Court has explained, restraints that are "unlawful *per se*" are those that

"have such predictable and pernicious anticompetitive effect, and such limited potential for

procompetitive benefit" that it is obvious they are unreasonable restraints of trade.  *Khan*, 522

U.S. at 10.  The *per se* rule applies to restraints "'that would always or almost always tend to

restrict competition and decrease output.'"  *Leegin*, 551 U.S. at 886.  Accordingly, the *per se* rule

is reserved for restraints with respect to which "courts have had considerable experience" such

that they "can predict with confidence that [the restraint] would be invalidated in all or almost all

instances under the rule of reason[.]"  *Leegin*, 551 U.S. at 886-87.

A-8

Most restraints are not *per se* unlawful but are instead analyzed under the rule of reason. *Khan*, 522 U.S. at 10. Under the rule of reason, "the finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect." *Khan*, 522 U.S. at 10. Generally, this requires a plaintiff to show the defendant has "market power—that is the ability to raise prices significantly without going out of business—without which the defendant could not cause anticompetitive effects on market pricing." *Agnew v. National Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012). In this case, market power would be the power to suppress wages.

Courts sometimes apply a third test of reasonableness, the quick look, which is a short form of rule of reason analysis. *Illinois Corp. Travel, Inc. v. American Airlines, Inc.*, 806 F.2d 722, 727 (7th Cir. 1986) ("This is the sort of short form or quick look Rule of Reason analysis endorsed in *NCAA v. Board of Regents*, 468 U.S. 85, 109-10 & n. 42 (1984)). As the Seventh Circuit has explained:

> the quick-look approach can be used when 'an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets,' but there are nonetheless reasons to examine the potential procompetitive justifications.

*Agnew*, 683 F.3d at 336 (internal citation omitted) (quoting *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999)). Under quick-look analysis, if the defendant lacks legitimate justifications for facially anticompetitive behavior then the court "condemns the practice without ado" without resort to analysis of market power. *Agnew*, 683 F.3d at 336; *Chicago Prof. Sports Ltd. Partnership v. NBA*, 961 F.2d 667, 674 (7th Cir. 1992); *see also National Collegiate Athletic Ass'n v. Board of Regents*, 468 U.S. 85, 109-10 n. 42 (1984) ("While the 'reasonableness' of a

9

A-9

particular alleged restraint often depends on the market power of the parties involved, because a judgment about market power is the means by which the effects of the conduct on the market place can be assessed, market power is only one test of 'reasonableness.' And where the anticompetitive effects of conduct can be ascertained through means short of extensive market analysis, and where no countervailing competitive virtues are evident, a lengthy analysis of market power is not necessary.").

In this case, plaintiff has styled her Sherman Act claim as a restraint that is either unlawful *per se* or is unlawful under quick-look analysis. Defendant disagrees. Defendant argues that the restraint at issue in this case is most appropriately analyzed under the rule of reason such that plaintiff must include allegations of market power in the relevant market in order to state a claim. As defendants point out, plaintiff has not included allegations of market power in a relevant market. To decide which standard to apply, the Court must first consider the alleged restraint.

Here, plaintiff argues that she has alleged the existence of a horizontal agreement in restraint of trade. Plaintiff alleges that McDonald's franchisees signed written franchise agreements pursuant to which each agreed not to hire employees (including former employees who left within the prior six months) from other McDonald's restaurants. Specifically, the franchisees were not allowed to hire anyone who was employed (or had been employed in the prior six months) by "McDonald's, any of its subsidiaries, or by any person who is at the time operating a McDonald's restaurant[.]" (Am. Complt. ¶ 87). Plaintiff alleges that the McOpCos were similarly restricted.

Defendants argue that this is merely a vertical restraint, because it was spearheaded by the entity at the top of the chain. The Court agrees that the restraint has vertical elements, but the

10

A-10

agreement is also a horizontal restraint.  It restrains competition for employees among horizontal competitors:  the franchisees and the McOpCos.  Plaintiff has alleged that McOpCos run McDonald's-brand restaurants and, thus, compete directly with franchisees for employees.  Plaintiff has also alleged that the McOpCos are subsidiaries of defendant McDonald's and that the restraint explicitly restricts franchisees from hiring employees of McDonald's subsidiaries, i.e., the franchisees' competitors.  Thus, McDonald's, by including the no-hire provision in its agreement with franchisees, was protecting its own restaurants (i.e., *itself*) from horizontal competition for employees.  *Cf. Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771 (1984) ("the coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise for purposes of § 1 of the Sherman Act").  The Court finds that plaintiff has alleged a horizontal restraint of trade.

Naked horizontal agreements (i.e., those among competitors) to fix prices or to divide markets are *per se* unlawful.  *Leegin*, 551 U.S. at 886; *Federal Trade Comm'n v. Superior Court Trial Lawyers Assoc.*, 493 U.S. 411 (1990) (horizontal agreement among lawyers not to accept appointments to represent indigent criminal defendants until fees increased was a naked price restraint and *per se* unlawful); *Blackburn v. Sweeney*, 53 F.3d 825, 827 & 828 (7th Cir. 1995) ("reciprocal agreement [among attorneys] to limit advertising to different geographical regions was . . . an agreement to allocate markets so that the *per se* rule of illegality applies").  This includes naked agreements to set wages.  *Arizona Hosp.*, 2009 WL 1423378 at * 3 (plaintiff's allegations that hospital association set prices for temporary nurses stated claim for *per se* violation of the Sherman Act).

A horizontal agreement not to hire competitors' employees is, in essence, a market division.  *See United States v. eBay, Inc.*, 968 F.Supp. 2d 1030, 1039 (N.D. Cal. 2013) ("The

court thus finds that the United States' allegations concerning agreement between eBay and Intuit [not to hire each other's employees] suffice to state a horizontal market allocation agreement."). The Department of Justice, which enforces rather than interprets the law, has warned employers that it considers naked no-hire agreements to be *per se* unlawful. (Press Release, U.S. Dep't of Justice, *Justice Department and Federal Trade Commission Release Guidance for Human Resource Professionals on How Antitrust Law Applies to Employee Hiring and Compensation* (Oct. 20, 2016), *available at* https://www.justice.gov/opa/pr/justice-department-and-federal-trade-commission-release-guidance-human-resource-professionals.). Thus, because a no-hire agreement is, in essence, an agreement to divide a market, the Court has no trouble concluding that a naked horizontal no-hire agreement would be a *per se* violation of the antitrust laws. Even a person with a rudimentary understanding of economics would understand that if, say, large law firms in Chicago got together and decided not to hire each other's associates, the market price for mid-level associates would stagnate. With no competition for their talent (aside from lower-paying in-house or government jobs), associates would have no choice but to accept the salary set by their firms or to move to another city. Thus, such a claim would be suitable for *per se* treatment.

Not all horizontal restraints are *per se* unlawful, however. Some horizontal restraints are *ancillary* to agreements that are procompetitive, usually in the sense of enhancing output (i.e., producing either a greater quantity of goods or a new good that would not otherwise exist). *Polk Bros., Inc. v. Forest City Enterprises, Inc.*, 776 F.2d 185, 188-89 (7th Cir. 1985) ("A court must distinguish between 'naked' restraints, those in which the restriction on competition is unaccompanied by new production or products, and 'ancillary' restraints, those that are part of a larger endeavor whose success they promote."). A restraint is ancillary if it "promoted enterprise

12

A-12

and productivity when it was adopted." *Polk Bros.*, 776 F.2d at 189.  When a restraint is

ancillary, it is judged either under the rule of reason or given a "quick look."  For example, no-

hire agreements that are ancillary to the sale of a business can have procompetitive effects, so

they are judged under the rule of reason.  *Eichorn v. AT&T Corp.*, 248 F.3d 131, 144 (3d Cir.

2001).

      Similarly, where the horizontal restraint is necessary in order for the product to exist at

all, a restraint will not be judged *per se* unlawful but rather will be judged under the rule of

reason, including by "quick look."  *Law v. National Collegiate Athletic Assoc.*, 134 F.3d 1010

(10th Cir. 1998); *see also Broadcast Music, Inc. v. Columbia Broadcasting Sys., Inc.*, 441 U.S. 1

(1979); *National Collegiate Athletic Ass'n. v. Board of Regents of the Univ. of Okla.*, 468 U.S.

85 (1984).  In *Law*, a group of college basketball coaches brought suit challenging the NCAA's

rule limiting annual salaries for certain assistant basketball coaches to $16,000 per year.  Because

some restraints were necessary in order to make college sports available, the court concluded that

the horizontal price restraint should be analyzed under the rule of reason, and, in particular, the

"quick look."  *Law*, 134 F.3d at 1018 & 1020 ("We find it appropriate to adopt such a quick look

rule of reason in this case.")

      In this case, plaintiff has alleged a horizontal restraint that is ancillary to franchise

agreements for McDonald's restaurants.  Each time McDonald's entered a franchise agreement,

it increased output of burgers and fries, which is to say the agreement was output enhancing and

thus procompetitive.  (That is not to say that the provision itself was output enhancing.  The very

fact that McDonald's has managed to continue signing franchise agreements even after it stopped

including the provision in 2017 suggests that the no-hire provision was not necessary to

encourage franchisees to sign.)  Because the restraint alleged in plaintiff's complaint is ancillary

13

to an agreement with a procompetitive effect, the restraint alleged in plaintiff's complaint cannot be deemed unlawful *per se*. Plaintiff's claim does not rise and fall on *per se* treatment, though. She claims in the alternative that the restraint is unlawful under quick-look analysis.

The next question, then, is whether plaintiff has plausibly alleged a restraint that might be found unlawful under quick-look analyis. The Court thinks she has. Even a person with a rudimentary understanding of economics would understand that if competitors agree not to hire each other's employees, wages for employees will stagnate. Plaintiff herself experienced the stagnation of her wages. A supervisor for a competing McDonald's restaurant told plaintiff she would like to hire plaintiff for a position that would be similar to plaintiff's position but that would pay $1.75-2.75 more per hour than she was earning. Unfortunately for plaintiff, the no-hire agreement prevented the McOpCo from offering plaintiff the job. When plaintiff asked her current employer to release her, plaintiff was told she was too valuable. The Court agrees that an employee working for a below-market wage would be extremely valuable to her employer.

Defendants, nonetheless, argue that their restraint has pro-competitive benefits. Specifically, defendants argue that the no-hire restriction promotes interbrand competition, by which they mean the competition between McDonald's and Burger King, rather than the intrabrand competition between the McDonald's restaurant at, say, 111 W. Jackson and the McDonald's at, say, 233 W. Jackson. It makes sense for McDonald's franchisees and the McOpCos to cooperate to promote intrabrand competition for hamburgers, because a customer who is satisfied with a hamburger she buys today at the McDonald's at 111 W. Jackson might tomorrow prefer a hamburger from the McDonald's at 233 W. Jackson to a hamburger from Burger King. This case, though, is not about competition for the sale of hamburgers to consumers. It is about competition for employees, and, in the market for employees, the

McDonald's franchisees and McOpCos within a locale are direct, horizontal, competitors.[3] A way to promote intrabrand competition for employees would be an advertising campaign extolling the virtues of working for McDonald's. That is not what defendants are alleged to have done here. Here, they are alleged to have divided the market for employees by prohibiting restaurants from hiring each other's current or former (for the prior six months, anyway) employees. In the employment market, the various McDonald's stores are competing brands. Dividing the market does not promote intrabrand competition for employees, it stifles interbrand competition.

Defendants argue that the no-hire restriction promotes intrabrand competition for hamburgers by encouraging franchisees to train employees for management positions. Presumably, the theory is that better service equals happier customers. The Court has no doubt, as defendants argue, that McOpCos and franchisees were concerned about training and then losing employees. The restraint, though, is not limited to management employees who had received expensive training at Hamburger University. The restraint applies even to entry-level employees with no management training. Nor was the restraint limited to a reasonable period of time (say six months) after the employee had received the expensive training at Hamburger University. In any case, every employer fears losing the employees it has trained. That fear does not, however, justify, say, law firms agreeing not to hire each other's associates. Employers have plenty of other means to encourage their employees to stay without resorting to unlawful market division. Those options include paying higher wages/salaries and contracting directly with each employee to set an employment term.

-----

[3] Realistically, only restaurants within the same locale compete for employees. A McDonald's restaurant in Chicago does not compete for employees with a McDonald's restaurant in Florida.

15

A-15

Though the Court has concluded that plaintiff has stated a claim for a restraint that might be unlawful under quick-look analysis, the evidence at a later stage may not support it. As defendants have pointed out, plaintiff has not attempted to plead a claim under the rule of reason. This is perhaps unsurprising. To state a claim under the rule of reason, a plaintiff must allege market power in a relevant market. The relevant market for employees to do the type of work alleged in this case is likely to cover a relatively-small geographic area. Most employees who hold low-skill retail or restaurant jobs are looking for a position in the geographic area in which they already live and work, not a position requiring a long commute or a move. That is not to say that people do not move for other reasons and then attempt to find a low-skill job; the point is merely that most people do not search long distances for a low-skill job with the idea of then moving closer to the job. Plaintiff, though, seeks to represent a nationwide class, and allegations of a large number of geographically-small relevant markets might cut against class certification. Nonetheless, if plaintiff decides she would like to include a claim under the rule of reason, she has leave to amend, but she must do so soon, within 28 days.

