Nos. 22-2333 & 22-2334

## In the United States Court of Appeals for the Seventh Circuit

LEINANI DESLANDES AND STEPHANIE TURNER,

*Plaintiffs-Appellants*,

v.

MCDONALD'S USA LLC, MCDONALD'S CORPORATION, DOES 1-10,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division
Case Nos. 1:17-cv-04857 and 1:19-cv-05524 - Hon. Jorge L. Alonso

## Brief for Defendants-Appellees McDonald's USA LLC and McDonald's Corporation

Amir C. Tayrani
Gibson, Dunn & Crutcher LLP
1050 Connecticut Ave. NW
Washington, DC 20036

Rachel S. Brass
Caeli A. Higney
Julian W. Kleinbrodt
Gibson, Dunn & Crutcher LLP
555 Mission Street
San Francisco, CA 94105
(415) 393-8200

Attorneys for McDonald's USA LLC and
McDonald's Corporation

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 22-2333 and 22-2334

Short Caption: Deslandes, et al. v. McDonald's USA LLC, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]　　**PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)　　The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

　　McDonald's USA LLC; McDonald's Corporation

(2)　　The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

　　Gibson, Dunn & Crutcher LLP; A&G Law LLC

(3)　　If the party, amicus or intervenor is a corporation:

　　i)　　Identify all its parent corporations, if any; and

　　　　McDonald's Corporation is the parent corporation of McDonald's USA LLC

　　ii)　　list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

　　　　McDonald's Corporation is a publicly held company owning 100% of McDonald's USA LLC's stock

(4)　　Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

　　N/A

(5)　　Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

　　N/A

Attorney's Signature: /s/ Rachel S. Brass　　　　　Date:　08/17/2022

Attorney's Printed Name:　Rachel S. Brass

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).　Yes [✓]　No [ ]

Address:　555 Mission Street, Suite 3000

　　　　San Francisco, CA 94105-0921

Phone Number: 415-393-8293　　　　　Fax Number:　415-374-8429

E-Mail Address:　RBrass@gibsondunn.com

rev. 12/19 AK

Save As     Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 22-2333 and 22-2334

Short Caption: Deslandes, et al. v. McDonald's USA LLC, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
McDonald's USA LLC; McDonald's Corporation

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Gibson, Dunn & Crutcher LLP; A&G Law LLC

(3)     If the party, amicus or intervenor is a corporation:

i)     Identify all its parent corporations, if any; and

McDonald's Corporation is the parent corporation of McDonald's USA LLC

ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

McDonald's Corporation is a publicly held company owning 100% of McDonald's USA LLC's stock

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
N/A

Attorney's Signature: /s/ Amir C. Tayrani                 Date: 08/17/2022

Attorney's Printed Name:  Amir C. Tayrani

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     Yes ☐     No ☑

Address:  1050 Connecticut Ave. NW

Washington, DC 20036-5306

Phone Number: 202-887-3692                 Fax Number: 202-530-9645

E-Mail Address: ATayrani@gibsondunn.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 22-2333 and 22-2334

Short Caption: Deslandes, et al. v. McDonald's USA LLC, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

        ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    McDonald's USA LLC; McDonald's Corporation

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Gibson, Dunn & Crutcher LLP; A&G Law LLC

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        McDonald's Corporation is the parent corporation of McDonald's USA LLC

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        McDonald's Corporation is a publicly held company owning 100% of McDonald's USA LLC's stock

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: /s/ Caeli A. Higney    Date: 08/17/2022

Attorney's Printed Name:  Caeli A. Higney

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ☑

Address:  555 Mission Street, Suite 3000

    San Francisco, CA 94105-0921

Phone Number: 415-393-8248    Fax Number:  415-374-8431

E-Mail Address: CHigney@gibsondunn.com

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: <u>22-2333 and 22-2334</u>

Short Caption: <u>Deslandes, et al. v. McDonald's USA LLC, et al.</u>

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

<div style="border:1px solid">☐</div>   **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
   <u>McDonald's USA LLC; McDonald's Corporation</u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
   <u>Gibson, Dunn & Crutcher LLP; A&G Law LLC</u>

(3)    If the party, amicus or intervenor is a corporation:

   i)    Identify all its parent corporations, if any; and

      <u>McDonald's Corporation is the parent corporation of McDonald's USA LLC</u>

   ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

      <u>McDonald's Corporation is a publicly held company owning 100% of McDonald's USA LLC's stock</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

   <u>N/A</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

   <u>N/A</u>

Attorney's Signature: <u>/s/ Julian W. Kleinbrodt</u>     Date: <u>08/17/2022</u>

Attorney's Printed Name: <u>Julian W. Kleinbrodt</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  Yes ☐  No ☑

Address: <u>555 Mission Street, Suite 3000</u>

   <u>San Francisco, CA 94105-0921</u>

Phone Number: <u>415-393-8382</u>     Fax Number: <u>415-374-8470</u>

E-Mail Address: <u>JKleinbrodt@gibsondunn.com</u>

rev. 12/19 AK

**Table of Contents**

<div align="right">Page</div>

Introduction..................................................................................1

Jurisdictional Statement.............................................................3

Statement of the Issues ..............................................................3

Statement of the Case ................................................................4

    A.    The Advent and Success of the McDonald's System.....................4

    B.    Plaintiffs File Suit and Forgo a Rule-of-Reason Claim ................8

    C.    The District Court Denies Class Certification and Enters Judgment on the Pleadings ......................................................... 10

Summary of Argument ............................................................. 14

Standards of Review ................................................................. 16

Argument.................................................................................. 16

    I.    The Court Should Affirm the Judgment on the Pleadings........ 17

        A.    The Rule of Reason Applies to Plaintiffs' Antitrust Claim ................................................................................... 17

            1.    Plaintiffs' Allegations Do Not Justify Departure from Ordinary Rule-of-Reason Analysis.................. 17

                a.    Paragraph 14 Was a Vertical Restraint ........ 18

                b.    Paragraph 14 Was Not Obviously Anticompetitive.............................................. 22

            2.    Paragraph 14 Was Ancillary to the Franchise Agreement ................................................................. 29

                a.    Paragraph 14 May Have Contributed to the Success of the McDonald's System .......... 29

                b.    Plaintiffs' Attempt To Establish a Heightened Tailoring Inquiry is Contrary to Law ...................................................... 31

                c.    The District Court Properly Resolved Ancillarity on the Pleadings........................... 36

        B.    Plaintiffs Waived and Did Not Allege the Elements of a Rule-of-Reason Claim ..................................................... 38

            1.    Plaintiffs Waived a Rule-of-Reason Claim .............. 39

**Table of Contents**

Page

        2.     Plaintiffs Failed to Allege the Elements of a Rule-of-Reason Claim ................................................ 41

II.     McDonald's Also Was Entitled to Summary Judgment ............. 45

      A.     Undisputed Evidence Reinforced that the Restraint Was Ancillary ...................................................... 45

      B.     Even if the Quick-Look Framework Initially Applied, McDonald's Triggered the Full Rule of Reason by Proffering Procompetitive Justifications ........................... 47

      C.     Plaintiffs Did Not Attempt To Prove a Relevant Market .................................................................... 54

III.    The Court Did Not Abuse Its Discretion in Denying Class Certification ..................................................................... 56

      A.     The Absence of a Defined Relevant Market Defeats Predominance .................................................... 57

      B.     Plaintiffs Did Not Offer Common Proof of Antitrust Injury .............................................................. 58

IV.    There Is No Basis for Reassignment .......................................... 62

Conclusion ....................................................................................... 62

**Table of Authorities**

Page(s)

**Cases**

*Agnew v. NCAA,*
   683 F.3d 328 (7th Cir. 2012) .................................. 9, 18, 40, 41, 42, 47, 48, 54

*Arrington v. Burger King Worldwide, Inc.,*
   47 F.4th 1247 (11th Cir. 2022) ....................................................... 24

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) .................................................................. 42

*Aya Healthcare Services, Inc. v. AMN Healthcare, Inc.,*
   9 F.4th 1102 (9th Cir. 2021) .................................... 30, 32, 33, 34, 46

*Aydin Corp. v. Loral Corp.,*
   718 F.2d 897 (9th Cir. 1983) ......................................................... 26

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) .................................................................. 21

*Blackburn v. Sweeney,*
   53 F.3d 825 (7th Cir. 1995) ..................................................... 33, 34

*Blades v. Monsanto Co.,*
   400 F.3d 562 (8th Cir. 2005) ........................................................ 61

*Blue Cross & Blue Shield United of Wisc. v. Marshfield Clinic,*
   152 F.3d 588 (7th Cir. 1998) ........................................................ 24

*Bogan v. Hodgkins,*
   166 F.3d 509 (2d Cir. 1999) ................................................. 22, 24, 25

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.,*
   509 U.S. 209 (1993) .................................................................. 61

*Brown Shoe Co. v. United States,*
   370 U.S. 294 (1962) .................................................................. 58

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
   429 U.S. 477 (1977) .................................................................. 58

*Bunker Ramo Corp. v. United Bus. Forms, Inc.,*
   713 F.2d 1272 (7th Cir. 1983) ....................................................... 23

**Table of Authorities**

Page(s)

*Burns v. Orthotek, Inc. Employees' Pension Plan & Tr.*,
  657 F.3d 571 (7th Cir. 2011) ............................................................ 16

*Bus. Elecs. Corp. v. Sharp Elecs. Corp.*,
  485 U.S. 717 (1988) ............................................................ 19, 31

*Cal. Dental Ass'n v. FTC*,
  526 U.S. 756 (1999) ............................................................ 48, 51

*Car Carriers, Inc. v. Ford Motor Co.*,
  745 F.2d 1101 (7th Cir. 1984) ............................................................ 20

*Caudill v. Lancaster Bingo Co.*,
  2005 WL 2738930 (S.D. Ohio Oct. 24, 2005) ................................................ 37

*Cesnik v. Chrysler Corp.*,
  490 F. Supp. 859 (M.D. Tenn. 1980) ...................................................... 26

*Chi. Pro. Sports Ltd. P'ship v. NBA*,
  95 F.3d 593 (7th Cir. 1996) ............................................................ 27

*Chi. Pro. Sports Ltd. P'ship v. NBA*,
  961 F.2d 667 (7th Cir. 1992) ............................................................ 47, 50

*Coleman v. Gen. Elec. Co.*,
  643 F. Supp. 1229 (E.D. Tenn. 1986), *aff'd*, 822 F.2d 59 (6th Cir.
  1987) ............................................................ 25

*Conrad v. Jimmy John's Franchise, LLC*,
  2021 WL 3268339 (S.D. Ill. July 30, 2021) ............................................... 25

*Conrad v. Jimmy John's Franchise, LLC*,
  2021 WL 718320 (S.D. Ill. Feb. 24, 2021) ............................................... 60

*Consultants & Designers, Inc. v. Butler Serv. Grp., Inc.*,
  720 F.2d 1553 (11th Cir. 1983) ............................................................ 26, 48

*Cont'l T.V., Inc. v. GTE Sylvania, Inc.*,
  433 U.S. 36 (1977) .................................... 1, 17, 19, 26, 27, 31, 49

*Craftsmen Limo., Inc. v. Ford Motor Co.*,
  363 F.3d 761 (8th Cir. 2004) ............................................................ 47

# Table of Authorities

*Deppe v. NCAA*,
  893 F.3d 498 (7th Cir. 2018) .................................................................. 52

*Dreamstime.com, LLC v. Google LLC*,
  54 F.4th 1130 (9th Cir. 2022) ............................................................... 40

*Dupree v. Laster*,
  389 F. App'x 532 (7th Cir. 2010) .......................................................... 62

*EEOC v. Chi. Miniature Lamp Works*,
  947 F.2d 292 (7th Cir. 1991) ................................................................ 43

*Eichorn v. AT&T Corp.*,
  248 F.3d 131 (3d Cir. 2001) ........................................................... 42, 43

*Fishman v. Estate of Wirtz*,
  807 F.2d 520 (7th Cir. 1986) ................................................................ 53

*FTC v. Advoc. Health Care Network*,
  841 F.3d 460 (7th Cir. 2016) ........................................................... 54, 55

*Funeral Consumers Alliance, Inc. v. Serv. Corp. Int'l*,
  695 F.3d 330 (5th Cir. 2012) ................................................................ 58

*Garofalo v. Village of Hazel Crest*,
  754 F.3d 428 (7th Cir. 2014) ................................................................ 37

*General Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*,
  744 F.2d 588 (7th Cir. 1984) ................................................................ 51

*Gerlinger v. Amazon.Com, Inc.*,
  311 F. Supp. 2d 838 (N.D. Cal. 2004) ................................................... 38

*Goldman v. Gagnard*,
  757 F.3d 575 (7th Cir. 2014) ................................................................ 39

*Grajales v. Puerto Rico Port Auth.*,
  682 F.3d 40 (1st Cir. 2012) .................................................................. 41

*Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*,
  998 F.2d 391 (7th Cir. 1993) ................................................................ 59

**Table of Authorities**

Page(s)

*Gunn v. Continental Casualty Co.,*
968 F.3d 802 (7th Cir. 2020) ................................................................ 36

*Hanger v. Berkley Grp., Inc.,*
2015 WL 3439255 (W.D. Va. May 28, 2015) ................................. 37

*Hanover Ins. Co. v. R.W. Dunteman Co.,*
51 F.4th 779 (7th Cir. 2022).............................................................. 16

*Heller v. Equitable Life Assurance Soc'y,*
833 F.2d 1253 (7th Cir. 1987) ................................................... 37, 61

*Helmerich & Payne Int'l Drilling Co. v. Schlumberger Tech.*
*Corp.*, 2017 WL 6597512 (N.D. Okla. Dec. 26, 2017) .................... 37

