**Nos. 22-2333 and 22-2334**

# In the
# United States Court of Appeals
## for the Seventh Circuit

LEINANI DESLANDES and STEPHANIE TURNER,
on behalf of herself and all others similarly situated,

*Plaintiffs-Appellants,*

v.

McDONALD'S USA, LLC, et al.,

*Defendants-Appellees.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division, Nos. 1:17-cv-04857 & 1:19-cv-05524.
The Honorable **Jorge L. Alonso**, Judge Presiding.

## REPLY BRIEF OF PLAINTIFFS-APPELLANTS
## LEINANI DESLANDES and STEPHANIE TURNER

DEAN M. HARVEY
ANNE B. SHAVER
LIN Y. CHAN
LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, California 94111-3339
(415) 956-1000

JESSICA A. MOLDOVAN
LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013-1413
(212) 355-9500

DEREK Y. BRANDT
LEIGH M. PERICA
CONNOR P. LEMIRE
McCUNE LAW GROUP, McCUNE
WRIGHT AREVALO VERCOSKI KUSEL
WECK BRANDT APC
231 North Main Street, Suite 20
Edwardsville, Illinois 62025
(618) 307-6116

DANA R. VOGEL
McCUNE LAW GROUP, McCUNE
WRIGHT AREVALO VERCOSKI KUSEL
WECK BRANDT APC
18565 Jamboree Road, Suite 550
Irvine, California 92612
(714) 909-2326

*Counsel for Plaintiffs-Appellants*



# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................... 1

ARGUMENT ......................................................................................... 3

I.      THE NO-HIRE AGREEMENT IS PRESUMPTIVELY UNLAWFUL ...................... 3

      A.      The No-Hire Agreement Was A Horizontal Restraint Among Rival Employers ............................................................................ 3

      B.      Rival Employers Cannot Shield Anticompetitive Labor Restraints By Collaborating In A Consumer Market ....................... 7

II.     THE NO-HIRE AGREEEMENT WAS COMPLETELY UNNECESSARY TO MCDONALD'S FRANCHISE SYSTEM DURING THE CLASS PERIOD ............ 14

      A.      McDonald's Cannot Avoid Market Realities In Favor Of Speculation Regarding Ray Kroc's Intentions in 1955 ............... 15

      B.      McDonald's Cannot Justify The No-Hire Agreement's Egregiously Overbroad Scope ............................................. 17

      C.      McDonald's Purported Competitive Justifications Are Illegitimate ......... 19

III.    PLAINTIFFS' ANTITRUST CLAIM SHOULD BE RESOLVED ON A CLASS BASIS ................................................................... 21

      A.      Violation Will Rise Or Fall On Common Evidence Under Any Liability Standard ................................................... 21

      B.      Plaintiffs Establish Impact and Damages With Common Evidence ......... 25

IV.    REASSIGNMENT ON REMAND WOULD AVOID THE OPERATION OF BIAS ................................................................... 28

CONCLUSION ..................................................................... 29

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Am. Needle, Inc. v. Nat'l Football League,*
    560 U.S. 183 (2010) ................................................................................................ 11

*Arrington v. Burger King Worldwide, Inc.,*
    47 F.4th 1247 (11th Cir. 2022) ............................................................................... 8

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.,*
    9 F.4th 1102 (9th Cir. 2021) ................................................................................... 18

*Aydin Corp. v. Loral Corp.,*
    718 F.2d 897 (9th Cir. 1983) ................................................................................... 13

*Blackburn v. Sweeney,*
    53 F.3d 825 (7th Cir. 1995) ..................................................................................... 16

*Blades v. Monsanto,*
    400 F.3d 562 (8th Cir. 2005) ................................................................................... 27

*Bogan v. Hodkins,*
    166 F.3d 509 (2d Cir. 1999) .................................................................................... 11

*Cesnik v. Chrysler Corp.,*
    490 F. Supp. 859 (M.D. Tenn. 1980) ..................................................................... 13

*Chicago Board of Trade v. United States,*
    246 U.S. 231 (1918) ................................................................................................ 17

*Chicago Prof'l Sports Ltd. Partnership v. Nat'l Basketball Ass'n,*
    95 F.3d 593 (7th Cir. 1996) ..................................................................................... 8

*Coleman v. Gen. Elec. Co.,*
    643 F. Supp. 1229 (E.D. Tenn. 1986), *aff'd*, 822 F.2d 59 (6th Cir. 1987) ........... 13

*Conrad v. Jimmy John's Franchise, LLC,*
    2021 WL 3268339 (S.D. Ill. July 30, 2021) .......................................................... 13

*Consultants & Designers, Inc. v. Butler Serv. Grp., Inc.,*
    720 F.2d 1553 (11th Cir. 1983) .............................................................................. 12

*Cont'l T. V., Inc. v. GTE Sylvania Inc.,*
    433 U.S. 36 (1977) .................................................................................................. 11

# TABLE OF AUTHORITIES
## (continued)

Page

*Dupree v. Laster,*
  389 F.App'x. 532 (7th Cir. 2010) ................................................................. 29

*Freeman v. San Diego Ass'n of Realtors,*
  322 F.3d 1133 (9th Cir. 2003), *as amended on denial of reh'g* (Apr. 24, 2003) .................. 18

*Funeral Consumers Alliance, Inc. v. Serv. Corp. Int'l,*
  695 F.3d 330 (5th Cir. 2012) ..................................................................... 23

*Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.,*
  998 F.2d 391 (7th Cir. 1993) ..................................................................... 26

*Kleen Prods. LLC v. Int'l Paper,*
  306 F.R.D. 585 (N.D. Ill. 2015), *aff'd sub nom. Kleen Prods. LLC v. Int'l Paper Co.,* 831
  F.3d 919 (7th Cir. 2016) ......................................................................... 25

*Lektro-Vend Corp. v. Vendo Co.,*
  660 F.2d 255 (7th Cir. 1981) ................................................................. 12, 17

*Messner v. Northshore Univ. HealthSystem,*
  669 F.3d 802 (7th Cir. 2012) ..................................................................... 24

*Nat'l Collegiate Athletic Ass'n v. Alston,*
  141 S. Ct. 2141 (2021) ................................................................. 1, 8, 9, 17

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.,*
  468 U.S. 85 (1984) ............................................................................ 1, 22

*Nichols v. Spencer Int'l Press, Inc.,*
  371 F.2d 332 (7th Cir. 1967) ..................................................................... 12

*Ogden v. Little Caesar Enterprises, Inc.,*
  393 F. Supp. 3d 622 (E.D. Mich. 2019) ........................................................... 13