**B.     Plaintiff's state-law claims**

Plaintiff also asserts two state-law claims. First, in Count II, plaintiff asserts a claim under the Illinois Antitrust Act, 740 ILCS 10/1 *et seq.* The Illinois Antitrust Act states, in relevant part, that it is unlawful to "[m]ake any contract . . . (a) for the purpose or with the effect of fixing, controlling, or maintaining the price . . . or the fee . . . paid for any service . . . received by the parties thereto[.]" 740 ILCS 10/3(a)(1). The Illinois Antitrust Act goes on to state that "'[s]ervice' shall not be deemed to include labor which is performed by natural persons as employees of others." 740 ILCS 10/4.

16

A-16

Defendants argue that the plaintiff's claim is, thus, excluded from coverage under the Illinois Antitrust Act.  The Court agrees that the plain language of the statute excludes plaintiff's claim, which alleges that the no-hire agreement artificially suppressed her wage, i.e., the price paid for her service.  *See O'Regan v. Arbitration Forums, Inc.*, 121 F.3d 1060, 1066 (7th Cir. 1997) ("[T]o the extent [plaintiff's] claims relate to an alleged market for labor services, they are specifically excluded by § 10/4 of the [Illinois Antitrust] Act.").  Although plaintiff suggests this is merely an exception for collective bargaining, the statute includes a separate labor exemption. 740 ILCS 10/5(1) ("No provisions of this Act shall be construed to make illegal:  (1)  the activities of any labor organization or of individual members thereof which are directed solely to labor objectives which are legitimate under the laws of either the State of Illinois or the United States.").

Accordingly, defendants' motion to dismiss is granted as to Count II, and Count II is dismissed with prejudice.

Next, in Count III, plaintiff asserts a claim for violation of the Illinois Consumer Fraud and Deceptive Trade Practices Act.  Defendants move to dismiss, and the Court agrees that plaintiff cannot move forward on this claim.

To begin with, as defendants point out, the Illinois Supreme Court has concluded that the Illinois Consumer Fraud Act aims to protect consumers from fraud, not to provide extra enforcement of the antitrust laws.  *Laughlin v. Evanston Hosp.*, 133 Ill.2d 374, 390 (Ill. 1990). There, the Illinois Supreme Court said:

> There is no indication that the legislature intended that the Consumer Fraud Act be an additional antitrust enforcement mechanism.  The language of the Act shows that its reach was to be limited to conduct that defrauds or deceives consumers or others.  The title of the Act is consistent with its content.

17

A-17

*Laughlin*, 133 Ill.2d at 390.  Thus, plaintiff cannot use the ICFA to bring her antitrust claim.

According to plaintiff's allegations, she was injured because a no-hire agreement prohibited a

potential employer from hiring her.  Plaintiff was harmed in her capacity as an employee, which

is to say in her capacity as a supplier of services.  She was not defrauded as a consumer of

hamburgers, and she cannot state a claim under the ICFA.  *Hess v. Kanoski & Assoc.*, 668 F.3d

446, 454 (7th Cir. 2012) ("[Plaintiff] has no claim under the Illinois Consumer Fraud Act . . .

because [she] was an employee, not a 'consumer.'").

Count III is dismissed with prejudice.

## IV.    CONCLUSION

For the reasons set forth above, the Court grants in part and denies in part defendants'

motion to dismiss [34].[4]  The motion is denied as to Count I.  The motion is granted as to Counts

II and III, which are dismissed with prejudice.  This case is set for status on 8/15/18 at 9:30 a.m.


**SO ORDERED.**                                        **ENTERED:**  June 25, 2018

_____
**JORGE L. ALONSO**
**United States District Judge**

---

[4] In their motion, defendants also request that the Court dismiss plaintiff's demand for injunctive
relief.  Defendants have not sufficiently developed this argument, so the request is denied
without prejudice.

18

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| STEPHANIE TURNER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 19 C 5524 |
| v. | ) | |
| | ) | Judge Jorge L. Alonso |
| McDONALD'S USA, LLC, and | ) | |
| McDONALD'S CORP., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

Defendants' motion [27] to dismiss is denied.

## STATEMENT

In this case, which is consolidated with *Deslandes v. McDonald's, USA, LLC*, case no. 17-cv-4857, plaintiff Stephanie Turner (like plaintiff Leinani Deslandes before her) alleges that defendants violated the Sherman Act by agreeing with franchisees not to hire each other's employees or each other's former employees for a period of six months after employment. (Familiarity with the allegations in *Deslandes* and with the Court's decisions in that case is assumed. The Court does not include the detailed allegations here, because defendants do not move to dismiss this case for failure to state a claim.) Plaintiff alleges that the no-hire clause caused her wages to be depressed such that she was paid less than she would have been paid absent the no-hire clause in the franchise agreements.

In their motion to dismiss, defendants argue that plaintiff lacks Article III standing as well as antitrust standing and that plaintiff's claim is barred by the statute of limitations.

A-19

### A.     Article III standing

Defendants first argue that plaintiff lacks standing under Article III.  Article III of the United States Constitution limits a federal court's jurisdiction to "Cases" and "Controversies," and "the irreducible constitutional minimum of standing contains three elements." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-60 (1992).  To have standing, a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, __ U.S. __, 136 S.Ct. 1540, 1547 (2016) (citations omitted).  A plaintiff must establish standing "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561.  Thus, here, at the pleadings stage, allegations will suffice.

In this case, plaintiff alleges she "suffered reduced wages" due to the no-hire clause. (Complt. ¶ 18).  She alleges that the "fact that she could not even apply [for other positions at other McDonald's restaurants] also contributed to downward pressure on her own wages at the McOpCo, as she could not use a competing offer to negotiate better wages[.]"  (Complt. ¶ 66). She alleges the restraints "constrained competition" among McDonald's restaurants and "caused her wages to be depressed during her employment."  (Complt. ¶ 71).

Defendants argue that plaintiff suffered no injury in fact, but the Court does not agree. Defendants argue that plaintiff cannot have been injured by the no-hire clause unless she applied for and was rejected on account of the no-hire policy.  The argument misses the point of plaintiff's alleged injury:  plaintiff alleges she suffered depressed wages, which is to say the wages she was actually paid were less than the wages she would have been paid absent the allegedly-unlawful no-hire policy.  The loss of those wages is an injury in fact. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 342 (1979) ("where petitioner alleges a wrongful deprivation of

2

A-20

her money . . . by reason of respondents' anticompetitive behavior, she has alleged an injury in her 'property' under § 4 [of the Clayton Act]"); *see also Milwaukee Police Assoc. v. Flynn*, 863 F.3d 636, 639 (7th Cir. 2017) ("concrete financial injuries, namely deprivation of wages . . . are prototypical injuries for the purposes of Article III standing.").[1]

Plaintiff's claim is akin to a supplier who sells at a reduced price due to the anti-competitive behavior of a cartel of buyers. The Seventh Circuit has held "farmers who sold soybeans at allegedly depressed prices suffered injury sufficient to confer standing under Article III." *Sanner v. Board of Trade of City of Chi.*, 62 F.3d 918, 924 (7th Cir. 1995) ("The fact of a sale at an allegedly depressed price establishes discernable injury in a manner in which a failure to sell cannot."). Here, plaintiff alleges she sold her labor at an allegedly depressed price, and that is sufficient allegation of injury in fact.

Next, defendants argue that depressed wages cannot confer standing in this case, because such depressed wages are not fairly traceable to the alleged antitrust violation. Defendants argue that other factors, such as the unemployment rate, might have suppressed her wages and that plaintiff's allegation that the depressed wages were caused by the no-hire agreement is not plausible. Again, the Court disagrees. Plaintiff's causation allegations are plausible due to basic principles of economics: if fewer employers compete for the same number of employees, wages will be lower than if a greater number of employers are competing for those employees.[2] In

---

[1] That plaintiff may never be able to prove the quantity of such damages does not mean she has not suffered injury in fact. *See Blue Cross and Blue Shield United of Wis. v. Marshfield Clinic*, 152 F.3d 588, 594 (7th Cir. 1998) ("We are not saying that Blue Cross did not in fact lose any money as a result of the division of markets. . . . [T]here is . . . , and here critically, a difference between an actual and a quantifiable harm and also between a quantifiable and a quantified harm—and only the last supports an award of damages.").

[2] Defendants argue that plaintiff's allegation that the no-hire clause depressed her wages is not plausible in light of the Court's conclusion in *Deslandes* that Deslandes had not stated a claim for a *per se* violation of the antitrust laws. The Court disagrees. The reason Deslandes had not

3

A-21

addition, "[f]actual disputes over the relative market significance" of the no-hire agreement versus other factors "should not be resolved on a motion to dismiss." *Sanner*, 62 F.3d at 926. Plaintiff has alleged an injury that is fairly traceable to defendants' alleged antitrust violation.

Thus, this Court agrees with courts that have concluded plaintiffs have standing to pursue antitrust claims based on no-hire agreements when they allege their wages were depressed by such agreements. *Blanton v. Domino's Pizza Franchising, LLC*, Case No. 18-13207, 2019 WL 2247731 at *3-4 (E.D. Mich. May 24, 2019) ("[Plaintiff] says that his own wages were depressed. . . . He asserts that his depressed wages were a direct result of the allegedly unlawful no-hire agreement . . . The Court finds that [plaintiff] has sufficiently alleged standing."); *see also Butler v. Jimmy John's Franchise, LLC*, 331 F. Supp.3d 786, 793-94 (S.D. Ill. 2018).

In sum, plaintiff has adequately alleged standing by alleging the no-hire agreement depressed her wages. Whether she can *prove* that is a question for another day.

**B.    Antitrust standing**

Defendants also state that plaintiff has not alleged antitrust injury. The Court disagrees.

In addition to injury in fact, a plaintiff asserting an antitrust claim "must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' act unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). The Supreme Court went on to explain that "[t]he injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Brunswick*, 429 U.S. at 489. Thus, in *Brunswick*, the plaintiffs could

---

alleged a *per se* violation was *not* that a no-hire agreement would be unlikely to depress wages but rather that the no-hire agreement was ancillary to an agreement that was procompetitive in that it enhanced the output of hamburgers.

A-22

not recover as damages additional profits they might have earned had their competitors gone out

of business. The Supreme Court explained:

> At base, [plaintiffs] complain that by acquiring the failing centers [defendant] preserved competition, thereby depriving [plaintiffs] of the benefits of increased concentration. The damages [plaintiffs] obtained are designed to provide them with the profits they would have realized had competition been reduced. The antitrust laws, however, were enacted for 'the protection of competition not competitors.' *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962). It is inimical to the purposes of these laws to award damages for the type of injury claimed here.

*Brunswick*, 429 U.S. at 488. Thus, antitrust injury requires injury to competition.

Here, plaintiff has alleged injury to competition, namely the injury of depressed prices

(wages) to sellers (employees) due to anticompetitive behavior of buyers (employers). The

Seventh Circuit has explained why this type of injury is an injury to competition:

> Just as a sellers' cartel enables the charging of monopoly prices, a buyers' cartel enables the charging of monopsony prices; and monopoly and monopsony are symmetrical distortions of competition from an economic standpoint.

*Vogel v. American Soc. of Appraisers*, 744 F.2d 598, 601 (7th Cir. 1984); *cf. Mandeville Island*

*Farms v. American Chrystal Sugar Co.*, 334 U.S. 219 (1948) (sugar beet suppliers had antitrust

claim for price-fixing against sugar beet refiners); *see also Omnicare, Inc. v. UnitedHealth*

*Group, Inc.*, 524 F. Supp.2d 1031, 1040 (N.D. Ill. 2007) ("In a buyer's conspiracy case, a seller

sufficiently alleges antitrust injury by pleading that it has received excessively low prices from

members of the buyers' cartel.").

Accordingly, plaintiff has alleged antitrust injury in this case. *See Hunter v. Booz Allen*

*Hamilton, Inc.*, 418 F. Supp.3d 214, 223 (S.D. Ohio 2019) ("Plaintiffs alleged that the no-poach

agreements . . . 'did in fact suppress wages, benefit[s], and other aspects of compensation and

eliminate competition.' As such, Plaintiffs have pleaded . . . an injury of the type the antitrust

laws were intended to prevent[.]"); *In re: Papa John's Employee and Franchisee Employee*

A-23

*Antitrust Litigation*, Case No. 18-cv-825, 2019 WL 5386484 at *9 (W.D. Ky.  Oct. 21, 2019)

("Plaintiffs also sufficiently plead antitrust injury.  Plaintiffs contend that the No-Hire provision

is an agreement not to compete for labor and that the agreement had the purpose and effect of

depressing wages and diminishing employment opportunities."); *In re: High-Tech Employee*

*Antitrust Litigation*, 856 F. Supp.2d 1103, 1123 (N.D. Cal. 2012) ("In alleging that Defendants

conspired to fix salaries at artificially low levels, Plaintiffs have alleged 'an example of the type

of injury the antitrust laws are meant to protect against.'") (citation omitted); Phillip E. Areeda &

Herbert Hovencamp, *Antitrust Law:  An Analysis of Antitrust Principles and Their Application*,

¶ 352a (3rd and 4th Editions, 2018 Cum. Supp. 2010-2017) ("Employees may challenge antitrust

violations that are premised on restraining the employment market . . . Standing for employees

thus parallels that for 'suppliers' generally[.]").