*Ideal Steel Supply Corp. v. Anza,*
652 F.3d 310 (2d Cir. 2011)................................................................ 41

*Ill. Corp. Travel, Inc. v. Am. Airlines,*
889 F.2d 751 (7th Cir. 1989) ............................................................. 21

*In re Ins. Brokerage Antitrust Litig.,*
618 F.3d 300 (3d Cir. 2010)............................................................... 34

*K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.,*
61 F.3d 123 (2d Cir. 1995)................................................................. 49

*Kelsey K. v. NFL Enterp. LLC,*
2017 WL 3115169 (N.D. Cal. July 21, 2017)................................. 37

*Krehl v. Baskin-Robbins Ice Cream Co.,*
664 F.2d 1348 (9th Cir. 1982) .......................................................... 21

*Kress v. CCA of Tennessee, LLC,*
694 F.3d 890 (7th Cir. 2012) ............................................................ 16

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.,*
551 U.S. 877 (2007) ...................................................... 17, 23, 24, 26, 36

*Lektro-Vend Corp. v. Vendo Co.,*
660 F.2d 255 (7th Cir. 1981) ............................................................ 26

**Table of Authorities**

Page(s)

*Loeb Indus., Inc. v. Sumitomo Corp.*,
  306 F.3d 469 (7th Cir. 2002) ............................................................ 16

*LSP Transmission Holdings v. Lange*,
  329 F. Supp. 3d 695 (D. Minn. 2018) ................................................ 62

*Madison 92nd St. Assocs., LLC v. Courtyard Mgmt. Corp.*,
  624 F. App'x 23 (2d Cir. 2015) ......................................................... 43

*In re: McCormick & Co.*,
  217 F. Supp. 3d 124 (D.D.C. 2016) .................................................. 20

*Med. Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.*,
  922 F.3d 713 (6th Cir. 2019) ....................................... 32, 33, 51, 53

*Meredith Corp. v. SESAC LLC*,
  1 F. Supp. 3d 180 (S.D.N.Y. 2014) .................................................. 20

*Messner v. Northshore Univ. HealthSystem*,
  669 F.3d 802 (7th Cir. 2012) ........................................................... 56

*Midwestern Waffles, Inc. v. Waffle House, Inc.*,
  734 F.2d 705 (11th Cir. 1984) ............................................. 19, 21, 24

*MLB Props., Inc. v. Salvino, Inc.*,
  542 F.3d 290 (2d Cir. 2008) (Sotomayor, J., concurring in the
  judgment) ........................................................................................ 33

*In re Musical Instruments & Equip. Antitrust Litig.*,
  798 F.3d 1186 (9th Cir. 2015) ......................................................... 20

*Nat'l Bancard Corp. v. VISA USA, Inc.*,
  779 F.2d 592, 597 n.6 (11th Cir. 1986) (discussing *Mitchel v.
  Reynolds*, 24 Eng. Rep. 347 (1711)) ............................................... 35

*In re: NCAA Grant-In-Aid Cap Antitrust Litig.*,
  958 F.3d 1239 (9th Cir. 2020) ......................................................... 52

*NCAA v. Alston*,
  141 S. Ct. 2141 (2021) .......................... 2, 13, 16, 17, 18, 26, 27, 28, 52, 53, 57

*NCAA v. Bd. of Regents of the Univ. of Okla.*,
  468 U.S. 85 (1984) ............................................................. 35, 36, 52

**Table of Authorities**

Page(s)

*Nichols v. Spencer Int'l Press, Inc.*,
  371 F.2d 332 (7th Cir. 1967) ................................................................ 26

*Ogden v. Little Caesar Enters.*,
  393 F. Supp. 3d 622 (E.D. Mich. 2019) ............................................... 25

*Ohio v. Am. Express Co.*,
  138 S. Ct. 2274 (2018) ............................... 18, 19, 41, 42, 44, 48, 52

*Ore. Steam Nav. Co. v. Winsor*,
  87 U.S. 64 (1873) ................................................................................ 37

*Pearse v. McDonald's Sys. of Ohio, Inc.*,
  47 Ohio App. 2d 20 (1975) ................................................................... 7

*Phillips v. Vandygriff*,
  711 F.2d 1217 (5th Cir. 1983) ....................................................... 31, 36

*Polk Bros., Inc. v. Forest City Enters., Inc.*,
  776 F.2d 185 (7th Cir. 1985)...17, 29, 30, 32, 33, 35, 45, 46, 48, 49, 52, 53, 54

*Polygram Holding, Inc. v. FTC*,
  416 F.3d 29 (D.C. Cir. 2005) ............................................................... 34

*Premier Elec. Const. Co. v. Nat'l Elec. Contrs. Ass'n, Inc.*,
  814 F.2d 358 (7th Cir. 1987) ............................................................... 31

*In re Processed Egg Prods. Antitrust Litig.*,
  206 F. Supp. 3d 1033 (E.D. Pa. 2016) ................................................ 40

*Repub. Tobacco Co. v. N. Atl. Trading Co.*,
  381 F.3d 717 (7th Cir. 2004) ......................................................... 44, 60

*Rothery Storage Van Co. v. Atlas Van Lines*,
  792 F.2d 210 (D.C. Cir. 1986) ...................................................... 34, 50

*Sanchez v. City of Chicago*,
  880 F.3d 349 (7th Cir. 2018) ............................................................... 41

*Seaman v. Duke University*,
  2018 WL 671239 (M.D.N.C. Feb. 1, 2018) ........................................ 60

**Table of Authorities**

Page(s)

*Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*,
  950 F.3d 911 (7th Cir. 2020) ...................................................................... 56, 58

*Sheehan v. Daily Racing Form, Inc.*,
  104 F.3d 940 (7th Cir. 1997) .......................................................................... 59

*Sheridan v. Marathon Petroleum Co.*,
  530 F.3d 590 (7th Cir. 2008) .......................................................................... 43

*State Oil Co. v. Khan*,
  522 U.S. 3 (1997) ............................................................................... 1, 18, 48

*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*,
  373 F.3d 57 (1st Cir. 2004) ............................................................................. 54

*In re Sulfuric Acid Antitrust Litig.*,
  703 F.3d 1004 (7th Cir. 2012) ..................................................................... 24, 29

*Sullivan v. NFL*,
  34 F.3d 1091 (1st Cir. 1994) ........................................................................... 53

*Texaco v. Dagher*,
  547 U.S. 1 (2006) ........................................................................................ 18, 40

*Todd v. Exxon Corp.*,
  275 F.3d 191 (2d Cir. 2001) ............................................................................ 43

*Toys "R" Us, Inc. v. FTC*,
  221 F.3d 928 (7th Cir. 2000) ..................................................................... 34, 51

*Union Circulation Co. v. FTC*,
  241 F.2d 652 (2d Cir. 1957) ............................................................................ 25

*United States v. Bustamante*,
  493 F.3d 879 (7th Cir. 2007) ........................................................................... 21

*United States v. Gaines*,
  2020 WL 5215386 (D. Minn. Aug. 4, 2020) ..................................................... 37

*United States v. Manahe*,
  2022 WL 3161781 (D. Me. Aug. 8, 2022) ......................................................... 37

# Table of Authorities

Page(s)

*United States v. Townsend*,
924 F.2d 1385 (7th Cir. 1991) ........................................................... 21

*USA Petroleum Co. v. Atl. Richfield Co.*,
13 F.3d 1276 (9th Cir. 1994) ............................................................. 41

*Valley Liquor Inc. v. Renfield Importers*,
822 F.2d 656 (7th Cir. 1987) ............................................................. 60

*Viamedia, Inc. v. Comcast Corp.*,
951 F.3d 429 (7th Cir. 2020) ............................................................. 59

*Vidimos, Inc. v. Laser Lab Ltd.*,
99 F.3d 217 (7th Cir. 1996) ............................................................... 41

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) ................................................................... 57, 62

*Westman Comm'n Co. v. Hobart Int'l, Inc.*,
796 F.2d 1216 (10th Cir. 1986) ......................................................... 49

*White v. United States*,
8 F.4th 547 (7th Cir. 2021) ............................................................... 50

*Will v. Comprehensive Accounting Corp.*,
776 F.2d 665 (7th Cir. 1985) ............................................................. 18

*Williams v. I.B. Fischer Nev.*,
999 F.2d 445 (9th Cir. 1993) ............................................................. 25

*Williams v. Lampe*,
399 F.3d 867 (7th Cir. 2005) ............................................................. 37

*Williams v. Nevada*,
794 F. Supp. 1026 (D. Nev. 1992) ..................................................... 51

**Statutes**

15 U.S.C. § 1 ......................................................................................8

**Rules**

Fed. R. Civ. P. 12 ...................................................................... 40, 41

**Table of Authorities**

<u>Page(s)</u>

Fed. R. Civ. P. 23 ................................................................. 56, 61

Fed. R. Civ. P. 56 ....................................................................... 45

**Other Authorities**

Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An
  Analysis of Antitrust Principles and Their Application* (5th ed.) 23, 27, 34, 53

Richard Epstein, *Antitrust Overreach in Labor Markets*, 15
  N.Y.U. J. of L. & Liberty 407 (2022) ............................................ 30

Dept. of Justice, No-Poach Approach,
  https://www.justice.gov/atr/division-operations/division-update-
  spring-2019/no-poach-approach.......................................................... 20

Gregory J. Werden, *The Ancillary Restraints Doctrine after
  Dagher*, 8 Sedona Conf. J. 17 (2007) ....................................... 32, 53

## INTRODUCTION

Before it was a global brand, McDonald's was a new concept searching for a business model that worked. Ray Kroc changed the landscape of American business forever by remaking McDonald's restaurants from isolated, wholly self-interested operators into one of the world's most cohesive and iconic brands. The key was a transformational principle: "In business for yourself, but not by yourself." ECF 310-10, Ex. 104 at 104. Turning that principle into practice, McDonald's imposed a series of restraints on its franchisees to enhance consistency, quality, and cooperation. One of these provisions became known as Paragraph 14, a time-limited restriction on a franchisee's ability to hire the employees of another McDonald's operator. This provision, like others, promoted "trust between [McDonald's] franchisees and the company" and incentivized the franchisee investments critical "to the success of McDonald's." McD A-315-16, 337-38. This in turn fostered interbrand competition—"the primary purpose of the antitrust laws," *State Oil Co. v. Khan*, 522 U.S. 3, 15 (1997)—by improving the ability of the McDonald's franchise system to compete with other quick-serve restaurants.

Consistent with 45 years of precedent, the district court rebuffed Plaintiffs' attempt to condemn Paragraph 14 as *per se* unlawful. *See Cont'l T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 55 (1977). The court found that Paragraph 14 was ancillary to a franchise agreement with vast procompetitive potential

to increase output of jobs and hamburgers alike, not obviously and demonstrably anticompetitive. As the Supreme Court recently held, such restraints, which operate in a "labor market [and] yield benefits in [a] consumer market," are evaluated case-by-case under the rule of reason. *NCAA v. Alston*, 141 S. Ct. 2141, 2151, 2154-57 (2021). The district court correctly applied that holding.

Plaintiffs elected to forgo a rule-of-reason claim—a decision they try to obscure in this Court but openly acknowledged below, expressly conceding that "[t]here was a deadline to amend to file a rule of reason claim" and they did not do so. McD A-67. Moreover, Plaintiffs failed to allege a threshold element of that claim—market power in a defined, relevant market. The only market that conceivably can be discerned from the Complaints, a nationwide market of McDonald's (and only McDonald's) restaurant workers, is implausibly over- and underinclusive. As the district court recognized, any plausible market is far smaller geographically and includes a far broader range of competing employers.

These deficiencies are sufficient to affirm the district court's entry of judgment in McDonald's favor. Each is also independently sufficient to entitle McDonald's to summary judgment. The undisputed evidence confirmed the procompetitive origin and application of Paragraph 14, which reduced friction between McDonald's restaurants, deterred franchisee free-riding, and expanded output. This triggered the burden on Plaintiffs to prove market

power—a burden they did not even try to meet. And because Plaintiffs' claim fails as a matter of law, there is no need to reach the order denying class certification, which rightly held Plaintiffs failed to establish commonality or predominance.

Because Plaintiffs have not adequately pled and cannot prove their Sherman Act claim, judgment should be affirmed.

## JURISDICTIONAL STATEMENT

Plaintiffs' jurisdictional summary is complete and correct.

## STATEMENT OF THE ISSUES

I.      Whether the district court properly entered judgment on the pleadings because (A) the rule of reason applies to Plaintiffs' antitrust challenge to Paragraph 14, a vertical intrabrand restraint that contributed to the success of the McDonald's franchise system, and (B) Plaintiffs deliberately forwent and failed to allege a rule-of-reason claim.

II.      Whether, in the alternative, McDonald's was entitled to summary judgment because uncontroverted evidence confirmed that (A) Paragraph 14 was an ancillary restraint and (B) Paragraph 14 was supported by plausible procompetitive justifications—each of which triggered the rule of reason—and (C) Plaintiffs failed to create a triable issue of fact as to whether McDonald's exercised market power in a relevant market.

III.    If the Court concludes that McDonald's is not entitled to judgment on the pleadings or summary judgment, whether the district court abused its discretion by denying class certification on the ground that individualized questions predominated.

IV.    If the Court remands, whether the case should be reassigned to a different district court judge.

## STATEMENT OF THE CASE

### A.    The Advent and Success of the McDonald's System

McDonald's is now "the model for franchising around the world," McD A-140, but in 1955 it was an unproven business model, McD A-313. Franchisees' focus on their own profits prevented brand growth. McD A-141-44. They offered different menus, skimped on ingredients, and featured distinct restaurant designs. McD A-143-44. Some didn't even call themselves McDonald's. *Id.* Ray Kroc changed all that through a series of *intra*brand restraints that promoted consistency, quality, cooperation, and investment, including exclusive territories, menu limits, and restrictions on franchisees' abilities to operate other businesses. Those restraints remade McDonald's into a formidable *inter*brand competitor. McD A-314-16.