*Ohio v. Am. Express Co.,*
  138 S. Ct. 2274 (2018) ........................................................................... 23

*Pearse v. McDonald's Sys. of Ohio, Inc.,*
  47 Ohio App. 2d 20 (1975) ....................................................................... 12

*Polk Bros. v. Forest City Enterprises, Inc.,*
  776 F.2d 185 (7th Cir. 1985) ..................................................................... 15

- iii -

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Republic Tobacco Co. v. N. Atl. Trading Co.*,
    381 F.3d 717 (7th Cir. 2004) ............................................................. 23, 24

*Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*,
    950 F.3d 911 (7th Cir. 2020) .................................................................. 23

*Sheehan v. Daily Racing Form, Inc.*,
    104 F.3d 940 (7th Cir. 1997) .................................................................. 26

*Union Circulation Co. v. Fed. Trade Comm'n*,
    241 F.2d 652 (2d Cir. 1957) .................................................................. 12

*United States v. Topco Assocs., Inc.*,
    405 U.S. 596 (1972) ................................................................................ 1

*Valley Liquors, Inc. v. Renfield Importers, Ltd.*,
    822 F.2d 656 (7th Cir. 1987) .................................................................. 23

*Viamedia, Inc. v. Comcast Corp.*,
    951 F.3d 429 (7th Cir. 2020) .................................................................. 26

*Williams v. I.B. Fischer Nevada*,
    999 F.2d 445 (9th Cir. 1993) .................................................................. 11

*Zenith Elecs. Corp. v. WH-TV Broad. Corp.*,
    395 F.3d 416 (7th Cir. 2005) .................................................................. 25

**Other Authorities**

*Antitrust and the FTC: Franchise Restraints on Worker Mobility*, Promarket, Dec. 1, 2021 .... 5

Herbert Hovenkamp & Phillip E. Areeda, *Antitrust Law: An Analysis of Antitrust
    Principles and Their Application* ¶1902e (5th ed. 2022) .................................... 1, 5

Herbert J. Hovenkamp, *Competition Policy for Labour Markets*, U. of Penn. Inst. for Law &
    Econ., Research Paper No. 19-29 (May 17, 2019) ............................................ 5

Viva R. Moffat, *Making Non-Competes Unenforceable*, 54 Ariz. L. Rev. 940 (2012) .............. 4

## INTRODUCTION

At stake in this appeal is whether the antitrust laws permit *thousands* of rival employers to agree not to compete for each other's employees. The Sherman Act, our "Magna Carta of free enterprise," protects these workers. *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 610 (1972). Its foundational belief is that "market forces," not collusion, "'yield the best allocation' of the Nation's resources." *Nat'l Collegiate Athletic Ass'n v. Alston*, 141 S. Ct. 2141, 2147 (2021) (quoting *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 104 n.27 (1984)). There is a consensus among state and federal antitrust enforcers across the political spectrum: McDonald's No-Hire Agreement is presumptively anticompetitive and unlawful. U.S.-FTC Br. 8-20; State AG Br. 3-20. Antitrust's preeminent treatise, on which the district court and McDonald's substantially rely, agrees with this consensus, in specific reference to this case. Herbert Hovenkamp & Phillip E. Areeda, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶1902e (5th ed. 2022).

While Plaintiffs established a prima facie violation of Section 1 of the Sherman Act, McDonald's cannot satisfy its "heavy burden of establishing an affirmative defense which competitively justifies [its] apparent deviation from the operations of a free market." *Bd. of Regents*, 468 U.S at 113. Contrary to McDonald's caricature, Plaintiffs do not challenge the legitimate coordination among McDonald's and its franchisees in the downstream consumer market for fast-food. Plaintiffs challenge a horizontal restraint

that was completely unnecessary to those legitimate, output-enhancing activities. McDonald's own amici make the point. "Franchisees direct the day-to-day operations of their restaurants—for example, *who to hire*, and setting wages and schedules—while franchisors set standards to maintain brand uniformity and consistency—such as what food the restaurant serves and how it is prepared." Restaurant Law Ctr. Br. 18 (emphasis added). The No-Hire Agreement violated this important distinction, crossing the line from legitimate product coordination to unlawful employer collusion.

As a result of successful antitrust enforcement efforts, horizontal hiring restraints in franchise systems are now consigned to the dustbin of antitrust history. State AG Br. 7-8. *Hundreds* of franchisors, including McDonald's, voluntarily removed such restraints rather than defend them. *Id.* The market reality here is undisputed: when McDonald's voluntarily abandoned the No-Hire Agreement, its franchisees did not merely "survive[.]" Resp. 46. Franchisees *thrived like never before*, and McDonald's has continued to grow its successful franchise system. ECF 403 ¶ 51. Unlike Plaintiffs, who used real-world pay data to confirm and measure the anticompetitive effects of the No-Hire Agreement, McDonald's did not even attempt to provide evidence that its abandonment frustrated McDonald's meritless competitive concerns. The reason is simple: the No-Hire Agreement was not, in fact, reasonably necessary to McDonald's franchise system during the class period of June 28, 2013 to July 12, 2018. No amount of

inadmissible and irrelevant speculation regarding Ray Kroc's intentions in 1955 can obscure this market reality.

The district court should be reversed, and these actions should advance to trial. A jury should determine whether McDonald's orchestrated and joined the No-Hire Agreement, and whether, and to what extent, the No-Hire Agreement suppressed worker pay. Plaintiffs' antitrust claim rises or falls on common evidence, and that claim should be decided on a classwide basis.

## ARGUMENT

## I.    THE NO-HIRE AGREEMENT IS PRESUMPTIVELY UNLAWFUL

### A.    The No-Hire Agreement Was A Horizontal Restraint Among Rival Employers

McDonald's does not dispute that an agreement among rival employers not to hire each other's workers is presumptively unlawful, subject to a defense that the restraint was reasonably necessary to legitimate competitive benefits. Instead, McDonald's argues that this rule does not apply here, because Paragraph 14 was a vertical restraint. McDonald's is incorrect, and ignores important elements of the No-Hire Agreement that extended beyond Paragraph 14.

In the employment context, the distinction between vertical and horizontal restraints is simple. Vertical non-compete agreements are restraints between an employer and its employee, and are assessed pursuant to state law. *See* Viva R. Moffat,

*Making Non-Competes Unenforceable*, 54 Ariz. L. Rev. 940 (2012). Vertical restraints are not at issue here, since no employee is a party to the No-Hire Agreement.