### C.     Statute of limitations

Finally, defendants argue that plaintiff's claim is barred by the four-year statute of

limitations applicable to antitrust claims.  15 U.S.C. § 15b ("Any action to enforce any cause of

action under section 15, 15a, or 15c of this title shall be forever barred unless commenced within

four years after the cause of action accrued.").  Defendants' theory is that plaintiff's cause of

action accrued no later than 2009 or 2010, when she alleges she first learned about the no-hire

clause.  (Complt. ¶ 66) ("In or around 2009 or 2010 . . . [plaintiff's] supervisor at the McOpCo

restaurant told her she could not be hired at a franchise-owned McDonalds' without a release

unless she first stopped working at the McOpCo for six months.  The supervisor also informed

[plaintiff] that the franchisee would not be permitted to speak with her without a release from the

McOpCo.").

Failure to comply with a statute of limitations is an affirmative defense.  *See United States Gypsum Co. v. Indiana Gas Co., Inc.*, 350 F.3d 623, 626 (7th Cir. 2003); Fed.R.Civ.P. 8(c)(1).  A plaintiff need not plead around an affirmative defense, and the Court may not dismiss on the basis of an affirmative defense unless the plaintiff alleges, and thus admits, the elements of the affirmative defense.  *Chicago Bldg. Design, P.C. v. Mongolian House, Inc.*, 770 F.3d 610, 613-14 (7th Cir. 2014); *United States Gypsum*, 350 F.3d at 626.  Here, plaintiff's allegations do not establish that her claim is time-barred.

"The period of limitations for antitrust litigation runs from the most recent injury caused by the defendants' activities rather than from the violation's inception."  *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 902 (7th Cir. 2004) (citing *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321 (1971)).  In *Zenith Radio*, the Supreme Court said "each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and . . . as to those damages the statute of limitations runs from the commission of the act."  *Zenith Radio*, 401 U.S. at 338.  In *Xechem*, the Seventh Circuit cited *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 188-191 (1997) as "describing how this approach works[.]"  *Xechem*, 372 F.3d at 902.  In *Klehr*, the Supreme Court explained:

> Antitrust law provides that, in the case of a 'continuing violation,' say, a price-fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years, 'each overt act that is part of the violation and that injures plaintiff,' *e.g., each sale to the plaintiff, 'starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times.'*  But the commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period.

*Klehr*, 521 U.S. at 189 (emphasis added) (citations omitted).  In other words, in a sellers' cartel, each additional sale is an injury that starts the statute of limitations for that injury, and, in a buyers' cartel, each purchase is an injury that starts the statute of limitations for that injury.

Analogously, in this case, each time plaintiff was paid a depressed wage for her labor, she was injured and the four-year statute of limitations for that injury began.[3]

Here, plaintiff alleges that she was paid a depressed wage for her labor as recently as September 2018. (Complt. ¶¶ 70-71). She filed her complaint on August 15, 2019. Plaintiff has not alleged (and thus admitted) the ingredients of defendants' statute-of-limitations affirmative defense, and the Court will not dismiss her claim on statute-of-limitations grounds.

For all of these reasons, defendants' motion to dismiss is denied.


SO ORDERED.                                      ENTERED:  April 24, 2020


                                                 _____
                                                 JORGE L. ALONSO
                                                 United States District Judge

---

[3] This does not mean a plaintiff can recover for depressed wages that were paid to her more than four years before filing suit. *See Klehr*, 521 U.S. at 189 ("But the commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period.").

A-26

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LEINANI DESLANDES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 17 C 4857 |
| | ) | |
| v. | ) | |
| | ) | Judge Jorge L. Alonso |
| McDONALD'S USA, LLC, | ) | |
| McDONALD'S CORPORATION, and | ) | |
| DOES 1 through 10, | ) | |
| | ) | |
| Defendants. | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

After a hiring restriction prevented plaintiff Leinani Deslandes ("Deslandes") from taking

a better-paying position with a rival McDonald's outlet, she filed this suit seeking relief under

Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. Deslandes and Stephanie Turner

("Turner"), who filed a related suit (19-cv-5524), move for certification of a nationwide class of

persons who were employed by a McDonald's restaurant during a five-year period. For the

reasons set forth below, plaintiffs' motion is denied.

**I.      BACKGROUND**

Deslandes filed suit against two defendants. The first is McDonald's USA, LLC, which

is a wholly-owned subsidiary of the second defendant, McDonald's Corporation. Together

("McDonald's"), these entities are the franchisors of the popular restaurants ("McDonald's

restaurants"), with McDonald's Corporation serving as franchisor for franchise agreements

signed until 2005 and McDonald's USA, LLC serving as the franchisor for franchise agreements

signed after that time. Although most (90-95%) of McDonald's restaurants are owned and

operated by franchisees, the rest are operated by McDonald's USA, LLC (Def. Brief at 3/Docket

299 at 10) and are commonly referred to as McOpCos.

    For many years, including at least 1973 to 2017, the franchise agreement contained a

provision that stated:

> Franchisee shall not employ or seek to employ any person who is at the time
> employed by McDonald's, any of its subsidiaries, or by any person who is at the
> time operating a McDonald's restaurant or otherwise induce, directly or
> indirectly, such person to leave such employment. This paragraph 14 shall not be
> violated if such person has left the employ of any of the foregoing parties for a
> period in excess of six months.

Plaintiffs allege that this provision violated the Sherman Antitrust Act and suppressed their

wages.

    In or about March 2017, McDonald's Corp. announced to the McOpCos and the

franchisees that it would discontinue enforcement of the no-hire provision. (Singer Report at ¶

3). In July 2018, McDonald's Corp. entered an agreement with the Washington State Attorney

General that it would neither include the hiring provision in future franchise agreements nor

enforce it with respect to the franchise agreements that already include the provision. (Singer

Report at ¶ 3).

## II.    DISCUSSION

    "The class action is 'an exception to the usual rule that litigation is conducted by and on

behalf of the individual named parties only.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348

(2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-701 (1979)). "A class action may be

maintained if Rule 23(a) is satisfied and" if the case falls within at least one of the categories

outlined in Rule 23(b). Fed.R.Civ.P. 23(b); *see also Wal-Mart Stores*, 564 U.S. at 345. Rule

23(a) allows "[o]ne or more members of a class" to "sue or be sued as representative parties on

behalf of all class members only if:

A-28

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a).  Rule 23(b)(3) allows class certification where "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed.R.Civ.P. 23(b)(3).  Rule 23(c)(1)(A) requires that "[a]t an early practicable time after a person sues or is sued as a class representative, the court must determine by order whether to certify the action as a class action."  Fed.R.Civ.P. 23(c)(1)(A).

To support a motion for class certification, a "party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc."  *Wal-Mart*, 564 U.S. at 350.  Thus, the "party seeking certification bears the burden of demonstrating that certification is proper by a preponderance of the evidence."  *Chicago Teachers Union, Local No. 1 v. Board of Ed. of City of Chi.*, 797 F.3d 426, 433 (7th Cir 2015).  A court considering a motion for class certification must engage in "a rigorous analysis" that "will frequently" overlap with the merits, because the considerations "are enmeshed in the factual and legal issues comprising the plaintiff's cause of action."  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33-34 (2013) (citations omitted).

A-29

Plaintiffs seek to certify a class of:

> All persons who were employed at a McDonald's-branded restaurant in the
> United States from June 28, 2013 to July 12, 2018.  Excluded from the Class are
> Defendants' directors and officers, the Judge, and the Judge's staff and immediate
> family members.

(Plfs. Brief at 1/Docket 268 at 7).

### 1.    Numerosity

First, the Court agrees that the number of class members makes joinder impracticable.

Plaintiffs assert that there are "hundreds of thousands" of class members.  (Docket 268 at 8).

Defendants say there are "millions" of class members.  (Docket 299 at 8).  Either way, the class

contains far more members than would be practicable to join.  *See Mulvania v. Sheriff of Rock

Island Cty.*, 850 F.3d 849, 859 (7th Cir. 2017) ("While there is no magic number that applies to

every case, a forty-member class is often regarded as sufficient to meet the numerosity

requirement.").

### 2.    Common issues and whether they will predominate

Next, the Court considers whether plaintiffs have shown the existence of one or more

common issues and whether such common questions will predominate over individual questions.

The Supreme Court has described what makes an issue common.  It has said:

> Commonality requires the plaintiff to demonstrate that the class members 'have
> suffered the same injury.  This does not mean merely that they have all suffered a
> violation of the same provision of law.  . . .  Their claims must depend upon a
> common contention[.] . . .  That common contention, moreover, must be of such a
> nature that it is capable of classwide resolution—which means that determination
> of its truth or falsity will resolve an issue that is central to the validity of each one
> of the claims in one stroke.

*Wal-Mart*, 564 U.S. at 349-50 (citations omitted).  In describing the difference between common

and individual questions, the Supreme Court has explained:

A-30

> An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'

*Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (citation omitted); *see also Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 815 (7th Cir. 2012) ("If, to make a prima facie showing on a given question, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question.") (quoting *Blades v. Monsanto Co.*, 400 F.3d 562, 566 (8th Cir. 2005)).

To be suitable for class action treatment, a case must not only involve common questions (Fed.R.Civ.P. 23(a)(2)), but those common questions must predominate (Fed.R.Civ.P. 23(b)). "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623 (1997). Rule 23(b)(3)'s "predominance criterion is far more demanding" than "Rule 23(a)'s commonality requirement[.]" *Amchem*, 521 U.S. at 623-34. "Analysis of predominance under Rule 23(b)(3) 'begins, of course, with the elements of the underlying cause of action.'" *Messner*, 669 F.3d at 815 (quoting *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S.Ct. 2179, 2184 (2011)).

The parties agree[1] that the elements of plaintiffs' cause of action are: (1) a violation of the antitrust laws; (2) injury resulting from the violation, which is to say that plaintiffs suffered antitrust "impact;" and (3) damages. *Messner*, 669 F.3d at 815. The parties do not agree, however, on the proper analysis of plaintiff's antitrust claim, so the Court must first resolve that issue.

---

[1] S*ee* Plfs. Brief at 20/Docket 268 at 26; Def. Brief at 11, 16, 18/Docket 299 at 18, 23, 25.

A-31

*Quick look versus Rule of Reason*

The parties disagree about whether plaintiffs' antitrust claim may be considered under a quick look analysis or whether it will require rule of reason analysis.[2]

This Court has previously explained:

> Section 1 of the Sherman Antitrust Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce . . . " 15 U.S.C. § 1. This language has long been interpreted to "outlaw only *unreasonable* restraints" of trade. *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997). Some restraints are deemed so anti-competitive (and, thus, unreasonable) that they are illegal *per se*, while other restraints, which may have procompetitive effects, are judged under the rule of reason (or its subset: the quick look).

> As the Supreme Court has explained, restraints that are "unlawful *per se*" are those that "have such predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit" that it is obvious they are unreasonable restraints of trade. *Khan*, 522 U.S. at 10. The *per se* rule applies to restraints "'that would always or almost always tend to restrict competition and decrease output.'" *Leegin*, 551 U.S. at 886. Accordingly, the *per se* rule is reserved for restraints with respect to which "courts have had considerable experience" such that they "can predict with confidence that [the restraint] would be invalidated in all or almost all instances under the rule of reason[.]" *Leegin*, 551 U.S. at 886-87.

> Most restraints are not *per se* unlawful but are instead analyzed under the rule of reason. *Khan*, 522 U.S. at 10. Under the rule of reason, "the finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect." *Khan*, 522 U.S. at 10. Generally, this requires a plaintiff to show the defendant has "market power—that is the ability to raise prices significantly without going out of business—without which the defendant could not cause anticompetitive effects on market pricing." *Agnew v. National Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012). In this case, market power would be the power to suppress wages.

---

[2] The Court notes the Supreme Court issued its decision in *NCAA v. Alston*, __ U.S. __, 141 S.Ct. 2141 (2021), after the parties had briefed their motion for class certification. The Court allowed each party to file a brief discussing the impact of that case on this motion.

A-32

Courts sometimes apply a third test of reasonableness, the quick look, which is a short form of rule of reason analysis. *Illinois Corp. Travel, Inc. v. American Airlines, Inc.*, 806 F.2d 722, 727 (7th Cir. 1986) ("This is the sort of short form or quick look Rule of Reason analysis endorsed in *NCAA v. Board of Regents*, 468 U.S. 85, 109-10 & n. 42 (1984)). As the Seventh Circuit has explained:

> the quick-look approach can be used when 'an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets,' but there are nonetheless reasons to examine the potential procompetitive justifications.