Paragraph 14 was one such restraint. Introduced in 1955 alongside Kroc's other reforms, it provided that franchisees "shall not employ or seek to

employ any person who is at the time employed by McDonald's, any of its subsidiaries, or by any person who is at the time operating a McDonald's restaurant." McD A-56; *see also* ECF 380-16 (1955 franchise agreement). McDonald's thereafter made only modest changes to its founder's groundbreaking franchise agreement—including virtually no changes to what eventually became Paragraph 14. McD A-314. This network of intrabrand restraints, "inextricable from McDonald's brand," became a "textbook" feature of a successful modern franchise. McD A-146.

As explained by one of the last-living franchising executives from McDonald's early years, Paragraph 14 promoted "trust between [McDonald's] franchisees and the company"—a critical ingredient "to the success of McDonald's as a company." McD A-315-16, 337-38; *see also* ECF 381-13, 381-14, 382-3, 382-4, 382-5 (current franchisees, their managers, and former McDonald's executives explaining the cooperation promoted by Paragraph 14). Such cooperation is not merely theoretical: Franchisees attend Hamburger University together, hold joint trainings, and run brand-wide television ads. McD A-194-98 & n.296. Paragraph 14 also addressed the risk of one restaurant raiding another for workers—sacrificing the guest experience at the raided store, and, in turn, diminishing their experience with the entire McDonald's brand—thereby protecting franchisees' investments in training. McD A-338-39.

Paragraph 14's purpose was *not* to suppress wages or coordinate a conspiracy between franchised and company-owned restaurants ("McOpCos"). McD A-338-39. McOpCos *did not even exist* when Paragraph 14 was adopted. McD A-313-14. And McDonald's earns royalties on franchisees' gross revenue, not profits—meaning its financial incentive is to *increase* restaurants' labor expenditures to generate higher sales. McD A-316.

The results of Kroc's system are undeniable. Snapping out of stagnation, the McDonald's brand grew from fewer than a dozen restaurants in 1955 to 224 restaurants in 1960. McD A-316. Exponential growth in output followed:



McD A-143; *see also* McD A-316. McDonald's has since not only sold billions of hamburgers but also become "America's Best First Job™." ECF 419-4 at 41-42.

One in every twelve working Americans has worked at McDonald's. McD A-339.

It was no secret that intrabrand restraints—including Paragraph 14—drove this remarkable success. McDonald's has filed its franchise agreement annually with state regulators since the 1970s. McD A-314-15. And McDonald's litigated the lawfulness of Paragraph 14 in 1972; the Ohio Court of Appeals upheld the provision after "balanc[ing] all of the interests, social, economic and private." *Pearse v. McDonald's Sys. of Ohio, Inc.*, 47 Ohio App. 2d 20, 25 (1975). As that court recognized, reducing "the enticement and hiring of its franchisees' managers within the system" was "convincingly" tied to "the overall unified operation of [McDonald's] system." *Id.* at 26.

By 2017, however, the business landscape had changed. Paragraph 14 was unenforced given other priorities; McDonald's was defending litigation over whether it was a joint-employer with its franchisees; and the company was aware of increasing scrutiny and new political focus on non-compete clauses and similar restrictions. *See* McD A-323-24. Accordingly, McDonald's confirmed to franchisees in March 2017—well before this suit was filed or any Attorney General investigation launched—that it "w[ould] not enforce" Paragraph 14, that the restraint "would not be included in future franchise agreements," and that they were "free to make their own employment decisions."

McD A-324. In 2018, McDonald's agreed with the Washington AG to continue that already-announced policy. ECF 310-2, Ex. 18.

## B.    Plaintiffs File Suit and Forgo a Rule-of-Reason Claim

Leinani Deslandes and Stephanie Turner (whose lawsuits were coordinated) sued McDonald's alleging that Paragraph 14 was an unlawful agreement under Section 1 of the Sherman Act, 15 U.S.C. § 1. McD A-8, 12, 22-23, 81, 97-99. Plaintiffs theorize that Paragraph 14 suppressed wages because it limited competition between McDonald's restaurants. McD A-4, 77-78. This theory was unsupported by any allegations of a relevant market; instead, the Complaints assume that McDonald's restaurants are a nationwide market unto themselves, competing with no one else for workers. *See, e.g.*, McD A-3, 29, 101-03. Plaintiffs allege that Paragraph 14's "express," "standard language" was a "per se violation of the antitrust laws" or, alternatively, unlawful "under a 'quick look' analysis" applicable to obviously anticompetitive practices. McD A-3, 22, 32-34, 87, 96-97, 107. The Complaints do not assert that Paragraph 14 violated the Sherman Act under the rule of reason or include any allegations that would support that conclusion. McD A-33-34, 107; *see also* SA-10.

McDonald's moved to dismiss the first-filed Deslandes Complaint for failure to state a claim under the rule of reason or any other framework. The district court rejected *per se* liability at the outset, reasoning that Paragraph 14's

"vertical elements"—embodied in the relationship between McDonald's and its franchisees—are ancillary to an "output enhancing and thus procompetitive" franchising arrangement. SA-10-13. The court recognized that the Complaint contained neither a rule-of-reason claim nor facts required to support one. SA-16. Most notably, there were no allegations of "market power in a relevant market," which was "likely to cover a relatively-small geographic area" for workers "who hold low-skill retail or restaurant jobs"—at odds with the nation-wide class Plaintiff "s[ought] to represent." *Id.*

The court nevertheless allowed the Deslandes case to proceed because Paragraph 14 "might be found unlawful under quick-look analysis." SA-14. Quick look is a "short form of rule of reason analysis" used "when 'an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect.'" *Id.* (quoting *Agnew v. NCAA*, 683 F.3d 328, 336 (7th Cir. 2012)). The quick-look framework does not require *allegations* of a "specific definition of the relevant market"— although that *evidentiary showing* must be made by a plaintiff when a re-straint cannot be characterized as a "naked restriction[] on price or output" or when "a procompetitive justification is shown." *Agnew*, 683 F.3d at 337. Ac-cordingly, the court found that the dearth of market-power allegations did not doom the quick-look claim on the pleadings. SA-16.

Because "the evidence at a later stage may not support" a quick-look claim, the court invited Plaintiff to "plead a claim under the rule of reason." SA-13-16. Plaintiffs elected "not to amend the complaint to add a claim under the rule of reason." SA-52; *see also* McD A-107. As they later acknowledged, "[t]here was a deadline to amend to file a rule of reason claim" that came and went. McD A-67. Discovery therefore ensued under only the quick-look framework. *See* ECF 143 at 13-14, 31-32, 48-49; ECF 171 at 26-29.[1]

## C. The District Court Denies Class Certification and Enters Judgment on the Pleadings

Discovery confirmed what common sense predicted: There was no overarching conspiracy to suppress wages within McDonald's restaurants. McD A-316-22. Contrary to Plaintiffs' arguments, AOB 49, adherence to Paragraph 14 varied widely and McOpCos and franchisees frequently hired from one another without limitation. ECF 302-1, Ex. 1 at 131-33; *see also* ECF 380-2 at 129-30; ECF 382-11 at 168-75; ECF 382-9 at 27, 71. There is no better example of the canyon between Plaintiffs' evidence and their characterizations than the exhibit proffered to show "enforce[ment]," AOB 12—an email in which McDonald's expressly informed a franchisee that "McDonald's will not enforce Paragraph 14." ECF 270-39; *see also* ECF 417 at 9-14 & McD A-334-35 (explaining

---

[1] McDonald's subsequently moved to dismiss Ms. Turner's later-filed Complaint on separate grounds. *Turner* ECF 28. That motion was denied. *Turner* ECF 64.

how evidence cited by Plaintiffs revealed wide variation in practices and worker mobility).

Nor was there any discernable connection between Paragraph 14 and wages. Wages in McDonald's restaurants kept apace with or ahead of competitors—exhibiting no causal change after Paragraph 14's 2017 removal from the franchise agreement or after McDonald's 2018 agreement with the Washington AG:



ECF 302-1, Ex. 2 at Fig. 15A.

The contrary conclusions of Plaintiffs' experts were deeply flawed. ECF 300 & 301. Both forwent any analysis of the relevant market—despite admitting it was "necessary." ECF 302-1, Ex. 3 at 236-38; *see also* ECF 270-5 at 50-

51; ECF 338-6 at 157-59. Dr. Singer's model, offered to establish nationwide wage suppression, showed no such thing. ECF 302-1, Ex. 2 at 52-113. For example, de-averaging the data showed that his model calculated wage *elevation* in Florida—where Ms. Deslandes worked and which accounted for more than half of his unrepresentative data set. ECF 301-1 at 1, 11; ECF 302-1, Ex. 2 at 101-02 & Fig. 19. And Plaintiffs' second expert, Dr. Cappelli, admitted that he formed his opinions about the transferability of McDonald's skills and training to other jobs *without reviewing any actual McDonald's training or interviewing any workers* (including Plaintiffs). ECF 302-1, Ex. 3 at 152, 172-84, 204-08; ECF 294-2 at 241-42.

On this record, the district court denied class certification. SA-53. The court concluded that the rule of reason applied for three mutually reinforcing reasons: (1) courts lack sufficient experience with intrabrand no-hire provisions to short-circuit the default analysis under the rule of reason; (2) McDonald's "put forth sufficient evidence of pro-competitive effects," including unrebutted and unchallenged testimony from Dr. Justin McCrary about how Paragraph 14 enabled McDonald's to flourish by facilitating intrabrand cooperation; and (3) Paragraph 14 operated vertically in the many local markets without a company-owned restaurant that could conceivably compete for workers with franchisees. SA-37-44. As a result, classwide adjudication entailed proof of anticompetitive effects in countless local markets—an inquiry that could not

be "answered for all members of the proposed class with the same evidence, because not all of the plaintiffs sold their services in the same relevant market." SA-43-44.

The court was "hesitant to certify the proposed class" for other reasons, too. SA-52. For one, Plaintiffs' counsel were "self-interested," having waived their individual clients' chances under the rule of reason for the "gamble" of collecting a "nationwide-class jackpot." SA-52-53. For another, the "proposed class [was] overly broad in that it contains individuals who could not have been injured by the alleged wrongful conduct"—such as "new hires" and workers who left "within the first few weeks of work." SA-53 n.8.

McDonald's then moved for judgment on the pleadings or, in the alternative, summary judgment. Consistent with its prior ruling, the court recognized that Paragraph 14 fell "in 'the great in-between' of restraints that require rule-of-reason analysis" because courts have inadequate experience "with no-hire provisions of franchise agreements to predict with confidence that they must always be condemned." SA-62-63 (quoting *Alston*, 141 S. Ct. at 2156). The same result followed, the court reasoned, because Paragraph 14 was an ancillary restraint akin "to dual distribution, where a 'manufacturer simultaneously sells to independent dealers and to those who might otherwise be customers of those dealers." SA-63 & n.4.

As the district court explained, Plaintiffs had waived a rule-of-reason claim by failing to allege that McDonald's exercised market power in any relevant market. SA-64-65. And attempting to do so would have been futile: It was implausible that McDonald's had market power where either Plaintiff lived and worked, as there were over 250 quick-serve restaurants—each a competing potential employer—within ten miles of their respective homes. SA-66. The district court granted McDonald's judgment on the pleadings, denying the parties' motions for summary judgment as moot. SA-66-67

## SUMMARY OF ARGUMENT

Plaintiffs' attempt to condemn an intrabrand restraint within a franchise system as *per se* unlawful has no support in modern antitrust law and would rewrite this Court's controlling precedent on ancillary restraints. The Court should reject Plaintiffs' legally and factually flawed arguments and affirm the judgment.

**I.** The district court properly granted judgment on the pleadings.

**A.** The rule of reason applies to Plaintiffs' claim. Paragraph 14 is (1) a vertical, intrabrand hiring restraint, which courts have not invariably found to be anticompetitive, that (2) contributed to the success of McDonald's franchise system. Evaluating Paragraph 14's competitive effects therefore requires the rule of reason's fact-specific assessment within a defined market.

14

**B.** Plaintiffs have not stated a rule-of-reason claim because (1) they expressly waived this claim and framework below and (2) they do not allege that McDonald's exercised market power in a plausible labor market—a prerequisite under the rule of reason.

**II.** This Court can also affirm on the alternative ground that McDonald's was entitled to summary judgment. Undisputed evidence confirmed that Paragraph 14 was an ancillary restraint and supported plausible procompetitive justifications for Paragraph 14, both of which triggered application of the rule of reason. Plaintiffs were therefore required to show that McDonald's exercised market power but failed to create a triable issue of fact because the undisputed evidence contradicted their asserted nationwide labor market in which McDonald's restaurants had no competitors.

**III.** The failure of Plaintiffs' claim on its merits disposes of this appeal. Regardless, the district court did not abuse its discretion in denying Plaintiffs' request to certify a nationwide class of all McDonald's restaurant workers because individualized issues concerning (A) relevant markets and (B) antitrust injury predominated.