Horizontal employment restraints are agreements between *rival employers* that restrict competition for each other's employees. Courts have assessed these restraints under the antitrust laws, and consider them per se unlawful, unless the defendant can prove that the restraint was reasonably necessary to a legitimate joint economic activity. AOB 25-27. The No-Hire Agreement is an employment restraint between rival employers: among franchisees, and between franchisees and McOpCos.

McDonald's contends that the No-Hire Agreement was vertical, because Paragraph 14 appeared in McDonald's standard franchise agreement. But a horizontal restraint among franchisees does not become vertical because it is orchestrated by a franchisor, much less a franchisor that competes with its franchisees for the same workers. McDonald's acknowledges that such "hub-and-spoke" conspiracies are horizontal restraints, but ignores evidence of a common understanding among the franchisee "spokes" here. Resp. 20-21.

First, Paragraph 14 is itself evidence of an understanding among the franchisees. As Professor Hovenkamp explains, in specific reference to Paragraph 14, "these agreements arise only because they are satisfying the wish of individual franchisees to be free of competition, not because they give effect to a franchisor's policy of encouraging optimal employee performance through a system of promotion to new

opportunities." *Antitrust and the FTC: Franchise Restraints on Worker Mobility*, Promarket, Dec. 1, 2021, *available at* https://promarket.org/2021/12/01/antitrust-ftc-franchise-worker-mobility-labor/. *See also* Herbert J. Hovenkamp, *Competition Policy for Labour Markets*, U. of Penn. Inst. for Law & Econ., Research Paper No. 19-29 at 12 (May 17, 2019) ("it is in a firm's best interests to use its employees in the most profitable way, and if an employee is valued more at a different location the firm will agree to the move," so franchisors would not be expected to forbid such movement, in contrast to "individual franchisees [who] maximize the value of their individual locations," which "inclines them to be more resistant to inter-firm movement that might deprive them of valued workers"), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3421036; Hovenkamp & Areeda, *supra*, ¶ 1902e ("We suggest that in cases of uniform noncompetition agreements of this sort . . . the inference should be strong that the arrangements are essentially horizontal.")

The record supports Professor Hovenkamp's analysis. There is a reason why McDonald's did not mind ditching the No-Hire Agreement at the first sign of antitrust trouble. As McDonald's admits, it was not in its interest as *franchisor* to prevent labor mobility and the efficient allocation of workers among its franchisees, because that would suppress output, and McDonald's-as-franchisor receives a share of franchisee revenue, not profit. Resp. 50. But it was very much in the interests of McDonald's *franchisees* to eliminate labor competition among them, and force their workers to

choose between working for the same franchisee or departing the McDonald's franchise system altogether.

If the No-Hire Agreement was not in McDonald's interest as franchisor, then why did it exist? Because the *franchisees* demanded it, and, after McDonald's opened its own restaurants, the *franchisees* demanded that McDonald's reciprocate the restraint (despite the fact that Paragraph 14 never required it). ECF 403 ¶¶ 7-18. For instance, McDonald's denies that it expanded its reciprocation of the No-Hire Agreement to include even entry-level crew, at an invitation-only meeting at the Venetian Hotel in Las Vegas with the "National Leadership Council" of its franchisees. *Id*. ¶¶ 9-11. But McDonald's cannot help but admit the purpose: to eliminate "disruptive" wage "pressure" between McOpCos and franchisees. Resp. 45 n.5. In other words, McDonald's admits that the No-Hire Agreement was a tool to fix wages. Further, while McDonald's contends it did not bother to enforce what it elsewhere describes as a necessary restraint "given other priorities," Resp. 7, it ignores that its *franchisees* also enforced the No-Hire Agreement among each other, using tools and methods that are not mentioned in the franchise contracts. ECF 403 ¶¶ 15-18. In truth, McDonald's enforced the No-Hire Agreement as well, to accommodate its franchisees. *Id*. ¶¶ 13-14, 18.

The No-Hire Agreement persisted during the class period because of franchisee pressure. While McDonald's attempts to distract from the relevant time period with

speculation regarding Ray Kroc's intentions in 1955, McDonald's admits "the business landscape had changed" by the class period. Resp. 7. McDonald's also concedes that no franchise agreement in effect during the class period was created in 1955. Resp. 48 ("Plaintiffs are correct"). As McDonald's primary witness James Kramer explained, in the "early days" McDonald's had to "convince franchisees" to join the system, but "by 1980, for sure" McDonald's was in a "seller's market" with respect to soliciting franchisees, with "extensive" demand, because "by this time McDonald's has proved to be a very, very successful company." ECF 403 ¶¶ 33-35. In other words, by well before the class period, McDonald's no longer needed to orchestrate a horizontal hiring restraint in order to entice additional franchisees. By 2002, McDonald's wanted to amend Paragraph 14 to remove its odious prohibition on hiring that extended to six months after a worker's employment ended. *Id*. ¶ 8. But, as Mr. Kramer admitted, McDonald's kept the term in because of "objections from the franchisees to the change." *Id*.

The No-Hire Agreement was a horizontal restraint among rival employers, and it should be condemned as such.

### B. Rival Employers Cannot Shield Anticompetitive Labor Restraints By Collaborating In A Consumer Market

McDonald's concedes that a franchisor and its franchisees are independent rival employers, and that agreements among them to eliminate labor competition are subject to Section 1 of the Sherman Act. Resp. 25 ("an issue not disputed in this appeal"). *See*

*Arrington v. Burger King Worldwide, Inc.*, 47 F.4th 1247, 1256 (11th Cir. 2022). McDonald's instead relies upon its erroneous characterization of the No-Hire Agreement as a vertical intrabrand restraint, "no different than other intrabrand restraints in the McDonald's system." Resp. 20. McDonald's conflates its legitimate coordination in the consumer market with its unlawful collusion in the labor market.

This Court and the Supreme Court have already anticipated and rejected McDonald's argument. In *Chicago Professional Sports Ltd. Partnership v. National Basketball Ass'n*, this Court explained that legitimate coordination in a consumer market cannot be used to justify collusion in the labor market. 95 F.3d 593, 600 (7th Cir. 1996). A restraint on labor competition can only be justified by showing that the labor restraint at issue was reasonably necessary to legitimate competitive benefits *in the labor market*. As this Court presciently explained, "the ability of McDonald's franchises to coordinate the release of a new hamburger does not imply their ability to agree on wages for counter workers[.]" *Id.* The Supreme Court recently quoted this same language, in service of the same point. *Nat'l Collegiate Athletic Ass'n v. Alston*, 141 S. Ct. 2141, 2157 (2021). "That *some* restraints are necessary to create or maintain a [franchise system] does not mean *all* [restraints] are." *Id.* at 2156 (quotation omitted) (emphasis in original). These cases are consistent with a long line of authority holding that conspirators cannot use benefits in one market to justify a restraint in another. AOB 39-40; AAI Br. 25 n.4.