*Agnew*, 683 F.3d at 336 (internal citation omitted) (quoting *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999)). Under quick-look analysis, if the defendant lacks legitimate justifications for facially anticompetitive behavior then the court "condemns the practice without ado" without resort to analysis of market power. *Agnew*, 683 F.3d at 336; *Chicago Prof. Sports Ltd. Partnership v. NBA*, 961 F.2d 667, 674 (7th Cir. 1992); *see also National Collegiate Athletic Ass'n v. Board of Regents*, 468 U.S. 85, 109-10 n. 42 (1984) ("While the 'reasonableness' of a particular alleged restraint often depends on the market power of the parties involved, because a judgment about market power is the means by which the effects of the conduct on the market place can be assessed, market power is only one test of 'reasonableness.' And where the anticompetitive effects of conduct can be ascertained through means short of extensive market analysis, and where no countervailing competitive virtues are evident, a lengthy analysis of market power is not necessary.").

*Deslandes v. McDonald's USA, LLC*, Case No. 17 C 4857, 2018 WL 3105955 at *4-5 (N.D. Ill.

June 25, 2018).

Plaintiff now argues, "[t]his Court has already held that an abbreviated from of the rule of

reason—the quick-look test—is appropriate given the predictable effects that ensue" from the

alleged conduct. (Docket 371 at 4). That is imprecise. The Court said plaintiff had *stated a*

*claim* for a restraint that *might* be unlawful under a quick look. Specifically, the Court stated:

> Here, plaintiff argues that she has alleged the existence of a horizontal agreement in restraint of trade. Plaintiff alleges that McDonald's franchisees signed written franchise agreements pursuant to which each agreed not to hire employees (including former employees who left within the prior six months) from other McDonald's restaurants. Specifically, the franchisees were not allowed to hire anyone who was employed (or had been employed in the prior six

7

A-33

months) by "McDonald's, any of its subsidiaries, or by any person who is at the time operating a McDonald's restaurant[.]" (Am. Complt. ¶ 87). Plaintiff alleges that the McOpCos were similarly restricted.

Defendants argue that this is merely a vertical restraint, because it was spearheaded by the entity at the top of the chain. The Court agrees that the restraint has vertical elements, but the agreement is also a horizontal restraint. It restrains competition for employees among horizontal competitors: the franchisees and the McOpCos. Plaintiff has alleged that McOpCos run McDonald's-brand restaurants and, thus, compete directly with franchisees for employees. Plaintiff has also alleged that the McOpCos are subsidiaries of defendant McDonald's and that the restraint explicitly restricts franchisees from hiring employees of McDonald's subsidiaries, i.e., the franchisees' competitors. Thus, McDonald's, by including the no-hire provision in its agreement with franchisees, was protecting its own restaurants (i.e., *itself*) from horizontal competition for employees. *Cf. Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771 (1984) ("the coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise for purposes of § 1 of the Sherman Act"). The Court finds that plaintiff has alleged a horizontal restraint of trade.

Naked horizontal agreements (i.e., those among competitors) to fix prices or to divide markets are *per se* unlawful. *Leegin*, 551 U.S. at 886; *Federal Trade Comm'n v. Superior Court Trial Lawyers Assoc.*, 493 U.S. 411 (1990) (horizontal agreement among lawyers not to accept appointments to represent indigent criminal defendants until fees increased was a naked price restraint and *per se* unlawful); *Blackburn v. Sweeney*, 53 F.3d 825, 827 & 828 (7th Cir. 1995) ("reciprocal agreement [among attorneys] to limit advertising to different geographical regions was . . . an agreement to allocate markets so that the *per se* rule of illegality applies"). This includes naked agreements to set wages. *Arizona Hosp.*, 2009 WL 1423378 at * 3 (plaintiff's allegations that hospital association set prices for temporary nurses stated claim for *per se* violation of the Sherman Act).

A horizontal agreement not to hire competitors' employees is, in essence, a market division. *See United States v. eBay, Inc.*, 968 F.Supp. 2d 1030, 1039 (N.D. Cal. 2013) ("The court thus finds that the United States' allegations concerning agreement between eBay and Intuit [not to hire each other's employees] suffice to state a horizontal market allocation agreement."). The Department of Justice, which enforces rather than interprets the law, has warned employers that it considers naked no-hire agreements to be *per se* unlawful. (Press Release, U.S. Dep't of Justice, *Justice Department and Federal Trade Commission Release Guidance for Human Resource Professionals on How Antitrust Law Applies to Employee Hiring and Compensation* (Oct. 20, 2016), *available at* https://www.justice.gov/opa/pr/justice-department-and-federal-trade-commission-release-guidance-human-resource-professionals.). Thus, because a

A-34

no-hire agreement is, in essence, an agreement to divide a market, the Court has no trouble concluding that a naked horizontal no-hire agreement would be a *per se* violation of the antitrust laws. Even a person with a rudimentary understanding of economics would understand that if, say, large law firms in Chicago got together and decided not to hire each other's associates, the market price for mid-level associates would stagnate. With no competition for their talent (aside from lower-paying in-house or government jobs), associates would have no choice but to accept the salary set by their firms or to move to another city. Thus, such a claim would be suitable for *per se* treatment.

Not all horizontal restraints are *per se* unlawful, however. Some horizontal restraints are *ancillary* to agreements that are procompetitive, usually in the sense of enhancing output (i.e., producing either a greater quantity of goods or a new good that would not otherwise exist). *Polk Bros., Inc. v. Forest City Enterprises, Inc.*, 776 F.2d 185, 188-89 (7th Cir. 1985) ("A court must distinguish between 'naked' restraints, those in which the restriction on competition is unaccompanied by new production or products, and 'ancillary' restraints, those that are part of a larger endeavor whose success they promote."). A restraint is ancillary if it "promoted enterprise and productivity when it was adopted." *Polk Bros.*, 776 F.2d at 189. When a restraint is ancillary, it is judged either under the rule of reason or given a "quick look." For example, no-hire agreements that are ancillary to the sale of a business can have procompetitive effects, so they are judged under the rule of reason. *Eichorn v. AT&T Corp.*, 248 F.3d 131, 144 (3d Cir. 2001).

Similarly, where the horizontal restraint is necessary in order for the product to exist at all, a restraint will not be judged *per se* unlawful but rather will be judged under the rule of reason, including by "quick look." *Law v. National Collegiate Athletic Assoc.*, 134 F.3d 1010 (10th Cir. 1998); *see also Broadcast Music, Inc. v. Columbia Broadcasting Sys., Inc.*, 441 U.S. 1 (1979); *National Collegiate Athletic Ass'n. v. Board of Regents of the Univ. of Okla.*, 468 U.S. 85 (1984). In *Law*, a group of college basketball coaches brought suit challenging the NCAA's rule limiting annual salaries for certain assistant basketball coaches to $16,000 per year. Because some restraints were necessary in order to make college sports available, the court concluded that the horizontal price restraint should be analyzed under the rule of reason, and, in particular, the "quick look." *Law*, 134 F.3d at 1018 & 1020 ("We find it appropriate to adopt such a quick look rule of reason in this case.")

In this case, plaintiff has alleged a horizontal restraint that is ancillary to franchise agreements for McDonald's restaurants. Each time McDonald's entered a franchise agreement, it increased output of burgers and fries, which is to say the agreement was output enhancing and thus procompetitive. (That is not to say that the provision itself was output enhancing. The very fact that McDonald's has managed to continue signing franchise agreements even after it stopped including the provision in 2017 suggests that the no-hire provision was not necessary to

encourage franchisees to sign.)  Because the restraint alleged in plaintiff's complaint is ancillary to an agreement with a procompetitive effect, the restraint alleged in plaintiff's complaint cannot be deemed unlawful *per se*.  Plaintiff's claim does not rise and fall on *per se* treatment, though.  She claims in the alternative that the restraint is unlawful under quick-look analysis.

The next question, then, is whether plaintiff has plausibly alleged a restraint that might be found unlawful under quick-look analysis.  The Court thinks she has.  Even a person with a rudimentary understanding of economics would understand that if competitors agree not to hire each other's employees, wages for employees will stagnate.  Plaintiff herself experienced the stagnation of her wages.  A supervisor for a competing McDonald's restaurant told plaintiff she would like to hire plaintiff for a position that would be similar to plaintiff's position but that would pay $1.75-2.75 more per hour than she was earning.  Unfortunately for plaintiff, the no-hire agreement prevented the McOpCo from offering plaintiff the job.  When plaintiff asked her current employer to release her, plaintiff was told she was too valuable.  The Court agrees that an employee working for a below-market wage would be extremely valuable to her employer.

*Deslandes*, 2018 WL 3105955 at *6-7.

The Court specifically stated, "Though the Court has concluded that plaintiff has stated a claim for a restraint that might be unlawful under quick-look analysis, the evidence at a later stage may not support it."  *Deslandes*, 2018 WL 3105955 at *8.  Accordingly, the Court gave plaintiff leave to amend to add a claim under the rule of reason.  *Id.*  Plaintiff declined.[3]

Alston

Since that time, the parties have engaged in discovery, and the Supreme Court has clarified when quick-look analysis applies, which is rarely.  In *NCAA v. Alston*, __ U.S. __, 141 S.Ct. 2141 (2021), college athletes brought suit against the NCAA, claiming its agreement with member schools to limit compensation to student athletes amounted to an unlawful restraint of trade in violation of the Sherman Antitrust Act.  The NCAA argued that the court should apply a quick look, but the Supreme Court disagreed.

_____

[3] Likewise, plaintiff Turner failed to state a claim under the rule of reason.  Her complaint is limited to a quick look claim.  [Case No. 19-cv-5524, Docket 1].

A-36

The Supreme Court, in a unanimous decision, first noted that claims regarding restraints of trade "presumptively" call for rule of reason analysis. *Alston*, 141 S.Ct. at 2151. It went on to explain that a quick look suffices:

> *only* for restraints at opposite ends of the competitive spectrum. For those sorts of restraints—rather than restraints in *the great in-between*—a quick look is sufficient for approval or condemnation.

*Alston*, 141 S.Ct. at 2155 (emphasis added). On one end of that spectrum, the Supreme Court explained, are restraints that are "so obviously incapable of harming competition that they require little scrutiny," such as joint ventures commanding such a small share of the market (say, 5-6%) that any reduction in output would be made up by the rest of the market. *Alston*, 141 S.Ct. at 2155-56. On the opposite end of the spectrum are those "agreements among competitors" that "so obviously threaten to reduce output and raise prices that they might be condemned" after a quick look. *Alston*, 141 S.Ct. at 2156. The Supreme Court said such quick-look condemnations should be rare, explaining, "we take special care not to deploy these condemnatory tools until we have amassed 'considerable experience with the type of restraint at issue' and 'can predict with confidence that it would be invalidated in all or almost all instances.'" *Alston*, 141 S.Ct. at 2156 (citing *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 886-887 (2007)).

This case falls in "the great in-between" of restraints that require rule-of-reason analysis. This Court cannot say that it has enough experience with no-hire provisions of franchise agreements to predict with confidence that they must always be condemned, which means, under *Alston*, that the Court must apply rule of reason analysis to this case. The Supreme Court's recent unanimous decision in *Alston* is not, however, the only reason the Court must apply the rule of reason. Two additional reasons support applying the rule of reason.

A-37

*Pro-competitive effects*

First, defendants have put forth sufficient evidence of pro-competitive effects of the

hiring restriction to warrant full rule of reason analysis.  Specifically, defendants put forth the

expert report of Dr. Justin McCrary ("Dr. McCrary"), who holds a Ph.D. in Economics and is a

Professor at Columbia University.[4]  (Plaintiffs do not challenge the admissibility of either Dr.

McCrary's report or the report by Dr. Kevin M. Murphy ("Dr. Murphy"), defendants' other

expert witness.)

Dr. McCrary first describes the benefits of a franchise business model and the free-rider

problem that can be expected with such a model.  Without franchising, an owner of a chain of

restaurants will face several problems in trying to expand quickly.  In addition to needing a

significant amount of capital, the owner might have difficulty ensuring the non-owner manager

of each outlet has an incentive to maximize sales and profits.  This is where the franchise model

can help.  When each outlet is owned and operated by a franchisee, the franchisee's

compensation is "directly tied to *the profits*" of running the outlet.  (McCrary Rep. at ¶ 32).

The franchise model allows for quicker growth of the brand but comes with a free-rider

problem.  As with any brand or trademark, the benefit of the brand to the consumer is the

consistency the consumer can expect each time he makes a purchase from that brand and the

reduced search costs inherent in sticking with what is known.  For such branding to be effective

in a franchise model, each franchisee must be delivering a product and experience that is nearly

identical.  Any given franchisee, however, (and particularly one with an outlet along, say, an

interstate highway that receives few repeat customers) has an incentive to cut corners (either in

---

[4] The Court is not suggesting that this evidence is undisputed or that a fact-finder would find it
persuasive.  The point is merely that in the face of defendants' significant evidence of pro-
competitive effects, a full analysis under the rule of reason, rather than a quick look, is necessary.

A-38

food quality or customer service) in order to boost its own profits. That hurts the brand, because when a customer has a bad experience at one outlet, he might refrain from visiting other outlets in the future. Dr. McCrary describes how franchisors, in order to control the free-rider problem and promote a consistent brand, include in their franchise agreements provisions and restraints to control quality. The franchisor, thus, requires, among other things, a particular level of quality, cleanliness and service. Dr. McCrary argues that these sorts of restrictions are procompetitive, because they strengthen the quality of the brand, thereby encouraging additional franchisees to open outlets and increasing the output of the end product.