**IV.** If the Court remands, the case should not be reassigned from Judge Alonso.

## STANDARDS OF REVIEW

The district court's order entering judgment on the pleadings is reviewed de novo. *Hanover Ins. Co. v. R.W. Dunteman Co.*, 51 F.4th 779, 785 (7th Cir. 2022). The Court "can affirm on any ground that the record fairly supports." *Burns v. Orthotek, Inc. Employees' Pension Plan & Tr.*, 657 F.3d 571, 575 (7th Cir. 2011); *see also Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 479-80 (7th Cir. 2002) (failure to convert a motion for judgment on the pleadings into a motion for summary judgment is not error if harmless). Because "the law gives broad leeway to district courts," this Court "review[s] the district court's decision regarding class certification for an abuse of discretion." *Kress v. CCA of Tennessee, LLC*, 694 F.3d 890, 892 (7th Cir. 2012).

## ARGUMENT

Plaintiffs obscure the straightforward principles that should dispose of this appeal. Under Section 1 of the Sherman Act, courts "presumptively" apply the "rule of reason"—a framework that involves a "fact-specific assessment of market power and market structure" to evaluate the challenged restraint's "actual effect on competition." *Alston*, 141 S. Ct. at 2151. That presumption is nearly irrebuttable where, as here, the challenged restraint is vertical. And while Plaintiffs try to overhaul this Circuit's precedent regarding ancillary restraints, the same "careful[]" consideration "under the Rule of Reason" applies

where, as here, a challenged restraint "may contribute to the success of a cooperative venture that promises greater productivity and output." *Polk Bros., Inc. v. Forest City Enters., Inc.*, 776 F.2d 185, 189 (7th Cir. 1985).

This case therefore ends with the district court's correct conclusion that the rule of reason applies. Plaintiffs deliberately decided to forgo a rule-of-reason claim and also failed to allege the essential elements of one. The judgment for McDonald's should be affirmed.

## I.     The Court Should Affirm the Judgment on the Pleadings

### A.     The Rule of Reason Applies to Plaintiffs' Antitrust Claim

The rule-of-reason framework applies to Plaintiffs' claim for multiple, independent reasons. First, Plaintiffs challenged a vertical, intrabrand restraint—not a horizontal market allocation conspiracy arguably subject to *per se* or quick-look scrutiny. *Sylvania*, 433 U.S. at 53-57. Second, Paragraph 14 was ancillary to a larger, procompetitive franchise agreement—independently requiring "evaluat[ion] under the Rule of Reason." *Polk Bros.*, 776 F.2d at 188.

#### 1.     Plaintiffs' Allegations Do Not Justify Departure from Ordinary Rule-of-Reason Analysis

"The rule of reason is the accepted standard for testing whether a practice restrains trade in violation of § 1." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007). It therefore applies "presumptively" to all but the most "obviously" anticompetitive practices. *Alston*, 141 S. Ct. at

2151, 2155-56; *accord Texaco v. Dagher*, 547 U.S. 1, 7 n.3 (2006); *Agnew*, 683 F.3d at 334-39. Courts deviate from this rule only where plaintiffs establish that a practice "so obviously threaten[s] to reduce output and raise prices" that it can be condemned *per se* or with merely a "quick look." *Alston*, 141 S. Ct. at 2156. That can occur only where courts "have amassed 'considerable experience with the type of restraint at issue' and 'can predict with confidence that it would be invalidated in all or almost all instances.'" *Id.* For everything else in the "great in between," courts use the rule of reason to "assess[] the challenged restraint's 'actual effects on competition.'" *Id.* at 2154 (quoting *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018)).

This is not the rare case where the allegations compel a departure from the rule of reason. Paragraph 14 was part of McDonald's franchise agreement and operated as an intrabrand restraint designed to incentivize investment and collaboration—thereby enhancing interbrand competition, "the primary purpose of the antitrust laws." *Khan*, 522 U.S. at 15. It was thus a vertical restraint between entities at different levels of a chain of distribution, not the kind of restraint courts have repeatedly and invariably found anticompetitive.

### a.    Paragraph 14 Was a Vertical Restraint

Plaintiffs do not dispute that Paragraph 14 was part of the standard franchise agreement between McDonald's and its franchisees, McD A-3, or that this relationship is vertical. *See Will v. Comprehensive Accounting Corp.*, 776

F.2d 665, 670 n.1 (7th Cir. 1985) (franchisor-franchisee relationship is akin to "vertical integration"). Franchise agreements often restrain intrabrand competition to foster interbrand competition by encouraging retailers to invest in services and expertise in the promotion of one brand over another. *Sylvania*, 433 U.S. at 55. Because these and other types of vertical restrictions are inherently more complex and less suspect than naked collusion among horizontal competitors, they are assessed under the rule of reason. *Amex*, 138 S. Ct. at 2284; *see also Sylvania*, 433 U.S. at 50.

Plaintiffs do not challenge those principles, arguing instead that Paragraph 14 is a "per se unlawful market allocation" because McOpCos and franchisees are horizontal competitors for labor. *See* AOB 25, 44. Yet "a restraint is horizontal not because it has horizontal effects, but because it is the product of a horizontal agreement." *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 n.4 (1988). The Supreme Court has long recognized that all manner of intrabrand restraints on franchisees are "vertical restrictions" with "complex . . . market impact." *Sylvania*, 433 U.S. at 50-51. Because of the nuances of this organizational structure, it does not "change the standard of analysis" when a franchisor "itself operates restaurants in certain territories." *Midwestern Waffles, Inc. v. Waffle House, Inc.*, 734 F.2d 705, 711 (11th Cir. 1984). The DOJ's publicly available guidance is the same, notwithstanding the United States' arguments to this Court. *See* DOJ, No-Poach Approach (last visited Jan.

3, 2023), https://www.justice.gov/atr/division-operations/division-update-spring-2019/no-poach-approach ("A restriction in a franchise agreement that forbids franchisees from poaching each other's employees, however, is subject to the rule of reason in the absence of agreement among the franchisees because it is a vertical restraint.").

Paragraph 14 is no different than other intrabrand restraints in the McDonald's system. McOpCos and franchisees may compete for customers, but myriad restraints—from menu to ingredients to décor—constrain their ability to "compete" across the McDonald's system, a commercial reality Plaintiffs' simplistic conception ignores. *See Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1110 (7th Cir. 1984) (courts are "not required to don blinders and to ignore commercial reality" when evaluating an antitrust claim on the pleadings). Restraints "should be analyzed under the rule of reason" where they "arguably ha[ve] both horizontal and vertical aspects." *In re: McCormick & Co.*, 217 F. Supp. 3d 124, 136 (D.D.C. 2016); *accord Meredith Corp. v. SESAC LLC*, 1 F. Supp. 3d 180, 206 (S.D.N.Y. 2014).

Plaintiffs try to liken Paragraph 14 to a hub-and-spoke conspiracy given the unquestionably vertical dimension of the franchise agreement, AOB 45-46, but missing here is a "rim of the wheel"—that is, "agreements among the [franchisee] spokes" without which there is no horizontal element. *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1192 (9th Cir. 2015);

*accord United States v. Bustamante*, 493 F.3d 879, 885 (7th Cir. 2007). "[M]ere knowledge of [McDonald's] activities, or those of the other [franchisees], is not enough to tie the conspiracy together." *United States v. Townsend*, 924 F.2d 1385, 1391 (7th Cir. 1991). And there is no allegation of "actual agreement" among the thousands of McDonald's franchisees. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 564 (2007).

The far better analogy is the one adopted by the district court: Dual distribution systems. SA-63 n.4. Dual distribution occurs when a "manufacturer simultaneously sells to independent dealers and to those who might otherwise be customers of those dealers." *Id.* That is akin to McDonald's system, where the franchisor also operates company-owned restaurants. *See Midwestern Waffles*, 734 F.2d at 720. Because the existence of two means of distribution expands the overall output of the brand, fostering "extra [interbrand] competition," dual distribution "does not subject to the per se ban a practice that would be lawful if the manufacturer were not selling direct to customers." *Ill. Corp. Travel, Inc. v. Am. Airlines*, 889 F.2d 751, 753 (7th Cir. 1989); *see also Krehl v. Baskin-Robbins Ice Cream Co.*, 664 F.2d 1348, 1350-51 (9th Cir. 1982) (explaining that dual distribution restraints are evaluated under the rule of reason). There is no basis in law or economics for a different rule where, as here, dual distribution expands demand for an input (labor) rather than output (e.g., hamburgers).

Although Plaintiffs ignore this part of the district court's decision, the United States contends the court "conflates product and labor markets" as "[j]ob opportunities are not a branded 'product.'" U.S. Br. 29. Not so. McDonald's not only staffs McOpCo restaurants but also, as the franchisor, promotes working for the brand as America's Best First Job™. McD A-196, 336. That is why TV ads promote a "McDonald's job." *See*, *e.g.*, Alma, *McDonald's "Envelope" Commercial*, YouTube (Feb. 7, 2017), https://tinyurl.com/cte4edu8. And McDonald's as franchisor supplies franchisees with employment toolkits, industrywide compensation surveys, and other materials related to hiring and competitive compensation. ECF 310-5, Exs. 45-46. As in other dual distribution scenarios, McDonald's thus competes as an employer brand in labor markets—ultimately enhancing interbrand competition. *See Bogan v. Hodgkins*, 166 F.3d 509, 515 (2d Cir. 1999) (distinguishing intrabrand restrictions on Northwestern Mutual agents from "classic interfirm" restraints).

### b.  Paragraph 14 Was Not Obviously Anticompetitive

The district court also correctly held that courts have insufficient experience with intrabrand no-hire provisions to condemn them *per se*—even if such provisions could be deemed horizontal. SA-62-63. "A particular course of conduct will not be termed a per se violation . . . until the courts have had considerable experience with that type of conduct and application of the rule of reason

has inevitably resulted in a finding of anticompetitive effects." *Bunker Ramo Corp. v. United Bus. Forms, Inc.*, 713 F.2d 1272, 1284 (7th Cir. 1983). Plaintiffs contend Paragraph 14 is a market allocation scheme and that all such agreements are unlawful *per se*. AOB 25. This argument fails for two reasons.

First, Plaintiffs ignore that an intrabrand restraint like Paragraph 14 arises from a fundamentally different competitive reality than a naked no-hire agreement among interbrand competitors. For example, "a potential fast-food franchisee may be willing to invest in a franchise in a relatively small town only if it has an assurance from the franchisor that the franchisor will not authorize a second franchisee within the same town." Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 2033a (5th ed., 2022 Cum. Supp.). Paragraph 14 provides that assurance for franchisees' investments in training, staffing, and joint advertising about working at McDonald's restaurants. McD A-128, 152-53, 195-97. Thus, while a no-hire restraint might not be justified between horizontal competitors in the interbrand context, in the intrabrand context, it serves to reduce friction, enhance cooperation, and promote investment—with "the overall effect of . . . increas[ing] rather than decreas[ing] output." Areeda & Hovenkamp ¶ 2033a. Consequently, "[t]he great majority" of intrabrand restraints "are found to be lawful." *Id.*; *see also Leegin*, 551 U.S. at 888.

23

Second, Plaintiffs do not allege a market allocation agreement at all. Horizontal competitors divide markets when they agree "to stay out of each other's territories," "enabl[ing] each of the firms . . . to charge higher prices to its customers." *Blue Cross & Blue Shield United of Wisc. v. Marshfield Clinic*, 152 F.3d 588, 591 (7th Cir. 1998). Plaintiffs do not plead, and never otherwise identified, a relevant market to be allocated. Absent an implausible nationwide market for McDonald's restaurant workers, *infra* 42-44, Paragraph 14 merely "constrain[ed] [franchisees] to some degree" but did not "comprise the entire set of suppliers of [the employees'] services." *Bogan*, 166 F.3d at 515. After all, "[w]here the relevant market is so much larger than that portion which may be influenced by certain horizontal competitors, it cannot be seriously contended that whatever restrictions are imposed in fact appreciably stifle competition," *Midwestern Waffles*, 734 F.2d at 720, much less do so with "no (or trivial) redeeming benefits ever," *In re Sulfuric Acid Antitrust Litig.*, 703 F.3d 1004, 1011-12 (7th Cir. 2012).

Analyzed on its actual terms—as an intrabrand no-hire restraint—Plaintiffs cannot identify a "considerable" history of adjudication to support "with confidence" a presumption that such restraints are "invalid[] in all or almost all instances." *Leegin*, 551 U.S. at 886-87. Plaintiffs and their *amici* instead primarily cite cases involving *inter*brand restraints. AOB 25-26; U.S. Br. 17-20; State AG Br. 6, 20. Plaintiffs' lone exception, *Arrington v. Burger*

*King Worldwide, Inc.*, 47 F.4th 1247, 1257 (11th Cir. 2022), considered only whether an intrabrand no-hire provision could plausibly be "concerted action" under the *Copperweld* doctrine (an issue not disputed in this appeal); the Eleventh Circuit expressly *declined* "to determine what level of scrutiny . . . should apply" to such a provision. So too for the district court orders noted by *amici*. *See* State AG Br. 6, 20.

Courts reaching the issue have rejected attempts to extend *per se* treatment to intrabrand labor restraints. For example, the Second Circuit refused to condemn *per se* a labor restraint by Northwestern Mutual agents on their sales personnel because the agreement was not the "classic interfirm horizontal [labor] restraint" considered to be "a typical per se illegal" agreement. *Bogan*, 166 F.3d at 515. As that court explained, rule-of-reason analysis is necessary because the alleged labor restraint "is akin to an intrafirm agreement . . . to restrain trade only in [employees] of that company," not a "classic interfirm horizontal restraint of trade in [employees]" of "multiple companies." *Id.*; *see also Williams v. I.B. Fischer Nev.*, 999 F.2d 445, 448 (9th Cir. 1993) (intrabrand franchise no-switching provision not *per se* unlawful); *Ogden v. Little Caesar Enters.*, 393 F. Supp. 3d 622, 632-36 (E.D. Mich. 2019) (same); *Conrad v. Jimmy John's Franchise, LLC*, 2021 WL 3268339, at *10 (S.D. Ill. July 30, 2021) (same); *Union Circulation Co. v. FTC*, 241 F.2d 652, 656-57 (2d Cir. 1957) (same in interbrand context); *Coleman v. Gen. Elec. Co.*, 643 F. Supp.