McDonald's misinterprets this authority. According to McDonald's, *Alston* allows for quick-look *approval* of a challenged restraint among participants in a joint economic endeavor, but requires a full rule of reason inquiry before condemning any such restraint. Resp. 28. This is wrong. *Alston* reaffirms the bedrock antitrust principle that restraints may be "condemned as unlawful per se or rejected after only a quick look" when, as here, they are clearly anticompetitive. 141 S. Ct. at 2156. *Alston* does not allow competitors to evade condemnation of an anticompetitive restraint merely by appending it to an otherwise lawful joint endeavor. Doing so would have been a sea change in antitrust law, eviscerating the Sherman Act. As Justice Kavanaugh further explained in his concurrence, legitimate collaboration among competitors does not place them "above the law" when they agree to restrain competition for labor among them. *Alston*, 141 S. Ct. at 2169. "Price-fixing labor is price-fixing labor. And price-fixing labor is ordinarily a textbook antitrust problem because it extinguishes the free market in which individuals can otherwise obtain fair compensation for their work." *Id.* at 2167-68. AOB 42-44; U.S.- FTC Br. 30-36.

The district court misunderstood *Alston* to require reversing its prior denial of McDonald's motion to dismiss because the district court concluded it did not have "enough experience with no-hire provisions of franchise agreements to predict with confidence that they must always be condemned[.]" SA-37. This was both erroneous (AOB 4; U.S.-FTC Br. 33-34; COSAL Br. 12-15) and inexplicable, given the district court's

earlier conclusion that "[e]ven a person with a rudimentary understanding of economics would understand that if competitors agree not to hire each other's employees, wages for employees will stagnate." SA-14. The district court buttressed its reversal by uncritically accepting the same procompetitive justifications it earlier rejected (*compare* SA-38-42 *with* SA-14-15), and by incorrectly characterizing the No-Hire Agreement as a vertical restraint in any location without a competing McOpCo (SA-42-44; AOB 44; U.S.-FTC Br. 14-18; AAI Br. 8-11; COSAL Br. 19-25).

In fact, the No-Hire Agreement was not an "intrabrand" restraint at all. While McDonald's restaurants may be a single brand to customers purchasing hamburgers, they are not the same employer to workers. The relevant "brand" for workers are the independent companies that hire them, set their pay and other benefits, and determine their schedules. For instance, Plaintiff Deslandes's employer was "Bam-B Enterprises of Central Florida, Inc.," ECF 32 ¶ 13, and Plaintiff Turner's employer was "Copeland Investments Corp.," *Turner*, 19-cv-05524, ECF1 ¶ 18. McDonald's expressly disclaims any common employer status with its franchisees: McDonald's does not "control the employment or compensation policies" of franchisees; franchisees "make their own decisions on how they run their businesses and pay their employees; and franchisees are "solely responsible for all employment-related matters in their restaurants," "exercis[ing] complete control" over the terms and conditions of employment of their

employees. ECF 270-7 at -101; 270-18 at -992; 270-17 (T. Brethauer, VP U.S. Franchising, Dep.) at 99:13-23.

McDonald's primary authority defines "intrabrand competition" as "competition between the distributors wholesale or retail of the product of a particular manufacturer." *Cont'l T. V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 52 n.19 (1977). McDonald's does not manufacture workers, and it does not distribute workers to its franchisees. Franchisees are responsible for finding and hiring their own workers. Members of the class figure into the McDonald's franchise system at one horizontal level: as suppliers of labor to rival employers, who individually hire them and, but for the No-Hire Agreement, would have competed for them (as they do now, after McDonald's eliminated the hiring restraint). U.S.-FTC Br. 28-29.

McDonald's other authorities also fail to place McDonald's above the law simply because its No-Hire Agreement existed in the context of a franchise system. In *Bogan v. Hodkins*, 166 F.3d 509, 516 (2d Cir. 1999), the restraint was factually indistinguishable from a restraint limited to employees of a single company, unlike here, where the No-Hire Agreement required McDonald's and its franchisees to behave in ways incompatible with how a single firm would operate. *Williams v. I.B. Fischer Nevada*, 999 F.2d 445, 447 (9th Cir. 1993), which held that a franchisor and franchisees were incapable of conspiring under the Sherman Act, is no longer good law after *American Needle, Inc. v. National Football League*, 560 U.S. 183 (2010). *Union Circulation Co. v. Federal*

*Trade Commission*, 241 F.2d 652, 658 (2d Cir. 1957) declined to apply the per se rule because, at that time, it was unclear whether it could apply in the employment context—there is no dispute that it does now. Nonetheless, the court found that the no-switching agreement was "harmful to competition," "an unreasonable restraint of trade," and "went beyond what was necessary." And *Pearse v. McDonald's Systems of Ohio, Inc.*, 47 Ohio App. 2d 20, 22, 24-27 (1975), resolved an interference with contract claim, not an antitrust claim. The court did not apply the ancillary-restraints doctrine, did not assess components of the No-Hire Agreement that extended beyond Paragraph 14, and—even with respect to Paragraph 14 itself—did not consider the six-month post-employment prohibition.

Other cases concern vertical agreements between employers and employees. *Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255, 265 (7th Cir. 1981)[1] (vertical employee-employer agreement, requiring a showing of reasonable necessity and proof restraint was "as limited as is reasonable"); *Nichols v. Spencer Int'l Press, Inc.*, 371 F.2d 332, 337 (7th Cir. 1967) (reversing summary judgment for defendant regarding employee-employer non-compete agreement); *Consultants & Designers, Inc. v. Butler Serv. Grp., Inc.*,

---

[1] While it may have been "beyond question" to some in 1981 that vertical employer-employee non-compete agreements have procompetitive benefits, such agreements have since come under substantial criticism and scrutiny, and the FTC has issued a proposed rule prohibiting them. *See* https://www.ftc.gov/news-events/news/press-releases/2023/01/ftc-proposes-rule-ban-noncompete-clauses-which-hurt-workers-harm-competition.

720 F.2d 1553, 1557-58, 1563 (11th Cir. 1983) (vertical restraint between employer and employee "not unreasonable," after determining whether "the restraint is greater than is needed to protect promisee's legitimate interest"; restraint satisfied standard because it was appropriately limited and "was in exchange for valuable consideration" provided to employee); *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 900 (9th Cir. 1983) (examining vertical "[e]mployee covenants not to compete or interfere with the employer's business").