Dr. McCrary goes on to describe the exponential growth in the number of McDonald's restaurants after 1955, when Ray Kroc ("Kroc") began including brand restrictions in franchise agreements. Among the restrictions Kroc included were:

> specific requirements related to: the look of the store, the neon sign, and the parking lot; employee appearance, product appearance (containers, bags, napkins, spoons, etc. had to meet . . . specifications); advertising and marketing (all 'signs, cards, notices, displays or decorations' were required to be supplied or approved by McDonald's), product and service quality, operations, and inspections of financial books and operation methods.

(McCrary Rep. at ¶ 67). Kroc also added a royalty payment of 1.9 percent of gross sales and included an employment restriction similar to the one at issue in this case. Specifically, those early franchisees agreed "'not [to] employ or seek to employ any person who is at the time employed' by McDonald's or a 'similar establishment' licensed by McDonald's, i.e., one of McDonald's other franchisees.'" (McCrary Rep. at ¶ 69). After Kroc's changes, McDonald's grew from nine outlets in 1955, to 229 in 1960, to more than 2000 by the early 1970's, to about 6,000 by 1980, and to more than 14,000 today.

Today, McDonald's restaurants are still required to maintain consistency. Franchisees are required to comply with standardized employee uniforms and appearance, hours of operation

and restaurant appearance.  McDonald's has specific rules for menu and food preparation (including the strict procedure for cooking fries), inventory control and bookkeeping. McDonald's restaurants are audited regularly to ensure compliance with the brand standards.

To that end, Dr. McCrary reports, McDonald's also imposes strict training guidelines. Although franchisees make their own hiring and compensation decisions, they are required to follow certain training guidelines.  Each restaurant must be managed by a person who has taken a week-long training class at McDonald's Hamburger University.  Defendant does not charge for that course, but the franchisee must pay the trainee's travel expenses and must also pay the trainee for the time spent there.  In fact, all employees must be paid for all the time they spend training.  Department managers complete about 45 weeks of training, and shift managers take about fourteen weeks of training.  In 2015, McDonald's estimated the cost of training a new manager to be $4,392 and the cost to train a shift manager to be $2,744.  Crew members, too, must learn restaurant maintenance, customer service and how to operate each food preparation station.

Dr. McCrary opines that the hiring restriction encourages franchisees to train their employees without fear that other outlets will free-ride on this training by hiring away employees trained in the McDonald's way.  It also encourages cooperation among franchisees.  For example, franchisees are required to manage their restaurants personally and are required to complete significant training (which can take years if the potential franchisee has no McDonald's experience) before signing a franchise agreement.  That training sometimes involves on-the-job training in an existing franchise restaurant.  Absent the hiring restriction, current franchisees would be reluctant to allow potential franchisees to train in their restaurants for fear they would use the opportunity to recruit employees.

14

A-40

Dr. McCrary opines that the hiring restraint increases output in the hamburger market, because it encourages the very training that enhances the brand (by ensuring uniform food quality, customer service and building cleanliness). Dr. McCrary says his opinion is consistent with labor theory developed by Gary Becker, who noticed that "firms are more willing to invest in training that is specific to their firm because there is a smaller chance they will lose that investment to competing firms." (McCrary Rep. at ¶ 331; *see also* ¶¶ 120-130). The hiring provision makes the training related to the brand specific to the franchisee (rather than just to the brand), because it prevents other outlets from free riding on that training. All that training leads to greater brand consistency, better food quality and customer satisfaction, which is to say a strong brand. (McCrary Rep. at ¶ 145). A strong brand with satisfied customers leads to additional franchise outlets, thereby increasing output of hamburgers and fries. Dr. McCrary cites evidence that many franchisees chose a McDonald's franchise (over other potential branded restaurants) to open, because of the hiring provision. (McCrary Rep. at ¶ 131). That suggests the provision itself was output enhancing in the market for hamburgers and fries. When new outlets open, the outlets must be staffed. Thus, new restaurants also increase output in the labor market (i.e., demand for labor).

Dr. McCrary also opined that it does not make economic sense for McDonald's, as franchisor, to enable its franchisees to act as monopsony purchasers of labor. In simple terms:

> [T]he alleged monopsony conspiracy does not make economic sense for McDonald's because it would lead to a reduction in labor at each franchisee, which would lead [to] a reduction in sales at McDonald's restaurants. Indeed, a basic tenet of franchising economics is that franchisors do not benefit when their franchisees gain market power because franchisees will then sell less of their products, which undermines the brand's growth.

(McCrary Rep. at ¶ 201(a)). To the extent a franchisee is a labor monopsonist, the franchisee would hire less labor (reduce labor output) at a lower price. In the process, the franchisee would

A-41

increase his profit but would be limited in his output of hamburgers, which, in turn reduces revenue. That is because the monopsonist franchisee is still selling into a competitive market for lunch and cannot increase price. His revenue per unit is the same, but he is selling fewer burgers, so his revenue goes down even as his profit goes up. This is good for the franchisee, but it is terrible for the franchisor, who is paid based on franchisees' revenue, not profit. So, while it might be good for the franchisee to be a labor monopsonist, it is terrible for the franchisor, who wants to increase output of hamburgers and fries. The case of McDonald's is slightly different, because it also operates restaurants, the McOpCos. As Dr. McCrary points out, however, defendant's revenue from franchise royalties is far greater than its revenue from operating restaurants.

Defendants have offered enough evidence of procompetitive effects to warrant rule of reason analysis.

### Vertical restraint in many locations

Second, the evidence plaintiffs put forth in connection with their motion for class certification does not show that all of the plaintiffs faced horizontal restraints ancillary to output-enhancing agreements. The reason the Court concluded that the plaintiff had adequately *alleged* a restraint that might be subject to quick look analysis is that plaintiff had alleged a horizontal restraint (albeit one that is ancillary to an output-enhancing agreement) by alleging that McOpCos compete directly with franchisees for labor. "[I]n the market for employees, the McDonald's franchisees and McOpCos *within a locale* are direct, horizontal competitors." *Deslandes*, 2018 WL 3105955 at 8 (emphasis added). In her complaint, plaintiff had alleged a provision of the franchise agreement that prohibited franchisees from hiring McDonald's Corp. employees within six months. That provision is part of a vertical franchise agreement (between

A-42

franchisor and franchisee), but it is also a horizontal agreement because entities (McOpCos) owned by the franchisor (McDonald's Corp.) compete with the franchisees, both in selling hamburgers and in hiring employees.

At the class certification stage, plaintiffs want to certify a nationwide class. They have not, however, put forth evidence that McOpCos compete with franchisees in every part of the United States. Plaintiffs agree that only "5-10%" of the McDonald's restaurants were owned by McOpCos, but they do not say where those McOpCos operated. (Plfs. Brief at 3/Docket 268 at 9). The total number of McDonald's restaurant locations exceeds 14,000. (Docket 299 at 10). Record evidence shows that, as of 2015, only 900 out of 3000 franchisees (many of whom owned multiple locations) operated a McDonald's restaurant near a McOpCo-owned McDonald's restaurant. (King Dep. at 99/Docket 270-14 at 20). Defendants put forth evidence that in many parts (some twenty states) of the United States, no McDonald's restaurants are owned by McOpCos. (Murphy Rep. at p. 10). In locations where no McOpCos compete with franchisees, the hiring provision cannot be said to be horizontal.[5] In locations where only franchisees compete, the hiring provision is merely vertical. Vertical restraints are judged under the rule of reason. *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 907 (2007).

For all of these reasons, the Court must apply rule of reason analysis to this case. The upshot of applying rule of reason analysis to this case is that the question of whether defendants engaged in an unreasonable restraint of trade is not a common question. It cannot be answered

---

[5] Plaintiffs also put forth evidence that, in 2015, the McOpCos, after raising their starting wages by $1 per hour, decided not to hire employees from franchisees for a period of one year. Whether that constituted a unilateral act or a horizontal agreement in connection with a vertical relationship is not clear from the evidence. Even if it is the latter, it still would be horizontal only where McOpCos compete with franchisees, not nationwide.

17

A-43

for all of the members of the proposed class with the same evidence, because not all of the

plaintiffs sold their services in the same relevant market.

      *Relevant market*

      Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, "outlaw[s] only *unreasonable*

restraints" of trade. *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997) (emphasis added). The rule of

reason, thus,:

> requires courts to conduct a fact-specific assessment of 'market power and market
> structure . . . to assess the [restraint]'s actual effect' on competition. The goal is
> to 'distinguis[h] between restraints with anticompetitive effect that are harmful to
> the consumer and restraints stimulating competition that are in the consumer's
> best interest.'

*Ohio v. American Express Co.*, __ U.S. __, 138 S.Ct. 2274, 2284 (2018) (citations omitted). To

establish a claim under the rule of reason, a plaintiff must first "prove that the challenged

restraint has a substantial anticompetitive effect that harms consumers *in the relevant market*" by

either using "[d]irect evidence" of "actual detrimental effects . . . such as reduced output,

increased prices, or decreased quality in the *relevant market*" or "[i]ndirect evidence" of "proof

of market power plus some evidence that the challenged restraint harms competition." *AmEx*,

138 S.Ct. at 2284 (emphasis added). The burden then shifts to the defendant "to show a

procompetitive rationale for the restraint." *AmEx*, 138 S.Ct. at 2284. Finally, the "burden shifts

back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably

achieved through less anticompetitive means." *AmEx*, 138 S.Ct. at 2284.

      Thus, the definition of a relevant market is essential on a rule of reason claim. *AmEx*,

138 S.Ct. at 2285 ("courts usually cannot properly apply the rule of reason without an accurate

definition of the relevant market"); *Alston*, 141 S.Ct. at 2158 ("Whether an antitrust violation

exists necessarily depends on a careful analysis of market realities."). How precisely that

relevant market must be defined depends on whether the alleged restraint is vertical or

horizontal.  In the case of vertical restraints, a relevant market must always be defined.  *AmEx*,

138 S.Ct. at 2285 n. 7.  That is because "[v]ertical restraints often pose no risk to competition

unless the entity imposing them has market power, which cannot be evaluated unless the Court

first defines the relevant market."  *AmEx*, 138 S.Ct. at 2285 n. 7; *see also Republic Tobacco Co.

v. North Atlantic Trading Co., Inc.*, 381 F.3d 717, 737 (7th Cir. 2004) ("As horizontal

agreements are generally more suspect than vertical agreements, we must be cautious about

importing relaxed standards of proof from horizontal agreement cases into vertical agreement

cases.").  In some cases of horizontal restraint, the definition of the market can be somewhat less

precise, although the general contours of the market must be apparent.  *AmEx*, 138 S.Ct. at 2285

n. 7 ("Given that horizontal restraints involve agreements between competitors not to compete in

some way, this Court concluded that it did not need to precisely define the relevant market to

conclude that these agreements were anticompetitive.") (citing *FTC v. Indiana Federation of

Dentists*, 476 U.S. 447, 460-61 (1986)).  In *Indiana Federation of Dentists*, the Supreme Court

did not require a precise definition of the relevant market, where it was clear the competitors had

100% of the market in one town and 67% in the other, "in light of the reality that markets for

dental services tend to be relatively localized[.]" 476 U.S. at 460-61.  In other words, "if a

plaintiff *can show the rough contours of a relevant market*, and show that the defendant

commands a substantial share of the market, then direct evidence of anticompetitive effects can

establish the defendant's market power—in lieu of the usual showing of a precisely defined

relevant market."  *Republic Tobacco*, 381 F.3d at 737 (emphasis added) ("Economic analysis is

virtually meaningless if it is entirely unmoored from at least a rough definition of a product and

geographic market.").

Plaintiffs have made no attempt to identify a relevant market, beyond arguing that "the 'rough contours' are the service market for McDonald's restaurant workers," (Plfs. Reply at 3/Docket 346 at 10) as though a relevant market could be limited to one brand or as though all the plaintiffs live in one "company town." The evidence plaintiffs have put forth in an attempt to establish anticompetitive effects *assumes* that plaintiffs sell their labor in one national market, as does their proposed class definition.

Plaintiffs have not, however, put forth evidence that they sell their labor in a national market, and it defies logic to suppose that they do. *See* Ioana Marinescu & Herbert Hovencamp, "Anticompetitive Mergers in Labor Markets" 94 *Indiana Law Journal* 1031, 1048 ("The boundaries of labor markets are driven mainly by employee skills or training. Geographic markets are driven mainly by the location and mobility of current or prospective employees. . . . [A]pplications for a job decline rapidly with distance[.] . . . Traditional geographic markets for products are frequently defined in terms of shipping costs . . . Measuring geographic markets for labor is more complex. Commuting 'costs' include not merely the price of a subway ticket or gasoline, but also time and convenience, and these things frequently vary from one commuter to another."); *see also* Herbert J. Hovencamp, "Competition Policy for Labour Markets" (2019) *Faculty Scholarship at Penn Law.* 2090 at ¶ 12 ("most labour markets are geographically quite small, many of them no larger than the commuting range of employees.").