1229, 1243 (E.D. Tenn. 1986), *aff'd*, 822 F.2d 59 (6th Cir. 1987) (same); *Cesnik v. Chrysler Corp.*, 490 F. Supp. 859, 866-67 (M.D. Tenn. 1980) (same); *Consultants & Designers, Inc. v. Butler Serv. Grp., Inc.*, 720 F.2d 1553, 1561 (11th Cir. 1983) (no-hire provision in employment agreement not *per se* unlawful); *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 899-900 (9th Cir. 1983) (same).

These cases recognize, as this Court has explained, that the "benefits of reasonably enforced noncompetition covenants" are "beyond question." *Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255, 265 (7th Cir. 1981); *see also Nichols v. Spencer Int'l Press, Inc.*, 371 F.2d 332, 337 (7th Cir. 1967) (concluding that "a standard of reasonableness" applied to a "no-switching agreement" by which companies refused *for a six-month period* to employ former employees of one another). That is why such provisions in the franchise context, like other intrabrand restraints with procompetitive potential, must be challenged under the rule of reason. *See Sylvania*, 433 U.S. at 50-51; *Leegin*, 551 U.S. at 886.

All told, Paragraph 14's "threat[]" to competition is far less "obvious[]" than the restraint the Supreme Court unanimously subjected to the rule of reason in *Alston*, 141 S. Ct. at 2156. There, the defendants had concentrated buyer power over a market in which student athletes had "nowhere else to sell their labor" and had "admitted horizontal price fixing" that "*in fact* decrease[d] the compensation that student-athletes receive[d] compared to what a competitive market would yield." *Id.* at 2154-56. The Court nevertheless held that the

26

rule of reason applied because the case involved "restrictions in [a particular] labor market yield[ing] benefits in [a corresponding] consumer market" that "present[] complex questions requiring more than a blink to answer." *Id.* at 2155-57.

On its face, Paragraph 14 presents similarly complex questions without clear anticompetitive effects in any relevant market. Like other intrabrand restraints—requiring restaurants to offer the Filet-O-Fish or Dollar Menu, for example—Paragraph 14 reduces competition between businesses that must collaborate while competing. *See* Areeda & Hovenkamp ¶ 2033a; *see also Sylvania*, 433 U.S. at 51 (recognizing "complex . . . market impact" where provision may reduce intrabrand competition and stimulate interbrand competition). Those intrabrand restraints can discourage individual owners from trying to get ahead with new or different menu items, coupons, or other promotions—or from raiding other operators for talent rather than investing in training and internal growth opportunities. *Cf. Chi. Pro. Sports Ltd. P'ship v. NBA*, 95 F.3d 593, 598 (7th Cir. 1996) ("[N]o one expects a McDonald's outlet to compete with other members of the system by offering pizza."). But in return it fosters cooperation on everything from jointly advertising that the McRib is Back to campaigns about America's Best First Job™. The payoff is brand-enhancing consistency and quality that increase sales. Paragraph 14 was thus part of an

"output enhancing [effort] in the market for fast food." SA-63. Tracing the degree of that impact is the very complex analysis that precludes *per se* condemnation under *Alston*.

Plaintiffs argue *Alston* has little import because there the defendant, not plaintiff, sought quick-look review. AOB 42-44. But that has no bearing on the general applicability of the Supreme Court's guidance about when courts may deviate from the "presumptive" rule-of-reason framework. 141 S. Ct. at 2151. As Plaintiffs recognize, *Alston* "reaffirmed" "the relevant legal standards." AOB 42; *see Alston*, 141 S. Ct. at 2156. Under those standards, the district court correctly concluded that the rule of reason applies. SA-62-63.

Plaintiffs last claim that *Alston* requires that restraints be "necessary" to a joint venture, AOB 43-44, and repeatedly cite a parenthetical that "the ability of McDonald's franchises to coordinate the release of a new hamburger does not imply their ability to agree on wages for counter workers," *id.* at 7, 39, 43 (quoting *Alston*, 141 S. Ct. at 2157). That echoes Plaintiffs' erroneous understanding of the ancillary restraints doctrine, *infra* 31-38, and ignores the context of those statements. The Supreme Court was explaining that while "*some* restraints [that] are necessary to create or maintain a league sport" can be held *lawful* after a quick look, "a fuller review may be appropriate for others." *Alston*, 141 S. Ct. at 2156-57. That is the fuller review the district court required—the rule of reason.

28

### 2.     Paragraph 14 Was Ancillary to the Franchise Agreement

The rule of reason also applies here because, as the district court determined, Paragraph 14 was ancillary to the broader franchise agreement. *See In re Sulfuric Acid Antitrust Litig.*, 703 F.3d at 1013 (rule of reason applies to ancillary restraints); *Polk Bros.*, 776 F.2d at 189 (same). Plaintiffs' arguments ignore their own allegations and run afoul of this Court's long-established precedent.

### a.  Paragraph 14 May Have Contributed to the Success of the McDonald's System

It is the law in this Circuit that a restraint is ancillary where it "may contribute to the success of a cooperative venture that promises greater productivity and output." *Polk Bros.*, 776 F.2d at 188-89. The Complaints recognize that Paragraph 14 did just that. Paragraph 14 was an "explicit contractual prohibition contained in standard McDonald's franchise agreements" that prevented franchisees from stealing one another's employees. McD A-3, 22, 76-77. As Plaintiffs allege, the success of the overall franchise system "depend[ed] in part on" the ability of restaurants "to recruit, motivate and retain a qualified workforce." McD A-25, 99.

It is not hard to see how Paragraph 14 may have contributed to the success of the then-nascent McDonald's franchise system, as the Complaints allege and district court concluded. *See* SA-13-14, 63. Allowing one franchisee to

29

raid another's restaurant is not only anathema to a spirit of franchise cooperation but also jeopardizes the quality of the raided restaurant. That, in turn, threatens the guest experience and risks driving unhappy customers to McDonald's competitors. It also sows distrust that defeats the joint brand-promoting obligations of franchisees. Paragraph 14 addressed those risks, enhancing the brand overall and making McDonald's a more formidable force in the marketplace. In Plaintiffs' own words, Paragraph 14 was a crucial "part of McDonald's system to maintain its significant competitive advantage." McD A-4, 77-78; *see also* Richard Epstein, *Antitrust Overreach in Labor Markets*, 15 N.Y.U. J. of L. & Liberty 407, 415-16 (2022) ("There are sensible efficiency reasons why firms might want to enforce these [intrabrand, franchise no-poach] covenants to prevent internal rivalries.").

The Ninth Circuit recently recognized the link between no-poach restraints and these kinds of procompetitive justifications in *Aya Healthcare Services, Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102 (9th Cir. 2021). As the court explained, an agreement that prohibits business partners from "proactively raiding" each other's workers is ancillary because it allows them to "collaborate . . . for the benefit of [their customers] without 'cutting [their] own throat.'" *Id.* at 1110-11 (quoting *Polk Bros.*, 776 F.2d at 189). That is only the most recent in a long history of appellate decisions recognizing labor restraints as "at

least potentially reasonably ancillary to joint, efficiency-creating economic activities" where they enhance collaboration among the venture's members. *Phillips v. Vandygriff*, 711 F.2d 1217, 1229 (5th Cir. 1983).

These cases reflect the straightforward application of Supreme Court precedent that has long refused to condemn other alleged market allocation provisions (such as exclusive territories) ancillary to franchise arrangements because those restraints "induce . . . investment of capital and labor" and thereby enhance the brand's competitiveness. *Sylvania*, 433 U.S. at 54; *see also Bus. Elecs.*, 485 U.S. at 729 (restraint was ancillary because its "plausible purpose" was to enable "better services under the sales franchise agreement"). Because on its face Paragraph 14 likewise had "the potential to create the efficient production that consumers value," it was a classic ancillary restraint. *Premier Elec. Const. Co. v. Nat'l Elec. Contrs. Ass'n, Inc.*, 814 F.2d 358, 370 (7th Cir. 1987).

### b.     Plaintiffs' Attempt To Establish a Heightened Tailoring Inquiry is Contrary to Law

Plaintiffs argue Paragraph 14 was naked, rather than ancillary, because the court failed to find it was strictly "necessary" or "essential" to the viability of McDonald's franchise system. AOB 23. That is not the law. The district court correctly recognized and applied the prevailing standard of ancillarity—

31

whether the restraint "*may contribute* to the success of a cooperative venture," *Polk Bros.*, 776 F.2d at 188-89 (emphasis added); *see* SA-63.

First, Plaintiffs' and *amici*'s assertion that the district court failed to consider Paragraph 14's relationship to the franchise agreement does not withstand scrutiny. *See* AOB 22; U.S. Br. 25-26. The court explicitly determined that Paragraph 14 "may contribute to the success" of the overall franchise system. SA-63 (quoting *Polk Bros.*, 776 F.2d at 189). That was a verbatim application of this Court's "tailor[ing]" inquiry, AOB 23, and was supported by Plaintiffs' own allegations. *Supra* 29-31.

*Amici*'s criticism of the district court for failing to use their preferred verbiage of "reasonable necessity," State AGs Br. 17; U.S. Br. 24, is equally meritless. The district court cannot be faulted for applying the standard mandated by *this Court's* precedent. In any event, "reasonable necessity" is merely *Polk Bros.* by another name. *See*, *e.g.*, *Aya*, 9 F.4th at 1110 (equating the Ninth Circuit's "reasonably necessary" standard with *Polk Bros.*); *Med. Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.*, 922 F.3d 713, 726-27 (6th Cir. 2019) (similar).

Second, there is no support for Plaintiffs' unprecedented *strict necessity* test under which a provision cannot be ancillary unless it is "essential" to the larger venture. AOB 23; *see also* Gregory J. Werden, *The Ancillary Restraints*

*Doctrine after* Dagher, 8 Sedona Conf. J. 17, 23–24 (2007) (comprehensive analysis by DOJ economist rejecting strict-necessity test). To the contrary, the cases Plaintiffs cite are "destructive" to this argument. *Elizabeth Place*, 922 F.3d at 726. For example, then-Judge Sotomayor's opinion in *MLB Properties* relied on this Court's precedent to explicitly *reject* the strict-necessity approach Plaintiffs press here: "Under the ancillary restraints doctrine, a challenged restraint need not be essential, but rather only 'reasonably ancillary to the legitimate cooperative aspects of the venture.'" *MLB Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 340 n.11 (2d Cir. 2008) (Sotomayor, J., concurring in the judgment). And while the United States maligns the Sixth Circuit's comprehensive rejection of a "necess[ity]" test as "mistaken[]" and contrary to this Court's precedent, U.S. Br. 25 n.7, that decision *expressly aligns* itself with *Polk Bros.*, which it recognizes as the "majority rule." *Elizabeth Place*, 922 F.3d at 727.[2]

Nothing in *Blackburn v. Sweeney*, 53 F.3d 825 (7th Cir. 1995), supports Plaintiffs' approach either. *See* AOB 23. *Blackburn* cites and applies *Polk Bros.* with approval, making no change to the applicable standard. 53 F.3d at 828. As the Ninth Circuit explained in rejecting an argument similar to Plaintiffs',

---

[2] The United States also suggests that courts must undertake a separate tailoring inquiry akin to the less-restrictive-alternative analysis conducted at the end of the rule-of-reason inquiry, *see* U.S. Br. 21-30—the very argument it made in *Aya*, which the Ninth Circuit rejected. *See* 9 F.4th at 1111 (finding argument unsupported by same cases the United States cites here). That argument should fail again for the same reasons, including that it goes well beyond the law of this Circuit.

the restraint in *Blackburn* was deemed naked because it was made "*after* the parties' joint venture concluded" and therefore could have had "no pro-competitive effects" related to the venture's success. *Aya*, 9 F.4th at 1110-11. *Blackburn* has no application to a restraint like Paragraph 14, "entered into at the same time the parties agreed to collaborate on a joint venture" with forward-looking procompetitive effects. *Id.* at 1111.

Nor do Plaintiffs' other authorities offer any greater support. The chapter of Areeda and Hovenkamp Plaintiffs and their *amici* cite *rejects* a strict "essential[ity]" rule. Areeda & Hovenkamp ¶ 1908(b); *see also In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 345-46 (3d Cir. 2010) (discussing in relevant part the same treatise chapter). And *Polygram Holding, Inc. v. FTC* did not involve any ancillarity analysis; it concerned a product wholly outside the bounds of the venture. 416 F.3d 29, 37 (D.C. Cir. 2005). As Judge Bork explained in a case Plaintiffs and the United States repeatedly cite, a restraint is ancillary not when it is essential but when it "*appears capable* of enhancing the group's efficiency." *Rothery Storage Van Co. v. Atlas Van Lines*, 792 F.2d 210, 213, 225, 229 (D.C. Cir. 1986) (emphasis added) (pooling agreement that "redefine[d] the terms on which it allowed its carrier agents to compete with the principal company" was "obvious[ly]" ancillary to "the parties' enterprise to carry on a useful business").