Other cases are inapposite or unpersuasive. *Coleman v. Gen. Elec. Co.*, 643 F. Supp. 1229, 1242 (E.D. Tenn. 1986), *aff'd*, 822 F.2d 59 (6th Cir. 1987) (no-hire agreement ancillary to sale of business, restricted only the seller, and expired two years after sale); *Cesnik v. Chrysler Corp.*, 490 F. Supp. 859, 866 (M.D. Tenn. 1980) (restraint incidental to sale of division, and made for an "obviously sound business purpose"); *Ogden v. Little Caesar Enters., Inc.*, 393 F. Supp. 3d 622, 635 (E.D. Mich. 2019) (uncritically assuming hiring restraint was part of "legitimate collaboration" in the consumer market, among other errors); *Conrad v. Jimmy John's Franchise, LLC*, No. 18-cv-00133-NJR, 2021 WL 3268339, at *10 (S.D. Ill. July 30, 2021) (same).

In a footnote, the district court analogized the No-Hire Agreement to a dual distribution restraint, SA-63 n.4, and McDonald's attempts to defend the analogy on appeal, Resp. 21-22. But these authorities concern product competition restraints imposed by a manufacturer of the product on its dealers or franchisees, with the added

-13-

fact that the manufacturer also sells its product in competition with those dealers or franchises. U.S.-FTC Br. 28-30. These dual distribution arrangements may inure to the benefit of consumers when a manufacturer competes with its retailers for customers. The analogy is inapt because, again, McDonald's does not in any sense "distribute" workers to its franchisees. In any event, McDonald's *could* have competed with its franchisees for workers to the benefit of those workers. Indeed, Paragraph 14 imposed no restriction on McDonald's hiring. Unfortunately for the class, however, McDonald's agreed to reciprocate the hiring restraint, first as to managers, and then as to crew, for the purpose of suppressing franchisee worker pay. ECF 403 ¶¶ 7-18.

## II. THE NO-HIRE AGREEEMENT WAS COMPLETELY UNNECESSARY TO MCDONALD'S FRANCHISE SYSTEM DURING THE CLASS PERIOD

McDonald's agrees that, to satisfy the ancillary-restraint doctrine, it must show that the No-Hire Agreement was reasonably necessary to its franchise system. Resp. 32 ("'[R]easonable necessity' is merely *Polk Bros.* by another name."). McDonald's contends that this was the test the district court applied, Resp. 35, but it was not. The district court held that the No-Hire Agreement was an ancillary restraint merely because part of it was contained in franchise contracts, SA-13, *notwithstanding* that the restraint was not reasonably necessary to competitive benefits, SA-14-15. This was clear error.

McDonald's mischaracterizes Plaintiffs' position as proposing an "unprecedented *strict necessity* test" whereby a restraint "would be condemned out of hand unless it was absolutely necessary." Resp. 32, 36. Plaintiffs propose no such thing.

-14-

The No-Hire Agreement flunks reasonable necessity—there is no need for a "strict necessity" test.

### A.     McDonald's Cannot Avoid Market Realities In Favor Of Speculation Regarding Ray Kroc's Intentions in 1955

McDonald's concedes that, by the class period, the No-Hire Agreement served no legitimate purpose. Resp. 7 ("the business landscape had changed" and "Paragraph 14 was unenforced given other priorities"). Thus, it should come as no surprise that, when McDonald's eliminated the No-Hire Agreement at the end of the class period, none of the speculative competitive concerns McDonald's conjured in this litigation materialized. ECF 403 ¶¶ 37-52. Training did not decrease. Cooperation among franchisees continued. Franchisees did better than ever, and McDonald's franchise system continued to expand. These dispositive facts should end the inquiry. The No-Hire Agreement was not, in fact, reasonably necessary to McDonald's franchise system during the class period, and no reasonable jury can conclude otherwise.

McDonald's deals with these inconvenient facts by ignoring them, and attempting to distract the Court from them with inadmissible speculation regarding Ray Kroc's intentions in 1955. ECF 400 at 21-23.

McDonald's relies on *Polk Brothers v. Forest City Enterprises, Inc.*, 776 F.2d 185, 189 (7th Cir. 1985). In *Polk Brothers*, this Court examined a claim based upon a single, discrete contract dated 1972 in which two retailers agreed to share one physical building, and agreed on the types of products each would sell in that building. 776 F.2d

at 187. Here, McDonald's admits that no franchise agreement from 1955 remained in effect during the class period. Resp. 48. Instead, these contracts had twenty-year terms. Thus, the oldest franchise contract in effect during the class period of 2013-2018 was executed no later than 1993, well after when Mr. Kramer was certain that market realities had shifted substantially. ECF 403 ¶¶ 34-35.

McDonald's also denies aspects of the No-Hire Agreement that were never part of franchise contracts: McDonald's managerial reciprocation, the "letter of release" practices, and McDonald's 2015 non-managerial reciprocation. The fact that these aspects of the No-Hire Agreement were not contemporaneous with entry into the legitimate venture disposes of the ancillarity argument. For instance, in *Blackburn v. Sweeney*, this Court rejected an ancillarity defense to a market allocation agreement where the restraint was not possibly "a necessary condition" for the "potential increase in competition" because it post-dated the law firm dissolution that caused the latter. 53 F.3d 825, 828-29 (7th Cir. 1995) (further noting lack of "necessary relation" to restraint's duration rendering restraint "naked, not ancillary, and per se illegal to boot"). Further, McDonald's denies that the No-Hire Agreement included any element other than Paragraph 14, conceding that, if Plaintiffs prove these other elements at trial, there can be no justification for them. McDonald's cannot contend a restraint was reasonably necessary if it asserts it did not exist.

This Court has never blinded itself to relevant market facts, and it should not start now. *Lektro-Vend*, 660 F.2d at 268 (courts "*must* ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and *after* the restraint was imposed; the nature of the restraint and its *effect, actual or probable*") (emphasis added) (quoting *Chi. Bd. of Trade v. United States*, 246 U.S. 231, 238 (1918)). *See also Alston*, 141 S. Ct. at 2158 ("Whether an antitrust violation exists necessarily depends on a careful analysis of market realities. . . . If those market realities change, so may the legal analysis.").

McDonald's complains, without support, that considering post-restraint evidence—that McDonald's franchisees did better than ever without the restraint— "would perversely preclude a company from *ever* reconsidering an ancillary restraint based on changed circumstances." Resp. 46. By this erroneous logic, antitrust plaintiffs would be precluded from using post-conspiracy data to establish a competitive benchmark to estimate damages, for fear that, otherwise, price-fixers would never stop price-fixing. That is not the law.