The Court has no doubt that national labor markets exist for certain jobs. The market for Chief Executive Officers is an obvious example. In the market for Chief Executive Officers, companies recruit nationally (or internationally), pay for the new hire to relocate and sometimes allow (or require) her to commute home via the company's private jet until she relocates. Likely, there are many other high-skill, high-earning jobs (such as dermatologist or computer engineer)

A-46

for which the relevant market is essentially national or regional.  That could be true in any labor market where positions are so highly-skilled or highly-paid that employers can recruit from across the nation, because the labor is worth enough to the employer to pay for relocation and/or the salary is sufficiently high to incentivize an employee to move.  That is not, however, the market in which these plaintiffs offer their services.  As this Court has previously said about the markets in which plaintiffs sell their labor:

> The relevant market for employees to do the type of work alleged in this case is likely to cover a relatively-small geographic area.  Most employees who hold low-skill retail or restaurant jobs are looking for a position in the geographic area in which they already live and work, not a position requiring a long commute or a move.  That is not to say that people do not move for other reasons and then attempt to find a low-skill job; the point is merely that most people do not search long distances for a low-skill job with the idea of then moving closer to the job.

*Deslandes*, 2018 WL 3105955 at *8.  Even looking at the rough contours of the relevant markets in which plaintiffs sell their labor suggests there are hundreds or thousands of local relevant markets in this case.

The evidence put forth at the class certification stage bears out the intuition that the proposed class members sell their labor in local geographic markets, generally within easy commuting distance.  Defendants, for example, put forth evidence of McOpCos in Kearney, Nebraska that, in 2015, sought approval to increase starting wages from $9.00 per hour due to competition from local employers (which they listed as Arby's, KFC, Taco Bell, HyVee, Walmart, Hotels, Qdoba, Jimmy Johns, Applebees, Buffalo Wild Wings, Perkins, Burger King, Culvers and The Buckle), many of whom paid $10 per hour.  (Docket 310-4 at 10-12).  Defendants put forth evidence of franchisees' declaring that they compete for employees with local employers.  [Docket 310-12 at 5 ("We sometimes offer raises to retain employees sought by other local employers, including quick-service restaurants like Wendy's and retail stores like

A-47

Wal-Mart, among many others."); Docket 310-12 at 14 ("The McDonald's stores I oversee [in

Orlando] compete for employees with the theme parks nearby, such as Disney and Universal, as

well as Culver's, Wendy's, Chipotle, and other retail establishments."); Docket 310-12 at 21-22

("The main competitors for labor in the Jacksonville market are the other quick service

restaurants in the vicinity of our restaurants.  Comparatively, the main competitors for labor in

the Orlando market are the other quick service restaurants, as well as theme parks, Wal-Mart,

Sam's Club, and Costco. . . . [W]e have offered raises to retain employees sought by other local

employers.  These employers include other quick-service restaurants, such as Krystals,

LongHorn Steakhouses, KFCs, Papa John's, Panera Breads, Starbucks, Chick-fil-A's, Burger

Kings, Little Caesars, Panda Expresses, Wendy's, and Fire House Subs—all of which (among

others) are located throughout Jacksonville near the restaurants operated by [us]."); Docket 310-

12 at 29 & 31 ("The main competitors for both workforce and customers to my McDonald's-

brand restaurants in the Northern Kentucky region are other quick service restaurants such as

Wendy's and Burger King."  . . .  "The turnover rate for my restaurants at the hourly crew person

level is 139%.  Most of the employees who leave fall into three categories:  1) Looking for a

more specific shift (9:00 a.m. to 5:00 p.m. and/or no weekend shifts); 2) the company can

provide more hours then we can; or 3) increased pay.  For example, the local Amazon

distribution center offers higher pay and more consistent weekly hours.")].

    The expert opinions are consistent with that evidence.  Even Dr. Peter Capelli ("Dr.

Capelli"), one of plaintiffs' experts, recognized that crew members likely sell their labor in local

markets.  (Capelli Dep. at 235-36/Docket 302-1 at 608-09) ("My testimony is that for the

restaurant employees in particular, the crew employees, there may be labor markets of different

geographic size and that the key issue there might not even be size, it might be commuting

distance."). Dr. McCrary said something similar. (McCrary Rep. at ¶ 288) ("McDonald's

franchisees also report surveying competitors *in their geographic location* in order to set market-

driven wages.") (emphasis added). Dr. Murphy, defendants' other expert (the admissibility of

whose report plaintiffs did not challenge), similarly opined:

> For low-skilled and relatively low-wage workers, such as the majority of those in
> the putative class, evidence suggests that labor markets generally are local.
> Commuting time and costs likely are too high for distant employers to be
> reasonable alternatives for most employees. There are certain fixed time and
> monetary costs of relocating (finding a new place to live, moving children into
> new schools) and those costs likely are relatively high the lower the expected
> increased earnings from relocating. Given average wages at [quick service
> restaurants], and other employers that individual McDonald's restaurants consider
> to be their competitors, it is unlikely that employees will seek opportunities more
> than a few miles from where they reside.

(Dr. Murphy Rep. at ¶ 109). Dr. Hal J. Singer ("Dr. Singer"), plaintiffs' expert, calculated that

only 8% of McDonald's employees commute ten or more miles to work. (Singer Rep. at ¶

64/Docket 270-5 at 54). Thus, about 92% of McDonald's employees work within ten miles of

home. The relevant market for each plaintiff's labor is a small, geographic area. There are likely

hundreds or thousands of relevant markets among the class members.

Any given plaintiff can establish that the restraint is anticompetitive only by showing

anticompetitive effects in the relevant market where she sells her labor. Those markets vary by

plaintiff, which means this is not a question that can be answered with common evidence. It is

simply not a question that is common to a nationwide class. To be sure, this might be a common

question as to the subset of plaintiffs who work in each of the respective relevant markets across

the country. For example, this is likely a common question as to every plaintiff in the relevant

market of, say, the Chicago Loop (which relevant market perhaps includes areas within a mile or

two radius thereof). It is not, however, a common question as to the nationwide class these

plaintiffs ask to certify. Plaintiffs do not seek to certify smaller subclasses.

23

A-49

The issue of anticompetitive effects in relevant markets will predominate. It will undoubtedly be true that in some relevant markets, McDonald's restaurants will have so many competitors for labor that the restraint will have no anticompetitive effect. In other markets, McOpCos and franchisees may have so little outside competition for employees that the restraint will impact the market. The anticompetitive effects of the restraint will have to be judged separately for each of the hundreds (or thousands) of relevant markets, and that will be the predominant issue, especially if, as plaintiffs assert, antitrust impact is a common question (an issue this Court need not address).[6]

The proposed class does not meet the predominance requirement of Rule 23(b).

### 3.    Adequacy

Rule 23(a)'s requirement that "the representative parties will fairly and adequately protect the interests of the class," has two components: the adequacy of the named plaintiffs and

---

[6] Because the Court has determined that the question of whether the restraint caused anticompetitive effects in the hundreds (or thousands) of relevant markets will predominate, the Court need not consider whether the question of antitrust impact is a common question. (It is difficult, though, to imagine that it could be a common question, as opposed to a question that would need to be answered separately for each relevant market. Each person's injury is the amount his or her wages were suppressed multiplied by the hours worked. The amount each person's wages are suppressed will almost certainly vary depending on the amount of labor market power McDonald's possessed in each relevant market. *See, e.g. State of Ala. v. Blue Bird Body Co., Inc.*, 573 F.2d 309, 327-28 (5th Cir. 1978) ("This proof of injury in a price-fixing case will generally consist of some showing by the plaintiff that, as a result of this conspiracy, he had to pay supracompetitive prices for school buses. . . . [W]e do not understand how the plaintiffs can make this proof without examining the relevant school bus market where each individual plaintiff is located.").) Because the Court need not consider whether impact is a common question, the Court need not decide whether to exclude the report and testimony of plaintiff's expert, Dr. Singer. *See Messner*, 669 F.3d at 812 ("When an expert's report or testimony is 'critical to class certification,' we have held that a district court must make a conclusive ruling on any challenge to that expert's qualifications or submissions before it may rule on a motion for class certification."). Here, the outcome of this motion is the same with or without Dr. Singer's report and testimony. The same is true as to the report and testimony of Dr. Capelli.

A-50

the adequacy of proposed class counsel.  *See Gomez v. St. Vincent Health, Inc.*, 649 F.3d 583,

592 (7th Cir. 2011) (citations omitted).

> One of the reasons why courts insist that class counsel be adequate is:

> the incentive of class counsel, in complicity with the defendant's counsel, to sell
> out the class by agreeing with the defendant to recommend that the judge approve
> a settlement involving a meager recovery for the class but generous compensation
> for the lawyers[.]

*Creative Montessori Learning Centers v. Ashford Gear LLC*, 662 F.3d 913, 918 (7th Cir. 2011).

The Seventh Circuit recognizes:

> There is . . . a much greater conflict of interest between the members of the class
> and the class lawyers than there is between an individual client and his lawyer.
> The class members are interested in relief for the class but the lawyers are
> interested in their fees, and the class members' stakes in the litigation are too
> small to motivate them to supervise the lawyers in an effort to make sure that the
> lawyers will act in their best interests.

*Thorogood v. Sears, Roebuck and Co.*, 547 F.3d 742, 744 (7th Cir. 2008) (citations omitted).

That is of "particular significance" where class members "lack both the monetary stake and the

sophistication in legal and commercial matters that would motivate and enable them to monitor

the efforts of class counsel on their behalf."  *Creative Montessori*, 662 F.3d at 917.

Accordingly, "[a]nything 'pertinent to counsel's ability to fairly and adequately represent

the class,'" bears "on the class certification decision."  *Reliable Money Order, Inc. v. McKnight

Sales Co., Inc.*, 704 F.3d 489, 498 (7th Cir. 2013) (citations omitted).  Among other things, a

court "must . . . consider counsel's work on the case to date."  *Reliable Money Order*, 704 F.3d

at 498 n. 7; *see also Nagel v. ADM Investor Services, Inc.*, 65 F. Supp.2d 740, 746 (N.D. Ill.

1999) (Easterbrook, J.) ("One important part of a judge's job under Rule 23 is to protect putative

class members from self-appointed champions whose work is not up to snuff.").

A-51

Even were it not the case that individual issues will predominate, the Court would be hesitant to certify the proposed class. One unusual aspect of this case is that, while plaintiffs cannot prevail as class, they could lose as one. That owes to the fact that counsel for the named plaintiff made a strategic decision early in this case not to amend the complaint to add a claim under the rule of reason. If the Court certified a nationwide class (which, again, would not be appropriate for the reasons outlined above), it would be to the great detriment of the class. The class members would lose on a rule-of-reason claim, because their attorneys waived it.[7] Dr. Singer, plaintiffs' expert, calculated aggregate class damages at $2.74 billion. (Singer Rep. at ¶ 5/Docket 270-5 at 9). It is no surprise, then, that attorneys might take a shot at a nationwide-class jackpot (of which they might hope to collect a third, which is about $913,000,000.00) rather than propose a small, local class under the rule of reason. The reward to any given plaintiff would likely be quite similar whether he proceeded as part of a small, local class or a massive nationwide class. Only the lawyers had something to gain by foregoing a claim under the rule of reason, which makes one wonder whether the attorneys were looking out mostly for themselves when they chose not to amend to add a claim under the rule of reason. Perhaps these attorneys took a gamble, choosing not to pursue a rule-of-reason claim in the hopes of the huge reward of certifying a nationwide class under quick-look analysis. Such a self-interested decision would not instill confidence that the attorneys would adequately represent the class.

---

[7] One might think this would have prompted defendants to consent to certification of a class, such that they could win with one fell swoop. *Thomas v. UBS AG*, 706 F.3d 846, 850 (7th Cir. 2013) ("[Defendant] opposed [class] certification even though a defendant with a winning case has much to gain from it—the judgment for a defendant will be *res judicata* in any suit by a class member who had not opted out of the class, provided 'that the named plaintiff at all times adequately represent the interests of absent class members.'") (citation omitted). Perhaps defendants assume most plaintiffs will opt out of a doomed-to-fail class. In any case, defendants do not want a nationwide class certified, and they will get their wish.

A-52

This case will not proceed as a class action.[8]  When plaintiff filed her complaint, it "toll[ed] the applicable statute of limitations for all persons encompassed by the class complaint."  *China Agritech, Inc. v. Resh*, __ U.S. __, 138 S.Ct. 1800, 1804 (2018) (citing *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974)); *see also Collins v. Village of Palatine, Ill.*, 875 F.3d 839, 843 (7th Cir. 2017) ("the filing of a proposed class action immediately pauses the running of the statute of limitations for all class members.").  Each class member remains free to pursue his or her own claim.  *China Agritech*, 138 S.Ct. at 1810.

## III.    CONCLUSION

For all of these reasons, plaintiffs' motions [268, 269] for class certification are denied. Defendants' *Daubert* motions [301, 307] to exclude the expert testimony of Dr. Singer are denied (without prejudice) as moot, and defendants' *Daubert* motions [300, 304] to exclude the expert testimony of Dr. Capelli are denied (without prejudice) as moot.  Plaintiff's unopposed motion [288] to file supplemental expert report is granted.  Defendants' motion to [348] file surreply is granted.