Plaintiffs are incorrect insofar as they suggest *NCAA v. Board of Regents of the University of Oklahoma*, 468 U.S. 85 (1984), compels a more rigorous test. AOB 22. *Board of Regents* does not mention ancillarity, much less set forth a general test. It rejected the NCAA's likening of its television plan to a joint venture because "NCAA football could be marketed *just as effectively* without the television plan" and the plan therefore "produced [no] procompetitive efficiencies" at all, in fact "reduc[ing] the volume of television rights sold." 468 U.S. at 114-15 (emphasis added). No court has read *Board of Regents* as imposing a strict-necessity requirement for ancillarity; rather, this Court in *Polk Bros.* understood *Board of Regents* and other precedent as equivalent to the test applied by the district court here. *See* 776 F.2d at 188-89.

Endorsing a strict-necessity standard would not only remake Seventh Circuit law but would also contravene the very purpose of the ancillary-restraints doctrine. The common-law rule of reason was first developed to evaluate a non-compete clause part and parcel of a broader arrangement. *Nat'l Bancard Corp. v. VISA USA, Inc.*, 779 F.2d 592, 597 n.6 (11th Cir. 1986) (discussing *Mitchel v. Reynolds*, 24 Eng. Rep. 347 (1711)). That makes sense, as the rule of reason "weighs all of the circumstances of a case," allowing courts to determine whether the challenged restraint, in its broader context, imposes "anticompetitive effect[s] that are harmful to the consumer" or "stimulat[es] competition . . .

in the consumer's best interest." *Leegin*, 551 U.S. at 885-86. Plaintiffs' unprecedented rule would compel the opposite result: A restraint with evident potential to benefit consumers as part of a larger project would be condemned out of hand unless it was absolutely necessary. That is not, and has never been, the law.

### c. The District Court Properly Resolved Ancillarity on the Pleadings

Finally, Plaintiffs and *amici* make two unpersuasive procedural arguments. First, Plaintiffs argue without citation that ancillarity is an "affirmative defense" that McDonald's waived in its Answer. AOB 36-37. It is not. Ancillarity is a gating inquiry that courts must apply to determine whether to deviate from the default analysis under the rule of reason. *See Phillips*, 711 F.2d at 1228. Nothing in the cases cited by Plaintiffs or *amici* suggests otherwise. *Board of Regents* refers loosely to the defendant's burden to show procompetitive justifications under the rule of reason as an "affirmative defense," 468 U.S. at 113, but that is irrelevant to the threshold ancillarity inquiry. And *Gunn v. Continental Casualty Co.*, 968 F.3d 802 (7th Cir. 2020), is an insurance case addressing the general burden of establishing an affirmative defense— without any discussion of the ancillary-restraints doctrine.[3]

---

[3] The only two decisions McDonald's has identified describing ancillarity as an "affirmative defense" are in *criminal* cases charging *per se* violations and use the phrase

*(Cont'd on next page)*

Regardless, the record defeats any claim of waiver. *See* AOB 36-37. McDonald's argued ancillarity from the case's inception, ECF 35 at 8-11, and maintained its position throughout, culminating in multiple orders expressly ruling on the merits of the ancillarity argument, *see*, *e.g.*, SA-12-14, 42, 63. This Court has rejected waiver arguments as "of course . . . frivolous" where, as here, a party raises a defense in a motion to dismiss and presses it thereafter. *Williams v. Lampe*, 399 F.3d 867, 870 (7th Cir. 2005); *see also Garofalo v. Village of Hazel Crest*, 754 F.3d 428, 436-37 (7th Cir. 2014) (similar).

Second, Plaintiffs and their *amici* suggest (without authority) that it was improper for the district court to resolve ancillarity on the pleadings. AOB 24; *see also* State AGs Br. 20-21. Plaintiffs did not raise this argument below and have therefore waived it. *Heller v. Equitable Life Assurance Soc'y*, 833 F.2d 1253, 1261-62 (7th Cir. 1987). Regardless, courts began deciding ancillarity on the pleadings before passage of the Sherman Act and still do so today. *See Ore. Steam Nav. Co. v. Winsor*, 87 U.S. 64, 70 (1873).[4]

---

in passing. *See United States v. Manahe*, 2022 WL 3161781, at *6 (D. Me. Aug. 8, 2022); *United States v. Gaines*, 2020 WL 5215386, at *4 (D. Minn. Aug. 4, 2020). Each holds simply that the government need not anticipate an ancillary-restraints argument in an indictment. That is not the issue here.

[4] *See also Helmerich & Payne Int'l Drilling Co. v. Schlumberger Tech. Corp.*, 2017 WL 6597512, at *4 (N.D. Okla. Dec. 26, 2017) (motion to dismiss); *Kelsey K. v. NFL Enterp. LLC*, 2017 WL 3115169, at *4 (N.D. Cal. July 21, 2017) (motion to amend); *Hanger v. Berkley Grp., Inc.*, 2015 WL 3439255, at *5 (W.D. Va. May 28, 2015) (motion to dismiss); *Caudill v. Lancaster Bingo Co.*, 2005 WL 2738930, at *3-6 (S.D. Ohio Oct.

*(Cont'd on next page)*

The United States nevertheless protests that the district court's decision to apply the ancillary-restraints doctrine at the pleadings stage is "especially worrisome." U.S. Br. 27. But it fails to explain why, particularly when it recently acknowledged the doctrine is not "inapplicable at the pleading stage." Br. of U.S. at 29 n.2, *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, No. 20-55679 (9th Cir. Nov. 19, 2020). Whatever the United States' hypothetical fears, *this* is precisely the kind of case where resolution on the pleadings is appropriate: The alleged restraint is part of a written contract, incorporated into the Complaints, and affirmatively alleged to contribute to the venture's success. That is all the district court needed to determine that Paragraph 14 was ancillary to McDonald's franchise agreement.

### B.  Plaintiffs Waived and Did Not Allege the Elements of a Rule-of-Reason Claim

The applicability of the rule of reason is fatal to Plaintiffs' case for two independent reasons. First, Plaintiffs forwent a rule-of-reason claim and cannot assert one now. Second, Plaintiffs did not allege an essential element of a rule-of-reason claim—McDonald's market power in any relevant market.

---

24, 2005) (motion for judgment on the pleadings); *Gerlinger v. Amazon.Com, Inc.*, 311 F. Supp. 2d 838, 849 (N.D. Cal. 2004) (same).

### 1.     Plaintiffs Waived a Rule-of-Reason Claim

From the very beginning of their respective cases, Plaintiffs decided to pursue their claim under only the *per se* or quick-look frameworks. SA-16, 36 n.3; *see also* U.S. Br. 5 (recognizing Plaintiffs pursued a claim only "under the 'per se' rule or a 'quick look' analysis"). They declined the district court's explicit invitation to add a rule-of-reason claim, SA-16—as Plaintiffs' counsel acknowledged in open court, McD A-67. The district court thus correctly concluded that Plaintiffs "made a strategic decision early in this case not to amend the complaint to add a claim under the rule of reason." SA-52.

The entire case proceeded based on that election. The magistrate judge oriented discovery around Plaintiffs' attempt "to try and prove under the quick-look analysis that there is a restraint of trade here." ECF 143 at 13. At immense cost, McDonald's engaged in more than two years of discovery under the quick-look framework. Not once in the course of discovery did Plaintiffs ever suggest that they could or would proceed under the rule of reason. *See*, *e.g.*, ECF 268 at 21 (arguing after the close of discovery that the case should be decided "without resort to analysis of market power").

Having "intentionally relinquish[ed] a clear opportunity" to plead or pursue the rule of reason, Plaintiffs are barred from doing so now. *Goldman v. Gagnard*, 757 F.3d 575, 580 (7th Cir. 2014). That is precisely what this Court

held in *Agnew v. NCAA*, 683 F.3d 328 (7th Cir. 2012). There, as here, the plaintiffs chose to proceed under the quick-look framework, omitting a rule-of-reason claim and the allegations required to plead one. *See id.* at 347. When this Court concluded that the rule of reason applied, it affirmed dismissal. *Id.*; *see also Dagher*, 547 U.S. at 7 & n.2 (declining to conduct rule-of-reason analysis where plaintiffs pursued only *per se* theory and "ha[d] not put forth a rule of reason claim").

Plaintiffs miss the point in arguing that they had no obligation to "plead legal theories." AOB 35. Plaintiffs affirmatively *disclaimed* the rule-of-reason analysis in word and deed, *supra* at 10, 39-40—waiver even under Plaintiffs' cases. *See In re Processed Egg Prods. Antitrust Litig.*, 206 F. Supp. 3d 1033, 1051 (E.D. Pa. 2016) (plaintiffs "waive[] their claims under [the] rule of reason" where they "exclusively plead[] a *per se* theory or expressly disavow[] the rule of reason"); *see also Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1140, 1143 (9th Cir. 2022) (new antitrust theory waived where plaintiff "expressly chose" to pursue an alternative despite the district court "repeatedly rais[ing]" the issue and providing "leave to file an amended complaint").

Nor was there anything improper in the district court granting judgment on the pleadings "after years of discovery." AOB 36. Plaintiffs cite no case from this Court that requires departing from the letter of Rule 12, which allows a district court to grant judgment on the pleadings anytime "[a]fter the pleadings

are closed" until doing so would "delay trial." Fed. R. Civ. P. 12(c). Regardless, this is not a case, like the out-of-circuit cases Plaintiffs cite, in which discovery clarified or expanded on relevant allegations. *See Grajales v. Puerto Rico Port Auth.*, 682 F.3d 40, 46 (1st Cir. 2012); *Ideal Steel Supply Corp. v. Anza*, 652 F.3d 310, 325-26 (2d Cir. 2011). Plaintiffs' Complaints did not include *any allegations at all* about either a relevant market or the rule of reason, each of which require entirely separate issues of proof. That in turn would necessitate a total redo here—new discovery, new expert analyses, and new argument. *See USA Petroleum Co. v. Atl. Richfield Co.*, 13 F.3d 1276, 1286 (9th Cir. 1994) (plaintiffs do not get a "second bite" to pursue an antitrust theory they "recognized was available but expressly chose not to pursue").

District courts "can and should hold the plaintiff to his original theory." *Vidimos, Inc. v. Laser Lab Ltd.*, 99 F.3d 217, 222 (7th Cir. 1996). That is what the court did here, and Plaintiffs cannot seek "rescue . . . from a tactical decision that, in hindsight, [they] regret[]." *Sanchez v. City of Chicago*, 880 F.3d 349, 360 (7th Cir. 2018).

### 2. Plaintiffs Failed to Allege the Elements of a Rule-of-Reason Claim

A threshold element under the rule of reason is the relevant market, *Amex*, 138 S. Ct. at 2285, for "[i]t is the existence of a commercial market that implicates the Sherman Act in the first instance," *Agnew*, 683 F.3d at 337. As

the district court explained, Plaintiffs failed to allege a relevant market, much less facts establishing McDonald's power in it—a fatal defect. SA-61-66. Plaintiffs' belated suggestion that they asserted a "market of McDonald's employers for Class member labor," AOB 33, is merely a "post hoc argument[] attempting to illuminate a [nonexistent] market allegation." *Agnew*, 683 F.3d at 347.

A relevant market in the labor context encompasses the competing employers that provide reasonably substitutable jobs. *Eichorn v. AT&T Corp.*, 248 F.3d 131, 147 (3d Cir. 2001). But Plaintiffs do not identify even a single allegation outlining their asserted market, much less explaining how or why "significant substitution in consumption or production" could support such a market. *Amex*, 138 S. Ct. at 2285. The district court repeatedly noted this omission, and Plaintiffs *conceded* below that they had not alleged a relevant market. *See, e.g.*, SA-16, 46, 61; ECF 268 at 21; ECF 344 at 2. They should not be heard to argue otherwise now.

Regardless, Plaintiffs' supposed nationwide market of McDonald's restaurant workers is implausible. As the district court observed, common sense dictates that the relevant labor market is limited to "a relatively-small geographic area" because "[m]ost employees who hold low-skill retail or restaurant jobs are looking for a position in the geographic area in which they already live and work." SA-16; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 664 (2009) (courts "draw on [their] experience and common sense" in evaluating pleadings). That

is consistent with Ms. Deslandes's allegation that she sought work at a "nearby McDonald's restaurant." McD A-18; *see also EEOC v. Chi. Miniature Lamp Works*, 947 F.2d 292, 295 (7th Cir. 1991) ("Chicago (the city only, not the metropolitan area) was the relevant labor market for [certain] entry-level workers.").

Nor is it plausible that McDonald's restaurants are a market unto themselves. Such single-brand markets are often "dismiss[ed] on the pleadings." *Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. 2001); *see also, e.g., Sheridan v. Marathon Petroleum Co.*, 530 F.3d 590, 595 (7th Cir. 2008) (affirming dismissal of single-brand market). That is particularly true for labor markets involving low-skill work, where "it is beyond doubt that [one brand of restaurants] would have to increase their wages to retain any employees" if all other nearby restaurants "suddenly doubled the wages they paid to their employees." *Madison 92nd St. Assocs., LLC v. Courtyard Mgmt. Corp.*, 624 F. App'x 23, 29 (2d Cir. 2015) (affirming dismissal of antitrust claim because single-brand labor market was implausible); *see also Eichorn*, 258 F.3d at 147 (rejecting similarly narrow alleged labor market).

While Plaintiffs emphasize McDonald's industry-leading training, AOB 33-34, they fail to allege that point-of-sale skills, food-safety knowledge, customer service experience, and the like have little or no value to Burger King, Walmart, or Disney World—much less that these (and other) employers do not

compete for McDonald's workers. No more persuasive is Plaintiffs' assertion that Paragraph 14 "would serve no economic purpose" absent a McDonald's-only market. *Id.* at 8-9. Their cited support—a summary of their damages estimate—offers none. ECF 270-5 at 8. And their argument erroneously assumes (without evidence) that Paragraph 14 could have been adopted only for the purpose of depressing wages, ignoring the extensive uncontroverted evidence establishing actual intrabrand-cooperation-focused reasons for the restraint. ECF 302-1, Ex. 2 at 73-74.