### B.    McDonald's Cannot Justify The No-Hire Agreement's Egregiously Overbroad Scope

There is no justification for the No-Hire Agreement's nationwide restriction, nor for its continued application up to six months after termination of employment. There is no legitimate reason for requiring an employee to work for the same franchisee or leave the franchise system altogether, regardless of where else in the country she may be

willing to work, or the amount of time since her current employer trained her. The restraint forced trained workers out of the franchise system, squandering the time and money spent to train them, rather than placing them at the location where they would be the most productive (and get paid the most).

McDonald's contends it can satisfy reasonable necessity without regard to whether the No-Hire Agreement was a reasonably tailored means for accomplishing its purported competitive goals. Resp. 33 n.2. McDonald's misstates the law. A restraint cannot be reasonably necessary if, as here, it is woefully overbroad. In *Aya Healthcare Services, Inc. v. AMN Healthcare, Inc.*, the Ninth Circuit did not reject such a requirement, it reaffirmed it and explained that it is part of reasonable necessity, consistent with its precedent. 9 F.4th 1102, 1111 n.5 (9th Cir. 2021). *See Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1151 (9th Cir. 2003), *as amended on denial of reh'g* (Apr. 24, 2003) ("Even assuming *arguendo* that defendants have a legitimate interest in standardizing support services, fixing the price of those services is not a reasonably tailored means of achieving the goal.") *See also* AOB 23-24; U.S.-FTC Br. 22-26; AAI Br. 13-16.

McDonald's describes the No-Hire Agreement as "time-limited." Resp. 1. But it was not time limited in a reasonable way. From the moment class members began working for McDonald's or a franchisee, they were prevented from seeking better pay, better working conditions, or a promotion from any of the thousands of potential employers nationwide who most valued their McDonald-specific training and

experience. This anticompetitive restraint continued indefinitely, potentially for decades, unless an employee left the franchise system for longer than six months. This time period has no reasonable relationship to the justifications McDonald's asserts.

McDonald's also cannot justify the No-Hire Agreement's nationwide scope. Indeed, McDonald's and its amici expend significant effort arguing that the relevant scope of geographic competition in this case is local, admitting there can be no justification for a nationwide restraint. The No-Hire Agreement prohibited competition among thousands of rival employers nationwide, regardless of the distance between them. The record includes many examples of enforcement over thousands of miles. ECF 403 ¶18.

A restraint cannot be reasonably necessary if it is egregiously overbroad.

### C.    McDonald's Purported Competitive Justifications Are Illegitimate

First, McDonald's contends the No-Hire Agreement fostered cooperation and encouraged employee training. Resp. 49-50. McDonald's falsely asserts that this justification went "unrebutted" below.[2] Resp. 50. In fact, Plaintiffs vigorously disputed it, explaining that McDonald's never relied on the No-Hire Agreement for these goals, but rather required the desired cooperation and training as predicates for renewal of the franchise agreement. ECF 403 ¶¶37-49; ECF 400 at 20-28; ECF 428 at 11-15. None of

---

[2] McDonald's asserts many times throughout its brief that Plaintiffs have "waived" arguments for not having made them below. Resp. 37-41, 61 n.8. McDonald's is incorrect. *Compare* AOB *with* ECF Nos. 400, 428, 268, 346, and 40.

these requirements changed since the No-Hire Agreement ended.  ECF 403 ¶¶ 37-49, 52.
There is no evidence that cooperation or training declined since McDonald's ended the
No-Hire Agreement.

Second, McDonald's argues the No-Hire Agreement deterred free-riding on the
training investments of other franchisees. Resp. 50-51. But a ride is not "free" if a hiring
franchisee has to pay for it. AOB 38-39; COSAL Br. 27-30. Here, Franchisee A hires
Franchisee B's trained worker by *paying a higher wage*. Franchisee B can prevent this by
paying the worker the competitive wage, just like any other employer who trains their
workers. Of course, this wage competition is exactly what the No-Hire Agreement
prevented. Further, there is no evidence that eliminating the No-Hire Agreement had
any negative impact on employee training. McDonald's never left training up to the
discretion of franchisees, and imposed the same training requirements during and after
the No-Hire Agreement. ECF 403 ¶ 45.

Third, McDonald's asserts the No-Hire Agreement increased output, both in
terms of products to consumers and jobs to workers.[3] Resp. 52-54. But there is no
evidence for it. Unlike Plaintiffs who measured harm to workers through suppressed

---

[3] The chart McDonald's includes in its brief illustrates the irrelevant evidence
McDonald's submitted. Resp. 6. It is a textbook example of confusing correlation with
causation, and does not separate out the effects of the No-Hire Agreement from the
effects of unchallenged restraints in the consumer market. Among other things,
McDonald's does not control for when the No-Hire Agreement was and was not in
place, which would make clear that there is no causal relationship whatsoever between
the No-Hire Agreement and the success of McDonald's franchise system.

pay, McDonald's made no effort to show that elimination of the No-Hire Agreement

decreased output of any kind. Indeed, the evidence is to the contrary. Since removing

the No-Hire Agreement, McDonald's franchise system has continued to expand,

producing more hamburgers and employing more workers (at higher pay). This is

unsurprising. A hypothetical single firm owning all McDonald's restaurants would

never prevent workers from moving to the locations where they would be the most

productive and valuable.

## III.  PLAINTIFFS' ANTITRUST CLAIM SHOULD BE RESOLVED ON A CLASS BASIS

### A.  Violation Will Rise Or Fall On Common Evidence Under Any Liability Standard

McDonald's does not dispute that the district court necessarily abused its

discretion if it applied the wrong standard in deciding Plaintiffs' motion for class

certification. Even if the rule of reason applies, however, the district court's concerns

about geographic factors, variations in labor competition, and even McDonald's

restaurants' share of local labor competition were accounted for—with common

evidence—in Dr. Singer's models. Dr. Singer's multivariate regression model

incorporated local factors that affected employee wages and it used that information to

isolate the effect of the No-Hire Agreement. ECF 270-5 ¶¶ 42, 49-50, 51, 62 (describing

controls for local labor market conditions including federal, state, or local minimum

wages; local unemployment rates; local per capita income; store-specific economic data;

and employee-specific attributes like job title); ¶ 58 (model sensitivity tests controlling for county population density, local county wages in fast food restaurants, distance to nearest McDonald's with different owner, and McDonald's share of Quick Service Restaurants within county); ECF 330-1 ¶¶ 73-76 (consistent results when controlling for local county wage trends in other limited service restaurants).