---

[8] The problems discussed above are not the only problems with the proposed class definition.  As defendants point out, the proposed class is overly broad in that it contains individuals who could not have been injured by the alleged wrongful conduct.  "[I]f the [class] definition is so broad that it sweeps within it persons who could not have been injured by the defendant's conduct, it is too broad."  *Kohen v. Pacific Inv. Mgt. Co., LLC*, 571 F.3d 672, 677 (7th Cir. 2009); *Messner*, 669 F.3d at 824 ("If, however, a class is defined so broadly as to include a great number of members who for some reason could not have been harmed by the defendant's allegedly unlawful conduct, the class is defined too broadly to permit certification.").  Here, plaintiffs challenge a hiring restriction that applies only to current employees or employees who have left in the past six months.  It can have no effect on new hires or on employees within the first few weeks of work.  More than 2% of new hires leave within two weeks.  More than 11% leave within a month.  More than 20% leave within two months.  (Figure 12 of Dr. Murphy Rep. at p. 67).  It is clear the proposed class definition was too broad, but the Court need not decide by what degree.

A-53

This case is set for status hearing on October 5, 2021 at 9:30 a.m.

**SO ORDERED.**                                    **ENTERED: July 28, 2021**

_____
**HON. JORGE ALONSO**
**United States District Judge**

28

A-54

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LEINANI DESLANDES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 17 C 4857 |
| | ) | |
| v. | ) | |
| | ) | Judge Jorge L. Alonso |
| McDONALD'S USA, LLC, | ) | |
| McDONALD'S CORPORATION, and | ) | |
| DOES 1 through 10, | ) | |
| | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| STEPHANIE TURNER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 19 C 5524 |
| | ) | |
| v. | ) | |
| | ) | Judge Jorge L. Alonso |
| McDONALD'S USA, LLC, and | ) | |
| McDONALD'S CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

After a hiring restriction prevented plaintiff Leinani Deslandes ("Deslandes") from taking

a better-paying position with a rival McDonald's outlet, she filed this suit seeking relief under

Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.  Stephanie Turner ("Turner") filed a

related suit, 19-cv-5524, which is consolidated with this one.  Defendants have filed a motion for

judgment on the pleadings or, in the alternative, for summary judgment.  Plaintiffs, too, have

filed a motion for summary judgment.[1]  For the reasons set forth below, plaintiffs' motion is

denied.  Defendants' motion is granted in part and denied in part.

I.      BACKGROUND

In 2017, Deslandes filed a three-count amended complaint challenging a no-hire

provision in McDonald's franchise agreements.  In Count I, Deslandes asserted that the no-hire

provision was an unlawful restraint of trade under Section 1 of the Sherman Antitrust Act.[2]  In

her amended complaint (familiarity with which is assumed), plaintiff alleged that the two

defendants (McDonald's Corporation and its wholly-owned subsidiary McDonald's USA, LLC)

served as the franchisor for the ubiquitous McDonald's restaurants.  (Plaintiffs usually refer to

the two defendants collectively as McDonald's, and the Court does, as well.)

Deslandes also alleged that each franchisee signed a franchise agreement that contained a

no-hire restriction, which read:

> Franchisee shall not employ or seek to employ any person who is at the time
> employed by McDonald's, any of its subsidiaries, or by any person who is at the
> time operating a McDonald's restaurant or otherwise induce, directly or
> indirectly, such person to leave such employment.  This paragraph [] shall not be
> violated if such person has left the employ of any of the foregoing parties for a
> period in excess of six (6) months.

(Am. Complt. ¶ 87).  Plaintiff further alleged that, although many McDonald's restaurants were

owned and operated by franchisees, many other McDonald's restaurants were owned and

operated by subsidiaries of defendant McDonald's Corporation.  The parties refer to the

restaurants owned by McDonald's Corporation as McOpCos.  Deslandes alleged that the

McOpCos competed directly with restaurants owned by franchisees.

---

[1] Although the parties intend for the motions to apply to both cases, they are filed on the docket
of the Deslandes case.

[2] The other two counts were previously dismissed with prejudice.

A-56

In her amended complaint, Deslandes styled her Sherman Act claim as a restraint that is unlawful either *per se* or under quick-look analysis. Defendants disagreed and filed a motion to dismiss. In their motion to dismiss, defendants argued that the restraint was most appropriately analyzed under the rule of reason, such that plaintiff, in order to state a plausible claim, was required to include in her complaint allegations of market power in the relevant market. Deslandes had not included such allegations.

In ruling on the motion to dismiss, the Court concluded that Deslandes had stated a claim for a restraint that might be unlawful under quick-look analysis. *Deslandes v. McDonald's USA, LLC*, Case No. 17-cv-4847, 2018 WL 3105955 at *8 (N.D. Ill. June 25, 2018) ("*Deslandes I*"). (Familiarity with that decision is assumed.) The Court reasoned that plaintiff, by alleging that the McOpCos compete directly with the franchisees, had adequately alleged a horizontal restraint, because the restraint prevented defendants' competitors (the franchisees) from hiring defendants' employees. *Deslandes I*, 2018 WL 3105955 at *6. The Court further concluded that the alleged restraint could not be illegal *per se*, because it was ancillary to an output-enhancing agreement, namely the franchise agreement itself, which increased output of burgers and fries. *Deslandes I*, 2018 WL 3105955 at *7.

In denying the motion to dismiss and allowing plaintiff's claim to proceed on the theory that the alleged restraint might be unlawful under a quick look, the Court gave plaintiff an explicit but time-limited opportunity to amend her complaint to add allegations that would support the finding of an unlawful restraint under the rule of reason. Specifically, the Court said:

> Though the Court has concluded that plaintiff has stated a claim for a restraint that might be unlawful under quick-look analysis, the evidence at a later stage may not support it. *As defendants have pointed out, plaintiff has not attempted to plead a claim under the rule of reason.* This is perhaps unsurprising. To state a claim under the rule of reason, a plaintiff must allege market power in a relevant market. The relevant market for employees to do the type of work

3

A-57

alleged in this case is likely to cover a relatively-small geographic area. Most employees who hold low-skill retail or restaurant jobs are looking for a position in the geographic area in which they already live and work, not a position requiring a long commute or a move. That is not to say that people do not move for other reasons and then attempt to find a low-skill job; the point is merely that most people do not search long distances for a low-skill job with the idea of then moving closer to the job. Plaintiff, though, seeks to represent a nationwide class, and allegations of a large number of geographically-small relevant markets might cut against class certification. *Nonetheless, if plaintiff decides she would like to include a claim under the rule of reason, she has leave to amend, but she must do so soon, within 28 days.*

*Deslandes I*, 2018 WL 3105955 at *8. (emphasis added). Deslandes chose not to amend.

The parties proceeded with discovery, and, eventually, plaintiffs Deslandes and Turner (who had, by that time, filed a similar suit that was consolidated with this one) moved to certify a nationwide class of persons who were employed by a McDonald's restaurant during a five-year period. This Court denied the motion for class certification. *Deslandes v. McDonald's USA, LLC*, Case No. 17 C 4857, 2021 WL 3187668 (N.D. Ill. July 28, 2021) ("*Deslandes II*"). (Familiarity with that decision is assumed.)

The primary reason why the Court denied class certification was its conclusion that individual issues would predominate. That conclusion stemmed from the conclusion that the restraint in this case would have to be judged under the rule of reason, which meant each plaintiff would need to establish that the restraint was anticompetitive in the relevant market in which she sold her labor. This Court explained in great detail its reasons for concluding that rule-of-reason analysis would apply. *Deslandes II*, 2021 WL 3187668 at *7-11. Those reasons included that the Supreme Court had recently decided, in a unanimous decision, that claims regarding restraints of trade "presumptively" call for rule-of-reason analysis. *Deslandes II*, 2021 WL 3187668 at *7 (citing *NCAA v. Alston*, __ U.S. __, 141 S.Ct. 2141 (2021)). Next, the Court explained that in many parts of the country (some twenty states), the no-hire agreement was only

4

A-58

a vertical agreement between franchisor and franchisee, because, in those areas, no McOpCos

competed with franchisee restaurants. *Deslandes II*, 2021 WL 3187668 at *10. Vertical

agreements are judged under the rule of reason. *Leegin Creative Leather Products, Inc. v. PSKS,*

*Inc.*, 551 U.S. 877, 907 (2007). Finally, defendants had put forth sufficient evidence of

procompetitive effects to warrant consideration of the restraint under the rule of reason.

*Deslandes II*, 2021 WL 3187668 at *8-10.

Because this Court denied class certification, this case is not a class action. What

remains of this case are the individual claims of two plaintiffs, Deslandes and Turner. Each

seeks relief under the Sherman Act for alleged reduced wages resulting from the no-hire

restriction.

Before the Court is defendants' motion for judgment on the pleadings, or, in the

alternative, summary judgment. As defendants point out, neither Deslandes nor Turner ever

included in her respective complaint a plausible claim under the rule of reason, which is to say

neither ever alleged a relevant market within which defendants have market power to suppress

wages. Plaintiffs, too, have filed a motion for summary judgment.

The following facts are undisputed unless otherwise noted.[3]

---

[3] Local Rule 56.1 outlines the requirements for the introduction of facts parties would like
considered in connection with a motion for summary judgment. The Court enforces Local Rule
56.1 strictly. *See FTC v. Bay Area Business Council, Inc.*, 423 F.3d 627, 633 (7th Cir. 2005)
("Because of the important function local rules like Rule 56.1 serve in organizing the evidence
and identifying disputed facts, we have consistently upheld the district court's discretion to
require strict compliance with those rules."). At the summary judgment stage, a party cannot
rely on allegations; she or it must put forth evidence. Fed.R.Civ.P. 56(c)(1)(A); *see also Grant v.
Trustees of Indiana Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) ("As the 'put up or shut up'
moment in a lawsuit,' summary judgment requires a non-moving party to respond to the moving
party's properly-supported motion by identifying specific, admissible evidence showing that
there is a genuine dispute of material fact for trial."). Where one party supports a fact with
admissible evidence (i.e., not complaint allegations) and the other party fails to controvert the
fact with citation to admissible evidence (i.e., not complaint allegations), the Court deems the

A-59

Deslandes, at some point (the parties do not say when) was employed by a franchisee in a McDonald's restaurant in Apopka, Florida, near Orlando. Within three miles of Deslandes's home were two McDonald's restaurants and between 42 and 50 other quick-service restaurants. Within ten miles of Deslandes's home were 517 quick-service restaurants.

Turner was employed, at some point (the parties do not say when), by a McOpCo in Covington, Kentucky. She was also employed, at some point (the parties do not say when), by a franchisee to work in McDonald's restaurants located in Florence, Hebron and Erlander, Kentucky. Within ten miles of Turner's home were 253 quick-serve restaurants.

## II.    STANDARD

A motion for judgment on the pleadings "is subject to the same standard as a motion to dismiss under Rule 12(b)(6)." *Gill v. City of Milwaukee*, 850 F.3d 335, 339 (7th Cir. 2017). Thus, the question is whether a plaintiff's complaint states a claim that is plausible on its face, meaning it "allows the court to draw the reasonable inference that defendant is liable for the misconduct alleged." *Gill*, 850 F.3d at 339 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). When considering a motion for summary judgment, the Court must construe the evidence and make all reasonable inferences in favor of the non-moving party. *Hutchison v. Fitzgerald Equip. Co., Inc.*, 910 F.3d 1016, 1021 (7th Cir. 2018). Summary judgment is appropriate when

---

fact admitted. *See Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 218-19 (7th Cir. 2015); *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817-18 (7th Cir. 2004). This does not, however, absolve the party putting forth the fact of the duty to support the fact with admissible evidence. *See Keeton v. Morningstar, Inc.*, 667 F.3d 877, 880 (7th Cir. 2012).

A-60

the non-moving party "fails to make a showing sufficient to establish the existence of an element

essential to the party's case and on which that party will bear the burden of proof at trial."

*Celotex v. Catrett*, 477 U.S. 317, 322 (1986).  "A genuine issue of material fact arises only if

sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for

that party."  *Brummett v. Sinclair Broadcast Group, Inc.*, 414 F.3d 686, 692 (7th Cir. 2005).

### III.     DISCUSSION

> #### A.       Motion for judgment on the pleadings

Defendants' theory as to why they are entitled to judgment on the pleadings is that the

Court has already determined that this case must be analyzed under the rule of reason, and

neither plaintiff included in her respective complaint allegations that plausibly suggest the

restraint would be unlawful under rule-of-reason analysis.  Specifically, neither Deslandes nor

Turner alleged in her respective complaint the relevant market in which she sold her labor or that

McDonald's had market power in that relevant market.  Such allegations are necessary to state a

plausible claim that a restraint is unlawful under the rule of reason.  *Agnew v. National*

*Collegiate Athletic Ass'n*, 683 F.3d 328, 347 (7th Cir. 2012) (affirming dismissal of rule-of-

reason claim where plaintiff failed to allege that defendant had market power within a relevant

market); *see also Deslandes II*, 2021 WL 3187668 at *11 (describing the importance of defining

a relevant market in vertical and horizontal restraint cases).  In *Agnew*, the Seventh Circuit

explained:

> Under a Rule of Reason analysis, the plaintiff carries the burden of showing that
> an agreement or contract has an anticompetitive effect on a given market within a
> given geographic area.  As a threshold matter, a plaintiff must show that the
> defendant has market power—that is, the ability to raise prices significantly
> without going out of business—without which the defendant could not cause
> anticompetitive effects on market pricing.