Unable to muster the requisite allegations of market power in a relevant market, Plaintiffs contend that "direct proof of detrimental effects" relieves them from any obligation to do so. AOB 31-32. This Court has already rejected that argument, holding "[e]conomic analysis is virtually meaningless if it is entirely unmoored from at least a rough definition of a product and geographic market." *Repub. Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 737 (7th Cir. 2004). For that reason, a plaintiff relying on "direct evidence of anticompetitive effects" must still establish the "rough contours of a relevant market" and the defendant's "substantial share of the market." *Id.*; *see also Amex*, 138 S. Ct. at 2284-85 (holding that where plaintiffs "rel[y] exclusively on direct evidence,"

courts "must first define the relevant market" to "assess this evidence"). Plaintiffs cannot overcome their failure to allege a relevant market or market power in it.[5]

## II.    McDonald's Also Was Entitled to Summary Judgment

Even if Plaintiffs' claim could not be resolved on the pleadings, McDonald's was entitled to summary judgment because undisputed evidence confirmed that Paragraph 14 was ancillary to the franchise agreement and supported by procompetitive justifications—requiring the rule-of-reason analysis that Plaintiffs foreswore. *See* Fed. R. Civ. P. 56.

### A.    Undisputed Evidence Reinforced that the Restraint Was Ancillary

Discovery confirmed what is clear on the face of the Complaints: Paragraph 14 was ancillary because it "promoted enterprise and productivity at the time it was adopted." *Polk Bros.*, 776 F.2d at 189. There is no evidence Para-

---

[5] Plaintiffs make much of McDonald's unilateral decision to improve compensation and benefits at McOpCo restaurants in 2015. AOB 10. No such allegations are in Plaintiffs' Complaints, and they were not argued as a basis to avoid judgment on the pleadings. Regardless, Plaintiffs' invocation of this unpreserved argument underscores the implausibility of a single-brand labor market. McDonald's responded to wage increases by major *retailers* by increasing pay and benefits for McOpCo workers in 2015 to "differentiate [itself] from [its] competitors" and "enhance the competitiveness of McDonalds" (and then adopted a six-month moratorium on hiring franchisee crew within 25 miles of any McOpCo to allow franchisees time to make the same move without facing disruptive pressure from their franchisor). McD A-333-34; *see also* ECF 417 at 10.

graph 14 was adopted to suppress wages, reduce costs, or harm workers; ra-
ther, it encouraged cooperation, protected franchise owners' training invest-
ments, and deterred intrabrand free-riding. *See* McD A-337-38; ECF 380-11 at
55-56. Paragraph 14 thus "help[ed] McDonald's ensure standardization, con-
sistency and quality across its stores," all of which enhance the McDonald's
brand. McD A-173. It also promoted "trust between [McDonald's] franchisees
and the company," which "is really important to the success of McDonald's as
a company." ECF 381-6 at 66-67. These salutary effects helped "McDonald's
grow and compete" in the marketplace. McD A-173.

Plaintiffs suggest Paragraph 14 was unnecessary because McDonald's
business survived after the provision's excision. AOB 12-13. But "necessity" is
not the controlling legal standard. *Supra* 32-36. Ancillarity turns on whether
the restraint "arguably . . . promoted enterprise and productivity *at the time it
was adopted*." *Polk Bros.*, 776 F.2d at 189 (emphasis added); *accord Aya*, 9
F.4th at 1110–11. The *ex post* rule advocated by Plaintiffs would perversely
preclude a company from *ever* reconsidering an ancillary restraint based on
changed circumstances.[6]

---

[6] The record does not support this argument either. The lone testimony Plaintiffs
cite—from Bill Lowery, McDonald's Vice President of Diversity—does not indicate
that Paragraph 14's removal had no effect. *See* AOB 12; McD A-337. His failure to
observe a change after Paragraph 14's removal was unsurprising: It had never "im-
*(Cont'd on next page)*

### B.  Even if the Quick-Look Framework Initially Applied, McDonald's Triggered the Full Rule of Reason by Proffering Procompetitive Justifications

Even if Plaintiffs were correct that proceeding past the pleadings on a quick-look basis was appropriate, their claim still failed at summary judgment. McDonald's adduced evidence of plausible procompetitive justifications, shifting the burden to Plaintiffs to prove up a "precise market definition." *Agnew*, 683 F.3d at 336-37. Plaintiffs dispute McDonald's justifications by first misstating the law, then the record.

The rule of reason is not cabined to cases with conclusive evidence of procompetitive justifications, AOB 29, although that standard was met here. Rather, the quick look shifts into a full rule-of-reason analysis upon "some explanation connecting the practice to consumers' benefits." *Chi. Pro. Sports Ltd. P'ship v. NBA*, 961 F.2d 667, 674 (7th Cir. 1992); *accord Agnew*, 683 F.3d at 336-37. That is because, "[w]hen determining whether to apply the rule of reason analysis . . . , the issue is not whether the restrictions *were* procompetitive, but whether they *could be*." *Craftsmen Limo., Inc. v. Ford Motor Co.*, 363 F.3d 761, 776 (8th Cir. 2004).

---

pacted" his day-to-day work "in the first place." *Id.* By contrast, McDonald's executives who actually worked with both Mr. Kroc and Paragraph 14 emphasized that the provision in fact "enhance[d] the trust element between owner-operators" and reduced "friction between them." ECF 381-6 at 181-82.

In suggesting otherwise, Plaintiffs conflate the abbreviated quick-look inquiry with the discerning analysis under the full rule of reason. The quick-look inquiry determines if "a full Rule of Reason analysis" is appropriate. *Agnew*, 683 F.3d at 336. If so, as part the rule of reason's second step, courts then determine whether the defendant in fact offered valid, non-pretextual, procompetitive justifications. *See Amex*, 138 S. Ct. at 2284 (describing the three-step rule-of-reason test). Requiring that same proof under the quick look would collapse these inquiries and render them redundant. *Consultants Designers*, 720 F.2d at 1562; *see also Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 771 (1999) (full rule of reason applies where "restrictions might plausibly be thought to have a net procompetitive effect").

Plaintiffs also are mistaken in attempting to divorce the quick-look analysis from Paragraph 14's historical purpose. AOB 40-41. As this Court has explained, the proper assessment is whether the challenged restraint "promoted enterprise and productivity *at the time it was adopted*." *Polk Bros.*, 776 F.2d at 189 (emphasis added); *see also Khan*, 522 U.S. at 10 (highlighting a company's "condition before and after the restraint was imposed" as well as "restraint's history, nature, and effect"). So while Plaintiffs are correct that "no franchise agreement in effect during the Class period was executed in 1955," AOB 40-41, it is also undisputed that Paragraph 14 remained the same in substance in every standard McDonald's franchise agreement from 1955 to 2017, *see* McD

A-329-30 (analyzing Paragraph 14 from 1955 to 2017). Under *Polk Bros.*, the uncontroverted evidence that Paragraph 14 promoted intrabrand cooperation, deterred free-riding, and expanded McDonald's output (of restaurants, hamburgers, and jobs) at the time it was adopted is more than sufficient. *See* SA-38-42.

First, unchallenged evidence established that Paragraph 14 was part of "Mr. Kroc's strategy" to enhance interbrand competition by fostering intrabrand coordination. McD A-146-47; *see also Sylvania*, 433 U.S. at 54-56. As explained above, Paragraph 14 stemmed the risks of one McDonald's restaurant raiding another or discouraging investments by restaurants in training their people, either of which could damage the brand as a whole. It further reduced friction among franchisees who must work together and pool resources in all manner of collaborations. *Supra* 4-5, 23, 29-30; *see also, e.g.*, ECF 381-6 at 180-82; McD A-189-90, 194. Such brand-enhancing collaboration is the archetypical procompetitive effect of intrabrand restraints. McD A-146-47; *see also K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 127-28 (2d Cir. 1995) ("Restrictions on intrabrand competition can actually enhance market-wide competition by fostering vertical efficiency and maintaining the desired quality of a product."); *Westman Comm'n Co. v. Hobart Int'l, Inc.*, 796 F.2d 1216, 1227 (10th Cir. 1986) (similar).

49

Plaintiffs do not contest this wholly unrebutted justification—waiving any argument against it. *White v. United States*, 8 F.4th 547, 552 (7th Cir. 2021). Plaintiffs instead caricature a portion of one of McDonald's interrogatory responses as asserting that Paragraph 14 enabled franchisees to "keep[] wages down to increase profits." AOB 39. McDonald's never asserted that justification below and does not press it here. ECF 417 at 20-23. Regardless, the undisputed evidence shows that McDonald's consistently encouraged its franchisees to pay *more* in wages to enhance the competitiveness of the brand— which makes sense because franchisees pay McDonald's a share of *revenue*, not *profit*. *See, e.g.*, McD A-316; ECF 384-33 at -432, -444; ECF 384-34 at -944-45. Franchisees understood that competitive wages "help[ed] . . . attract and retain the best people." ECF 384-34 at -945.

A second plausible "justification for cooperation" is deterring intrabrand free-riding, whereby franchisees forgo investing in training and instead hire workers trained by other franchisees. *Chi. Pro. Sports*, 961 F.2d at 674-75; *see also Rothery Storage*, 792 F.2d at 228 ("[E]limination of the free ride is an efficiency justification available to horizontal restraints that are ancillary to a contract integration."). Undisputed evidence underscored that Paragraph 14 did just that. *See* McD A-176-81; ECF 381-6 at 66-67; ECF 380-11 at 55-56.

Plaintiffs challenge this justification by mischaracterizing the concept of free-riding, arguing that there is no "free ride" because a franchisee has to pay

someone higher wages to jump ship. AOB 38-39; *see also* COSAL Br. 30. But the free-riding problem here is that the hiring franchisee will receive the benefit of the other franchisee's past training investment without paying for that training. *See Elizabeth Place*, 922 F.3d at 730 (recognizing legitimacy of deterring provider from free-riding on physician training). Plaintiffs' argument also ignores the need to incentivize training in the first place. The mere threat of free-riding reduces franchisees' incentive to make that investment—which is bad for workers and the brand. McD A-130-32.[7]

Plaintiffs also suggest in passing that Paragraph 14 was too broad because it was "not bound by time or geography." AOB 41; *see also* AAI Br. 13-14. But Paragraph 14 contains a six-month limit, McD A-56, and workers frequently moved notwithstanding the provision, McD A-236-46. Further, this argument confuses the inquiry actually before the Court—whether any plausible procompetitive justifications exist for the restraint—with the final step of the

---

[7] Plaintiffs cite cases in which "there was little or no opportunity to 'free' ride on anything." *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 938 (7th Cir. 2000); *accord General Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588, 592-94 (7th Cir. 1984). But here, free-riding on training investments is a well-documented public good problem that McDonald's reasonably sought to combat by adopting Paragraph 14. McD A-130-32. At minimum, this justification is "plausibl[e]." *Cal. Dental*, 526 U.S. at 771; *see also Williams v. Nevada*, 794 F. Supp. 1026, 1029 (D. Nev. 1992) (rejecting antitrust challenge to Jack-in-the-Box's "'no-switching' clause," which similarly combatted "raiding").

rule of reason, which asks whether the restraint is more restrictive than necessary. *See Amex*, 138 S. Ct. at 2284.

Finally, Paragraph 14 plausibly contributed to expanding McDonald's output—the quintessential procompetitive justification. *See Amex*, 138 S. Ct. at 2282; *Polk Bros.*, 776 F.2d at 190-91. Intrabrand restraints including Paragraph 14 propelled McDonald's to exponential growth, which provided jobs for millions of people. McD A-140-47; ECF 381-5 ¶ 6.

Without disputing any of this, Plaintiffs suggest in a single conclusory sentence that benefits in the consumer market for hamburgers cannot justify purported harm in the labor market. AOB 39. That ignores increased output in the labor market (jobs and training) as a result of McDonald's expansion. McD A-144-47, 338-39; *see also* ECF 302-1, Ex. 2 at 6-7. It also is wrong as a matter of law. The Supreme Court has credited cross-market justifications at least twice. *See Alston*, 141 S. Ct. at 2152 (labor market restraints benefit consumer market for viewing amateur sports); *Bd. of Regents*, 468 U.S. at 115-20 (restraint in market for televised games benefitted live sports market). This Court has done the same. *See Deppe v. NCAA*, 893 F.3d 498, 502-03 (7th Cir. 2018) (rules restraining competition for athletes' labor were "presumptively procompetitive" because they have benefits in the market for viewing amateur sports); *see also In re: NCAA Grant-In-Aid Cap Antitrust Litig.*, 958 F.3d 1239,

1258 (9th Cir. 2020) (accepting cross-market effects); *Sullivan v. NFL*, 34 F.3d 1091, 1112 (1st Cir. 1994) (same).

*Amici* contend that *Alston* "express[ed] no views" on cross-market balancing. AAI Br. 25 n.4 (quoting *Alston*, 141 S. Ct. at 2155). But cross-market justifications were the only ones offered there to support rule-of-reason analysis. *See Alston*, 141 S. Ct. at 2152. At a minimum, *Alston*'s demurral demonstrates that the dated dicta from *Philadelphia National Bank* and *Topco* cited by Plaintiffs, AOB 39-40, are not controlling. *See* Areeda & Hovenkamp ¶ 972. Scholarship is in accord. *See*, *e.g.*, Werden, *supra*, at 22-29 (DOJ economist explaining why statements from *Philadelphia National Bank* and *Topco* are not controlling).