Dr. Singer's model makes no assumptions about relevant geographic markets. Consistent with standard practice in labor economics, he uses nationwide data and controls for relevant local economic factors to investigate the effects of a nationwide course of misconduct. His analysis showed economically and statistically significant injury to 99 percent of Class members. ECF 270-5 ¶¶ 52, 66-82. It was backstopped by economic research demonstrating the monopsony power of employers over their employees, and dual impact studies based on a predictive injury model and a compensation-structure model. *Id*. Neither McDonald's nor its experts identified a single omitted variable that would upset Dr. Singer's statistical conclusions.

McDonald's contends that, because Plaintiffs did not define a relevant market in their complaints, one cannot possibly know whether McDonald's and its thousands of franchisees possess the collective power to suppress their employees' pay. Resp. 60-61, citing SA-50 n.6. But market definition is only one way of establishing market power, *Bd. of Regents*, 468 U.S. at 109-10 n.42, and the answer here is in the direct economic evidence: if McDonald's and its franchisees lacked this power, Dr. Singer's model

would not have shown the impact it did at the confidence level it did. And if—as McDonald's does not dispute, Resp. 60—an analysis like Plaintiffs' reliably measures impact and damages in a no-poach conspiracy between competitors, why would it not be equally reliable just because McDonald's (wrongly) labels its restraint "intrabrand"? Neither McDonald's nor the district court answers that question.[4]

McDonald's relies on *Ohio v. American Express Co.*, 138 S. Ct. 2274 (2018), for the proposition that market definition is necessary. Resp. 44-45. But the Supreme Court explained that this requirement was limited to vertical restraints, and reaffirmed that a market definition was unnecessary to evaluate "agreements between competitors not to compete in some way[.]" *Am. Express*, 138 S. Ct. at 2285 n.7. McDonald's also relies on *Republic Tobacco Co. v. North Atlantic Trading Co.*, 381 F.3d 717 (7th Cir. 2004). Resp. 44. But in that case, the Court explained that "there are some circumstances where to establish a violation of antitrust laws it is unnecessary to prove that defendant wielded

---

[4] The cases McDonald's cites also do not answer this question. *Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911, 916 (7th Cir. 2020), accepted that geographic markets can be large or small, but affirmed dismissal on the pleadings where the alleged markets were not plausible. This merely begs the question here, as Plaintiffs demonstrated McDonald's market power with direct evidence. *Funeral Consumers Alliance, Inc. v. Service Corp. Int'l*, 695 F.3d 330, 350 (5th Cir. 2012), rejected a nationwide class in a rule of reason group boycott claim that, unlike here, lacked evidence of a nationwide conspiracy. In *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 669 (7th Cir. 1987), a distributor's challenge to termination by its vertically-oriented supplier, the plaintiff failed to raise a genuine issue of material fact about market power because it failed to supply even "basic" necessary data, "let alone a sophisticated econometric analysis normally necessary to show market power."

market power in a properly defined product and geographic market, and may rely instead on direct evidence of anticompetitive effects." *Republic Tobacco*, 381 F.3d at 736. Those circumstances include horizontal agreements like the No-Hire Agreement at issue here. *Id*.

Further, Plaintiffs alleged, and provided substantial evidence, that employees without McDonald's-specific training and experience are not adequate substitutes for employees with those skills.[5] ECF 32 ¶¶ 110-114; *Turner*, ECF 1¶¶ 109-113; ECF 268 at 3-6; ECF 403 ¶¶ 57-67; ECF 270-6 ¶¶ 48-62. There is a reason why McDonald's franchisees were "upset beyond words" when McOpCo modestly raised the pay of its workers. AOB 10-11. At the time, McDonald's did not try to convince them that their concern "depend[ed] on the far-fetched premise that McDonald's can suppress wages[.]" Intl'l Ctr. Br. at 17. McDonald's and its franchisees well-understood that they had the collective market power to do exactly that. Thus, McDonald's agreed to extend its covert reciprocation of the No-Hire Agreement to even entry-level crew, AOB 11, eliminating "disruptive" wage "pressure" that would have otherwise occurred. Resp. 45 n.5.

---

[5] This is particularly true for class members in management positions. *See* ECF 270-6 ¶¶ 48-58. McDonald's contends that Plaintiffs waived the possibility of narrowing the class definition to managers. Resp. 8. To the contrary, when moving for class certification, Plaintiffs' submitted expert analysis that separately established impact and damages as to managers. ECF 270-5 ¶59. *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012) (if possible, courts should refine and narrow an over-inclusive class definition, not deny it).

**B.      Plaintiffs Establish Impact and Damages With Common Evidence**

McDonald's attacks on Dr. Singer's model—unaddressed by the district court—are unavailing. McDonald's argues that Plaintiffs did not answer whether the wage suppression was caused by the conspiracy, but this is incorrect. The elimination of the No-Hire Agreement pursuant to McDonald's settlement with the Washington Attorney General presented a textbook opportunity to study the effects of the restraint in a during-and-after context. Dr. Singer employed a multivariate regression, "[p]erhaps the leading tool" used by social scientists "to isolate the effects of multiple variables and determine how they influence one dependent variable." *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005); *see also Kleen Prods. LLC v. Int'l Paper*, 306 F.R.D. 585, 595 (N.D. Ill. 2015), *aff'd sub nom. Kleen Prods. LLC v. Int'l Paper Co.*, 831 F.3d 919 (7th Cir. 2016) ("One way of demonstrating predominance is to show that there is a common method for proving that the class plaintiffs [received lower] actual [wages] than in the but-for world, such as using an econometric regression model incorporating a variety of factors to demonstrate that a conspiracy variable was at work during the class period, [decreasing pay below] the 'but-for' level for all plaintiffs.").

Dr. Singer's study showed that the No-Hire Agreement negatively impacted class wages, and that the impact was statistically significant at the one percent level, meaning "that there is less than a one percent chance" that the observed difference in wages is due to happenstance rather than to the No-Hire Agreement. ECF 270-5 ¶ 52.

-25-

McDonald's cites *Viamedia, Inc. v. Comcast Corp.*, but *Viamedia* actually *rejects* the argument McDonald's makes here, *i.e.*, that the claim fails for lack of expert causation evidence. 951 F.3d 429, 485 (7th Cir. 2020) (expert on causation "not a legal requirement" for successful antitrust case).[6]

McDonald's argues that "de-averaging" Dr. Singer's regressions shows that the No-Hire Agreement somehow *increased* wages "in many places," and that Dr. Singer used industry-wide wage trends to find suppressed wages even at restaurants outside the McDonald's system. Resp. 59. While it may be *de riguer* among antitrust defendants to attack the concept of averaging, econometrics cannot function without some form of averaging. The relevant question is whether averaging and other statistical tools are used properly to expose causal relationships, rather than conceal them.