*Agnew*, 683 F.3d at 335 (internal citation omitted).

A-61

When this Court concluded that the restraint at issue must be judged under the rule of reason, it considered information outside the pleadings.  The conclusion, however, is the same based solely on the pleadings.  "[A]ntitrust courts must give wide berth to business judgments before finding liability."  *Alston*, 141 S.Ct. at 2163.  Deslandes's and Turner's claims "presumptively" call for rule-of-reason analysis.  *Alston*, 141 S.Ct. at 2151 ("Determining whether a restraint is undue for purposes of the Sherman Act 'presumptively' calls for what we have described as 'rule of reason analysis.'").

In *Alston*, the Supreme Court explained that a quick look suffices:

> *only* for restraints at opposite ends of the competitive spectrum.  For those sorts of restraints—rather than restraints in *the great in-between*—a quick look is sufficient for approval or condemnation.

*Alston*, 141 S.Ct. at 2155 (emphasis added).  On one end of that spectrum, the Supreme Court explained, are restraints that are "so obviously incapable of harming competition that they require little scrutiny," such as joint ventures commanding such a small share of the market (say, 5-6%) that any reduction in output would be made up by the rest of the market.  *Alston*, 141 S.Ct. at 2155-56.  On the opposite end of the spectrum are those "agreements among competitors" that "so obviously threaten to reduce output and raise prices that they might be condemned" after a quick look.  *Alston*, 141 S.Ct. at 2156.  The Supreme Court said such quick-look condemnations should be rare, explaining, "we take special care not to deploy these condemnatory tools until we have amassed 'considerable experience with the type of restraint at issue' and 'can predict with confidence that it would be invalidated in all or almost all instances.'"  *Alston*, 141 S.Ct. at 2156 (citing *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 886-887 (2007)).  The restraint at issue in this case falls in "the great in-between" of restraints that require rule-of-reason analysis.  This Court cannot say that it has enough experience with no-hire provisions of

A-62

franchise agreements to predict with confidence that they must always be condemned, which means, under *Alston*, that the Court must apply rule-of-reason analysis to this case.

Accordingly, the Court also rejects Turner's and Deslandes's argument that the alleged restraint is unlawful *per se*. *Per se* treatment is outside quick-look treatment on either end of the spectrum and is, thus, even more rare than quick-look analysis. This Court previously rejected, at the motion-to-dismiss stage, the idea that Deslandes had alleged a restraint that was unlawful *per se*. *Deslandes I*, 2018 WL 3105955 at *7. The alleged restraint was specifically alleged to be part of a franchise agreement, which is to say it was ancillary to an agreement that was output enhancing in the market for fast food. Thus, though the restraint as alleged in the plaintiffs' respective complaints had horizontal elements (in that the franchisees competed with the franchisor for labor), the restraint is not *per se* unlawful because it "may contribute to the success of a cooperative venture that promises greater productivity and output." *Polk Bros., Inc. v. Forest City Enterprises, Inc.*, 776 F.2d 185, 189 (7th Cir. 1985). Such restraints are judged under the rule of reason. *Polk Bros.*, 776 F.2d at 188-89 ("A court must distinguish between 'naked' restraints, those in which the restriction on competition is unaccompanied by new production or products, and 'ancillary' restraints, those that are part of a larger endeavor whose success they promote.").[4] The restraint plaintiffs allege must be judged under the rule of reason.

---

[4] The restraint alleged by Deslandes and Turner is similar to dual distribution, where a "manufacturer simultaneously sells to independent dealers and to those who might otherwise be customers of those dealers." Phillip E. Areeda & Herbert Hovencamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1605a (4th and 5th Editions, 2015-2021). Such arrangements are generally judged under the rule of reason, because the restraints generally "serve legitimate purposes without harming market competition." *Id.* ¶ 1605c ("The manufacturer's own presence at the dealer level in no way alters its strategy for profit maximization. That presence would not induce it to impose restraints that reward dealers with excess profits, because such profits necessarily reduce its own manufacturer-level profits."); *see also Krehl v. Baskin-Robbins Ice Cream Co.*, 664 F.2d 1348, 1357 (9th Cir. 1982) ("dual distribution systems must be evaluated under the traditional rule of reason standard").

Next, plaintiffs argue that they were not required to amend their complaints to add rule-of-reason allegations, because they need not plead legal theories. Plaintiffs are correct that "[f]ederal pleading rules . . . do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. Shelby*, 574 U.S. 10, 11 (2014). That does not, however, absolve either of these plaintiffs of the obligation to "plead facts sufficient to show that her claim has substantive plausibility." *Johnson*, 574 U.S. at 12 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)). In other words, this Court would not dismiss either plaintiff's antitrust claim for failing to include the words "rule of reason" in her respective complaint. The Court can, however, dismiss such a claim for failure to include allegations of market power in a relevant market, because those are the facts necessary to render plausible a claim that a restraint is unlawful under rule-of-reason analysis. Deslandes and Turner failed to include such facts.

Nor are plaintiffs saved by their suggestion that employment by McDonald's restaurants constitutes a market all its own, separate from the market for employment by other quick-serve restaurants. Plaintiffs could have sold their labor to other customers. As the Seventh Circuit has explained:

> Suppose that a well-conducted survey shows that vanilla is people's favorite flavor of ice cream, and by a large margin. It would not follow that vanilla ice cream is a separate market, because if its price rises any other ice cream producer could make more vanilla and less chocolate or pistachio. For a closely related reason, [the expert's] conclusion that at-shelf coupons uniquely appeal to 'impulse shoppers' (that is, shoppers who do not prepare in advance by clipping coupons from the Sunday supplements) does not identify an economic market. *Attributes of shoppers do not identify markets.* An example from *United States v. Rockford Memorial Corp.*, 989 F.2d 1278, 1284 (7th Cir. 1990), shows why. Suppose that diabetics must drink low-calorie soft drinks, if any at all. Could producers of artificially sweetened soft drinks raise prices as a result of those 'locked in' customers? No, they could not. A price increase not only would drive nondiabetic customers to other products but also would induce rivals to switch some of their production from standard drinks to artificially sweetened ones. The

10

A-64

healthy customers, and the products, combine to protect the diabetic customers. Just so with coupons. Careful shoppers and other producers protect the impulse buyers (or, to be accurate, protect the manufacturers that want to sell to impulse buyers).

*Menasha Corp. v. News Am. Mkg. In-Store, Inc.*, 354 F.3d 661, 665 (7th Cir. 2004) (emphasis added). The idea that Deslandes and Turner sold their labor in market that was limited to McDonald's outlets is implausible. They could have sold their labor to other buyers. As in *Agnew*:

Plaintiffs appear to have made the strategic decision to forgo identifying a specific relevant market. Whatever the reasons for the strategic decision, they cannot now offer post hoc arguments attempting to illuminate a buried market allegation.

*Agnew*, 683 F.3d at 347. Neither plaintiff alleged, in her respective complaint, a relevant market or that defendants had market power in that relevant market.

In a footnote, plaintiffs request leave to amend. It is far too late for that. On June 25, 2018, this Court explicitly gave plaintiff Deslandes an opportunity to file an amended complaint in order to add allegations that defendants had market power in the relevant market. [Docket 53 at 16]. The Court set a deadline of July 23, 2018 for the amendment. [Docket 53 at 16]. Deslandes did not file an amended complaint, and, thus, as this Court has mentioned in multiple orders, plaintiff waived the chance to add those allegations. Plaintiffs argue that plaintiff Turner was not given a deadline for amending her complaint. The reason the Court did not set an explicit deadline for Turner was that such a deadline was unnecessary. When Turner asked this Court to consolidate her case with Deslandes's, she specifically stated that she was asserting the same claim as Deslandes. (Docket 146 at 5) ("Ms. Turner's addition to the case will not significantly impact the scope of discovery as *she will assert the same legal theories* as Ms. Deslandes.") (emphasis added). It is far too late in this case, after discovery has closed, for either plaintiff to add allegations of market power in the relevant market. *Cf. Chapman v. First*

11

A-65

*Index, Inc.*, 796 F.3d 783, 785 (7th Cir. 2015) ("a district court has discretion to reject an attempt to remake a suit more than four years after it began").  Plaintiffs have not shown good cause for this Court to relieve them of a strategy they chose years ago.  Their neglect to amend in 2018 is not excusable.

Finally, the Court notes that amendment would be futile.  As this Court has previously explained, the relevant geographic market for the type of labor Deslandes and Turner were selling is a small, local area.  This Court explained why, at length, previously.  *Deslandes*, 2021 WL 3187668 at *12-13.  It would be futile for either plaintiff to amend.  It is undisputed that, within three miles of Deslandes's home were two McDonald's restaurants and between 42 and 50 other quick-serve restaurants.  Within ten miles of Deslandes's home were 517 quick-serve restaurants.  Accordingly, Deslandes cannot plausibly allege that defendants had market power in the relevant market within which she sold her labor.  Within ten miles of Turner's home were 253 quick-serve restaurants.  Accordingly, Turner cannot plausibly allege that defendants had market power in the relevant market in which Turner sold her labor.  Without market power, defendants could not suppress plaintiffs' wages; another buyer would step in to pay plaintiffs more.  *See Alston*, 141 S.Ct. at 2156 (citing *Polk Bros*, 776 F.2d at 191 ("Unless the firms have the power to raise price by curtailing output, their agreement is unlikely to harm consumers, and it makes sense to understand their cooperation as benign.")).  Amendment would be futile.

Deslandes failed to allege plausibly that the restraint is unlawful under rule-of-reason analysis.  She declined to amend when she had the chance, and now it is too late.  Defendants are entitled to judgment on the pleadings with respect to Count I of Deslandes's amended complaint. The same is true with respect to Turner.  Defendants are entitled to judgment on the pleadings on Count I of her complaint.

A-66

**B.      Motions for summary judgment**

Accordingly, the cross motions for summary judgment are denied as moot.

**IV.      CONCLUSION**

For these reasons, defendants' motion [378] for judgment on the pleadings or for summary judgment is granted in part and denied in part.  Plaintiffs' motion [390, 393] for summary judgment is denied as moot.  Defendants' motions [409, 411] to exclude experts are denied as moot.  Defendants are granted judgment on the pleadings with respect to Count I of Deslandes's amended complaint.  Deslandes's claims against Does 1-10 are dismissed for want of prosecution.

Defendants are granted judgment on the pleadings with respect to Count I of Turner's complaint.  Civil case terminated.

**SO ORDERED.**                                    **ENTERED: June 28, 2022**

_____
**HON. JORGE ALONSO**
**United States District Judge**

13

A-67

Case: 22-2333     Document: 47     Filed: 11/18/2022     Pages: 151
Case: 1:17-cv-04857 Document #: 470 Filed: 08/30/22 Page 1 of 1 PageID #:40242
ILND 450 (Rev. 10/29/2016) Judgment in a Civil Action

# IN THE UNITED STATES DISTRICT COURT
## FOR THE
### NORTHERN DISTRICT OF ILLINOIS

Leinani Deslandes

Plaintiff(s),

v.

McDonald's USA, LLC et al,

Defendant(s).

Case No.  1:17-cv-4857
Judge Jorge L. Alonso

## AMENDED JUDGMENT IN A CIVIL CASE

Judgment is hereby entered (check appropriate box):

☐    in favor of plaintiff(s)
and against defendant(s)
in the amount of $       ,

       which ☐ includes    pre–judgment interest.
              ☐ does not include pre–judgment interest.

Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.

Plaintiff(s) shall recover costs from defendant(s).

☒    in favor of defendant(s) McDonald's USA, LLC, McDonald's Corporation, Does 1-10
and against plaintiff(s) Leinani Deslandes

☐    other:

This action was *(check one)*:

☐ tried by a jury with Judge     presiding, and the jury has rendered a verdict.
☐ tried by Judge    without a jury and the above decision was reached.
☒ decided by Judge Jorge L. Alonso on the pleadings.

Date:  8/30/2022

Thomas G. Bruton, Clerk of Court

Lesley Fairley, Deputy Clerk

A-68

ILND 450 (Rev. 04/29/2016) Judgment in a Civil Action

## IN THE UNITED STATES DISTRICT COURT
### FOR THE
### NORTHERN DISTRICT OF ILLINOIS

Stephanie Turner

Plaintiff(s),

v.

McDonald's USA, LLC et al,

Defendant(s).

Case No.  1:19-cv-5524
Judge Jorge L. Alonso

## AMENDED JUDGMENT IN A CIVIL CASE

Judgment is hereby entered (check appropriate box):

☐    in favor of plaintiff(s)
and against defendant(s)
in the amount of $           ,

which ☐ includes           pre–judgment interest.
☐ does not include pre–judgment interest.

Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.

Plaintiff(s) shall recover costs from defendant(s).

---

☒    in favor of defendant(s) McDonald's USA, LLC, McDonald's Corporation
and against plaintiff(s) Stephanie Turner

---

☐    other:

---

This action was (check one):

☐ tried by a jury with Judge           presiding, and the jury has rendered a verdict.
☐ tried by Judge           without a jury and the above decision was reached.
☒ decided by Judge Jorge L. Alonso on the pleadings.

Date:  8/30/2022

Thomas G. Bruton, Clerk of Court

Lesley Fairley, Deputy Clerk

A-69