To ignore benefits in the consumer market would stand antitrust law on its head by condemning "restrictions on competition that would actually enhance the *overall competitive process*." *Fishman v. Estate of Wirtz*, 807 F.2d 520, 537 (7th Cir. 1986) (emphasis added). If anything, it makes the most sense to consider cross-market justifications in the context of ancillary restraints like Paragraph 14. Because an ancillary restraint by definition is "part of a larger endeavor," *Polk Bros.*, 776 F.2d at 188-89, its benefits and costs will frequently cut across multiple markets. *See*, *e.g.*, *Elizabeth Place*, 922 F.3d at 730-31 (an-

cillary restraint in market for doctor labor benefited market for patient services); *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 62-63 (1st Cir. 2004) (similar).

Paragraph 14's procompetitive effects on output in multiple sectors, combined with its other plausible justifications, are more than enough to shift the burden to Plaintiffs to establish a relevant market. *See Agnew*, 683 F.3d at 336-37.

### C. Plaintiffs Did Not Attempt To Prove a Relevant Market

Under the ancillary-restraints doctrine and as a result of McDonald's proffered procompetitive justifications, Plaintiffs had the burden of proving a relevant market. *Polk Bros.*, 776 F.2d at 191; *Agnew*, 683 F.3d at 337. They did not even attempt to do so. *See* SA-46. Their allusions to purported "suppress[ion]" of "worker pay nationwide" assume that McDonald's restaurants are a nationwide market unto themselves. AOB 31. But the evidence unequivocally demonstrates local markets brimming with competing employers. *See* SA-46.

To start, the universe of "reasonably interchangeable" jobs, which defines the set of employers in a labor market, goes far beyond McDonald's restaurants. *FTC v. Advoc. Health Care Network*, 841 F.3d 460, 467 (7th Cir. 2016). Franchisees and hiring managers testified about how they are constantly recruiting from, and losing employees to, Burger King, Arby's, Taco

Bell, Culver's, Wendy's, Chipotle, Walmart, Amazon, Target, and the like. ECF 310-12 at 14, 31; ECF 382-19 at 4; *see also* McD A-319, 321-22 (extensive documentation of the same). As one example, McOpCos in Kearney, Nebraska raised their starting wage from $9 to $10 after they found wages at nearby restaurants and retailers were outpacing their restaurants. ECF 310-4, Ex. 32 at 5. As another, McOpCos' 2015 compensation increase was driven by competition with major brands, including retailers. ECF 381-13 at 176-77. Both are the definition of competition. *See Advoc. Health Care*, 841 F.3d at 476.

Plaintiffs tout "practical indicia" that "McDonald's-specific training ha[d] unique value to McDonald's employers." AOB 33-34. But anecdotes about skills with marginally more utility at a McDonald's restaurant do not suffice to define a market. Every job entails some employer-unique experience, but that does not prevent competition for those workers in a broader marketplace. ECF 302-1, Ex. 1 at 152-55 & Ex. 2 at 69-73. Regardless, Plaintiffs' own experiences belie their argument: Each testified to leveraging their McDonald's experience to seek or obtain other jobs. *See* ECF 384-39 at 176-77; ECF 384-12 at 298.

Plaintiffs' suggestion of a nationwide market is similarly unsupported. Fact and expert witnesses testified without exception that competition for quick-serve, retail, and similar positions is local as most workers commute short distances for jobs at McDonald's restaurants or similar establishments. McD A-322; ECF 270-5 at 53-54; SA-47-49. Plaintiffs' own expert "recognized

that crew members likely sell their labor in local markets." SA-48-49 (citing ECF 302-1, Ex. 3 at 235-36); *see also* SA-49 ("92% of McDonald's employees work within ten miles of home."). As the district court found, it therefore "defies logic to suppose" that Plaintiffs "sell their labor in a national market." SA-46; *see also Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911, 917 (7th Cir. 2020) (explaining that geographic markets are "small" where local "convenience is important").

Plaintiffs thus failed to establish an issue of fact with regard to the alleged product or geographic market—each fatal to their claim.

## III.    The Court Did Not Abuse Its Discretion in Denying Class Certification

Because Plaintiffs failed to state a claim—or establish a triable issue of fact—the Court need not reach the district court's denial of class certification. In any event, the district court acted well within its discretion in denying Plaintiffs' request to certify a nationwide class of millions of people. To certify a Rule 23(b)(3) class, a plaintiff must establish that common questions predominate. *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012). Plaintiffs flunk this inquiry at least twice over.

**A.    The Absence of a Defined Relevant Market Defeats Predominance**

Plaintiffs' primary argument is that they need only "prove the existence of the agreement and that McDonald's joined it," AOB 49—erroneously assuming that no relevant market need be defined because the *per se* rule applies. That assumption—and Plaintiffs' interpretation of *Alston*, *id.* at 42-44—are incorrect. *Supra* 28, 41-45. Because the rule of reason *does* apply, the district court had to "rigorous[ly] analy[ze]," *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011), whether individual issues concerning defining and analyzing relevant markets predominated over common ones.

The district court rightly concluded that individualized issues predominate given the "hundreds or thousands of local relevant markets" implicated by the class. SA-47. Plaintiffs offered no evidence of relevant markets and undisputed evidence established the relevant labor markets were local, not national. *Supra* 54-56. Plaintiffs' expert acknowledged that "the labor market across McDonald's varies quite a bit," including "by location in the U.S." ECF 302-1, Ex. 3 at 237. Defining the geographic bounds of each local market for a nationwide class entails innumerable individualized assessments.

That is only the start. Within each market, a jury would have to determine the "local employers" with which specific McDonald's restaurants compete. SA-47. These include not only other quick-serve restaurants like Burger

King but also hotels (like the one at which Ms. Turner worked) and retail stores (like the one at which Ms. Deslandes worked). SA-47-48; *see also supra* 55. This too varied over time and place. *See* SA-47-49.

Plaintiffs do not address this point*, see* AOB 50-54, but they cannot leap-frog the individualized questions presented by this element of their claim. Each town, county, or state requires unique studies about commuting distances, surveys about workers' willingness to commute, and evidence about businesses' perceptions of their competitors—among many other things. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962); *Sharif Pharmacy*, 950 F.3d at 917. The district court did not abuse its discretion in finding these individualized questions predominate. *See Funeral Consumers Alliance, Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 350 (5th Cir. 2012) (affirming denial of certification of nationwide class where the "correct geographic market [was] localized and not nationwide," making each claim "not susceptible to class-wide proof").

### B.     Plaintiffs Did Not Offer Common Proof of Antitrust Injury

Plaintiffs also failed to demonstrate that they could establish antitrust injury—"injury of the type the antitrust laws were intended to prevent and that flows from that which makes [the] defendants' acts unlawful," *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)—with common evidence. Plaintiffs contend that their "expert analysis" demonstrated classwide wage suppression. AOB 51. But even setting aside the inadmissibility of those

opinions, *see* ECF 300 & 301, neither of their experts could answer whether the alleged conspiracy *caused* wage suppression. *See Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 495 (7th Cir. 2020).

Plaintiffs' primary evidence of antitrust injury is Dr. Singer's regressions. AOB 51-52. Once de-averaged, those regressions actually showed *increased* wages associated with Paragraph 14 in many places, including where Ms. Deslandes worked and lived. *Supra* 12. Moreover, taken on their face, Dr. Singer's analyses do not demonstrate that the alleged conspiracy "was the cause-in-fact" of any wage suppression. *Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*, 998 F.2d 391, 395 (7th Cir. 1993) (antitrust injury requires that challenged conduct be the but for cause-in-fact of the injury). Dr. Singer failed to test the relevant question—whether, after the removal of Paragraph 14, "compensation of McDonald's restaurant employees increased *relative to* compensation of workers of similar employers"—and instead hardwired his model to find injury based on industry-wide wage trends. ECF 302-1, Ex. 2 at 112. Confirming this confusion of correlation with causation, Dr. Singer's regressions further suggested that Paragraph 14 somehow suppressed wages at restaurants *outside* the McDonald's system. ECF 302-1, Ex. 2 at 81-84, 111-12; *see also Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 942 (7th Cir. 1997) ("equating a simple statistical correlation to a causal relation" is "entitled to zero weight" and cannot suffice as common proof).

59

The district court cited another fatal flaw: Dr. Singer's model failed to account for the fact that Paragraph 14's ability to suppress wages "var[ied] depending on the amount of labor market power McDonald's possessed in each relevant market." SA-50 n.6. Again, Plaintiffs do not dispute this finding. AOB 53-54. But Dr. Singer's error was critical as a matter of law and economics, for without "sufficient market share," an employer does not "have the market power necessary to affect [wages] and therefore harm competition." *Valley Liquor Inc. v. Renfield Importers*, 822 F.2d 656, 667 (7th Cir. 1987). And no such power is present in the many counties, cities, and towns where McDonald's restaurants competed with hundreds or thousands of other employers.

For these reasons, *Seaman v. Duke University*, 2018 WL 671239 (M.D.N.C. Feb. 1, 2018), is inapt. *See* AOB 53-54. Market definition was not an element of the *per se* claim in that case, challenging a naked no-poach conspiracy between interbrand competitors. *See* 2018 WL 671239, at *4-6. The same is true for Plaintiffs' other cited cases. *See* AOB 51-54. Where Dr. Singer's similar analyses were offered in a case like this one—challenging a franchise agreement's no-poach provision—the court excluded them. *Conrad v. Jimmy John's Franchise, LLC*, 2021 WL 718320, at *19 (S.D. Ill. Feb. 24, 2021).

Plaintiffs' reliance on Dr. Cappelli is similarly unavailing. *See* AOB 52-53. He too refused to conduct an analysis within a relevant market, leaving his opinions "virtually meaningless." *Repub. Tobacco*, 381 F.3d at 737. And his

speculation about a supposed common wage structure among McDonald's restaurants was unsupported by the record, which showed that local market pressures dictated each restaurant's varying pay decisions. *See*, *e.g.*, ECF 310-4 at 2, 8, 12; McD A-249 n.451.

Plaintiffs' expert testimony therefore falls short of the common proof required to certify a nationwide class of *millions* of workers seeking *billions* in damages. *See Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) ("Expert testimony is useful as a guide to interpreting market facts, but it is not a substitute for them."). Left with nothing else, each claim requires *localized* evidence of relevant markets and of recruitment and pay within those markets, ECF 302-1, Ex. 2 at 53-54; ECF 270-5 at 53-54, as well as localized evidence of market share and power, SA-50 n.6. Thus, "the impact of defendants' alleged antitrust violations cannot be shown on a classwide basis with common proof" but instead "is a highly individualized, fact-intensive inquiry that necessarily requires consideration of factors unique to each potential class member." *Blades v. Monsanto Co.*, 400 F.3d 562, 571 (8th Cir. 2005).[8]

---

[8] Plaintiffs' attempt to redefine the class by excising the vast majority of putative members, AOB 54-55, not only underscores the district court's adequacy concerns but also is waived. *Heller*, 833 F.2d at 1261-62. This made-for-appeal argument is an apparent attempt to preempt the other concerns acknowledged by the district court under Rule 23(a), SA-50-53, and arguments that it did not reach, ECF 299 at 20-30 (class conflicts, typicality, absence of common proof of the alleged hub-and-spoke agreement). If this Court finds the district court abused its discretion in rejecting

*(Cont'd on next page)*

## IV. There Is No Basis for Reassignment

Plaintiffs punctuate their misplaced arguments by seeking a remand with reassignment, suggesting the "volume and character of the district court's errors" demonstrate "unusual hostility." AOB 56. But the "volume and character of the district court's errors" are generally not "a valid basis to question a judge's impartiality." *Dupree v. Laster*, 389 F. App'x 532, 535 (7th Cir. 2010). Plaintiffs' attempt to fabricate "hostility" mischaracterizes the record. First, Judge Alonso refused to "further consider[]" a *per se* or quick-look claim, *id.*, *after* he had carefully and repeatedly considered them. SA-10-16, 32-50, 64-65. Second, Judge Alonso acted well within his discretion by denying the United States' opposed, months-late request to file a brief given the voluminous papers already submitted. *See LSP Transmission Holdings v. Lange*, 329 F. Supp. 3d 695, 703-04 (D. Minn. 2018). And third, Judge Alonso's comment about counsel's prioritization of their self-interest in rejecting class certification conforms to the required "rigorous analysis" at class certification. *Dukes*, 564 U.S. at 350-51. This Court should reject Plaintiffs' attempt to impugn Judge Alonso's impartiality simply because he did not always favor them.

## CONCLUSION

The Court should affirm the judgment.

---

class certification, these other defects—and McDonald's denied-as-moot *Daubert* motions, SA-53—will need to be addressed on remand.

Dated:  January 3, 2023                Respectfully Submitted,


                                       */s/Rachel S. Brass*

                                       Rachel S. Brass
                                       Caeli A. Higney
                                       Julian W. Kleinbrodt
                                       Gibson, Dunn & Crutcher LLP
                                       555 Mission Street, Suite 3000
                                       San Francisco, CA 94105
                                       (415) 393-8200

                                       Amir C. Tayrani
                                       Gibson, Dunn & Crutcher LLP
                                       1050 Connecticut Ave. NW
                                       Washington, DC 20036
                                       (202) 955-8500

## Certificate Of Compliance

1.    This brief complies with the type-volume requirement of Circuit Rule 32(c) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(a)(7)(B), it contains 13,999 words, as determined by the word count function of Microsoft Word.

2.    This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and Circuit Rule 32(b) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 13-point New Century Schoolbook font.

Dated:  January 3, 2023                    Respectfully submitted,


                                           */s/Rachel S. Brass*

                                           Rachel S. Brass
                                           Gibson, Dunn & Crutcher LLP
                                           555 Mission Street, Suite 3000
                                           San Francisco, CA 94105
                                           (415) 393-8200