Unlike Dr. Singer, McDonald's expert omitted critical control variables and dropped millions of observations, creating separate state-by-state regressions, notwithstanding the fact that the No-Hire Agreement was nationwide and enforced

---

[6] McDonald's cites Judge Brennan's partial concurrence and dissent, Resp. at 59, *citing Viamedia*, 951 F.3d at 495, which does not address causation. *Greater Rockford Energy & Technology Corp. v. Shell Oil Co.*, 998 F.2d 391, 395 (7th Cir. 1993), also does not suggest any shortcoming in Dr. Singer's opinions. In addition to involving "no evidence of concerted action," 998 F.2d at 397, the claim there failed to account for a litany of "intervening economic and market factors," *id.* at 402-404, which is precisely what Dr. Singer controlled for. That process makes his analysis unlike the expert's approach in *Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 942 (7th Cir. 1997), an age discrimination claim in which the expert failed to account for "any potential explanatory variables other than age." Contrary to McDonald's citation, *Sheehan* does not address the issue of common proof.

across state lines. ECF 330-1 ¶ 65. Nonetheless, even these defective regressions found some degree of wage suppression in nearly all states, and statistically significant wage suppression in the vast majority of them. *Id.* When corrected, they show economically and statistically significant wage suppression in *all states* for which there are data. *Id.* ¶¶ 65-71.

Dr. Singer never suggested that McDonald's restraint suppressed wages *outside* of the McDonald's system. Dr. Singer confirmed that even the industry wage trends McDonald's pointed to created no false positives when *properly* considered. ECF 330-1 ¶¶ 80-83. Dr. Singer's model accounted for local labor market conditions, ECF 270-5 ¶¶ 49-50, making it unlike the evidence in *Blades v. Monsanto*, 400 F.3d 562, 570-71 (8th Cir. 2005) (rejecting attempt to model "but-for" market with reference to a nationwide price list that "did not reflect the actual price paid" and failed to account for local competitive circumstances and varying regional pricing).

McDonald's also argues the district court "cited another fatal flaw" in Dr. Singer's supposed failure to account for McDonald's varying market power in each relevant market. Resp. 60, citing SA-50 n.6. What the district court actually did was ignore that Dr. Singer *had* controlled for varying market conditions, down to each individual restaurant location. ECF 270-5 ¶¶ 49-50.[7]

---

[7] Unlike, for instance, a merger challenge where market definition helps *predict* the impact of a merger that has *not yet occurred*, the restraint here has *already occurred* and

*Footnote continued on next page*

Finally, McDonald's attacks on Dr. Cappelli's opinions are equally unfounded.

Dr. Cappelli's opinions about McDonald's-specific skills and the existence of a wage

structure relied upon real-world, contemporaneous evidence, not assumptions about

market definition. ECF 270-6 at, *e.g.*, ¶¶ 48-58 (describing McDonald's training

requirements and programs); ¶¶ 105-108 (describing principles of internal equity to

avoid wage compression); ¶¶ 110-112, 115-134 (McDonald's conscientious about this

concern, educated franchisees). *See also id.* at ¶¶ 68-71, 73-78 (describing McDonald's

awareness of pressure market forces applied on franchisees in relation to 2015 wage

increase). Like Dr. Singer, there was no basis to exclude Dr. Cappelli's opinions and the

district court should not have ignored this evidence.[8]

## IV.  REASSIGNMENT ON REMAND WOULD AVOID THE OPERATION OF BIAS

Plaintiffs seek reassignment on remand not because Judge Alonso "did not

always favor them," Resp. at 62, but to avoid the operation of bias where he improperly

resolved factual issues beyond the pleadings and at summary judgment. McDonald's

does not deny that this Court frequently invokes Rule 36 in those situations, instead

---

*ended*; Dr. Singer is able to directly measure its impact by comparing wages during the restraint with wages after it was lifted. As McDonald's Dr. Murphy admitted, Dr. Singer's regression does not depend upon market definition being broad or narrow. ECF 330-6 at 45:18-23; ECF 330-1 ¶ 53.

[8] Dr. Singer's exclusion in *Conrad v. Jimmy John's Franchise, LLC*, No. 18-CV-00133-NJR, 2021 WL 718320, at *19 (S.D. Ill. Feb. 24, 2021), was based on what the court considered an unaccounted-for infirmity in the dataset—an issue not identified by the district court here or argued by McDonald's.

citing *Dupree v. Laster*, 389 F.App'x. 532, 535 (7th Cir. 2010). But the district court's claimed "prejudice" against the appellant-inmate's religious claim there was merely its dismissal at the screening stage. Here, the district court made factual findings, improperly crediting McDonald's factual defense to grant judgment on the pleadings and deny Plaintiffs' motion for summary judgment. This record supports Rule 36 reassignment.

## CONCLUSION

This Court should reverse and remand the cases for further proceedings.

Respectfully submitted,

Dated: February 21, 2023          */s/Dean M. Harvey*_____

Dean M. Harvey
Anne B. Shaver
Lin Y. Chan
**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, California 94111-3339
Tel: (415) 956-1000
dharvey@lchb.com
ashaver@lchb.com
lchan@lchb.com

Jessica A. Moldovan
**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Tel: (212) 355-9500
jmoldovan@lchb.com

Derek Y. Brandt
Leigh M. Perica
Connor P. Lemire
**MCCUNE LAW GROUP, MCCUNE
WRIGHT AREVALO VERCOSKI KUSEL
WECK BRANDT APC**
231 North Main Street, Suite 20
Edwardsville, Illinois 62025
Tel: (618) 307-6116
dyb@mccunewright.com
lmp@mccunewright.com
cpl@mccunewright.com

Dana R. Vogel
**MCCUNE LAW GROUP, MCCUNE
WRIGHT AREVALO VERCOSKI KUSEL
WECK BRANDT APC**
185656 Jamboree Road, Suite 550
Irvine, California 92612
Tel: (909) 557-1250
drv@mccunewright.com


Attorneys for Individual and Representative
Plaintiff-Appellants Leinani Deslandes and
Stephanie Turner

## <u>CERTIFICATE OF COMPLIANCE</u>

This document complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32, because this document contains 6,963 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f).

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 12-point Palatino Linotype style font.

Dated:  February 21, 2023

_/s/Dean M. Harvey_
Dean M. Harvey
One of the Attorneys for Appellants

**CERTIFICATE OF SERVICE**

I hereby certify that on February 21, 2023, the Reply Brief of Appellants was filed with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/*Dean M. Harvey*
Dean M. Harvey