In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

Nos. 22-2333 & 22-2334

LEINANI DESLANDES and STEPHANIE TURNER,
*Plaintiffs-Appellants*,

*v.*

MCDONALD'S USA, LLC, and MCDONALD'S CORPORATION,
*Defendants-Appellees*.

———————————

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
Nos. 17 C 4857 & 19 C 5524 — **Jorge L. Alonso**, *Judge*.

———————————

ARGUED MARCH 31, 2023 — DECIDED AUGUST 25, 2023

———————————

Before EASTERBROOK, RIPPLE, and WOOD, *Circuit Judges*.

EASTERBROOK, *Circuit Judge*. Until recently, every McDonald's franchise agreement contained an anti-poach clause. Each franchise operator promised not to hire any person employed by a different franchise, or by McDonald's itself, until six months after the last date that person had worked for McDonald's or another franchise. A related clause barred one franchise from soliciting another's employee. We use "anti-

poach clause" or "no-poach clause" to refer to these collectively.

Plaintiffs in this suit under §1 of the Sherman Act, 15 U.S.C. §1, worked for McDonald's franchises while these clauses were in force and were unable to take higher-paying offers at other franchises. They contend that the no-poach clause violates the antitrust laws. If this clause holds down the price of labor by reducing competition for fast-food workers, that could benefit owners—and conceivably consumers too. But the antitrust laws prohibit monopsonies, just as they prohibit monopolies. See *NCAA v. Alston*, 141 S. Ct. 2141 (2021).

Claims under §1 fall into two principal categories: naked restraints, akin to cartels, are unlawful *per se*, while other restraints are evaluated under the Rule of Reason. (The quick-look approach, see *NCAA v. University of Oklahoma*, 468 U.S. 85 (1984), is a subset of analysis under the Rule of Reason.) The district court rejected plaintiffs' *per se* theory after stating that the anti-poach clause is not a naked restraint but is ancillary to each franchise agreement—and, as every new restaurant expands output, the restraint is justified. 2018 U.S. Dist. LEXIS 105260 (N.D. Ill. June 25, 2018).

The court deemed the complaint deficient under the Rule of Reason because it does not allege that McDonald's and its franchises collectively have power in the market for restaurant workers' labor. Market power is essential to any claim under the Rule of Reason. See *Ohio v. American Express Co.*, 138 S. Ct. 2274, 2284 (2018); *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 885–86 (2007); *Ball Memorial Hospital, Inc. v. Mutual Hospital Insurance, Inc.*, 784 F.2d 1325, 1334–35 (7th Cir. 1986). The absence of such an allegation rendered the claim implausible, the court held. See *Bell Atlantic Corp. v.*

Nos. 22-2333 & 22-2334 3

*Twombly*, 550 U.S. 544 (2007) (establishing the plausibility requirement for antitrust complaints). The judge invited plaintiffs to file an amended complaint alleging market power. After they declined to do so, the judge dismissed the complaint with prejudice, ending the suit. 2022 U.S. Dist. Lexis 113524 (N.D. Ill. June 28, 2022).

On appeal plaintiffs assert that they didn't "really" waive or forfeit their opportunity to allege market power, but the district court's contrary conclusion is not an abuse of discretion. Plaintiffs also contend that the existence of market power is too obvious to need allegations and proof, but that line of argument depends on treating "workers at McDonald's" as an economic market. That's not sound. People who work at McDonald's one week can work at Wendy's the next, and the reverse. People entering the labor market can choose where to go—and fast-food restaurants are only one of many options. If wages are too low at one chain, people can choose other employers. The mobility of workers—both from one employer to another and from one neighborhood to another—makes it impossible to treat employees at a single chain as a market.

The district judge found it undisputed that within three miles of Deslandes's home there are between 42 and 50 quick-service restaurants as well as two McDonald's franchises, and that within ten miles of her home there are 517 quick-service restaurants. This is not a situation in which a court can treat employment for a single enterprise as a market all its own. See also, e.g., *Elliott v. United Center*, 126 F.3d 1003 (7th Cir. 1997) (peanut sales in or near a sports arena is not a meaningful market); *Menasha Corp. v. News America Marketing In-Store, Inc.*, 354 F.3d 661 (7th Cir. 2004) (store coupons, ice cream flavors, and diet soda are not meaningful markets). So the Rule

of Reason is out of this suit, and, as quick-look analysis is part of the Rule of Reason, it is out too.

But the district judge jettisoned the *per se* rule too early. The complaint alleges a horizontal restraint, and market power is not essential to antitrust claims involving naked agreements among competitors. See, e.g., *Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46 (1990).

An agreement among competitors is not naked if it is ancillary to the success of a cooperative venture. See, e.g., *Polk Bros., Inc. v. Forest City Enterprises, Inc.*, 776 F.2d 185 (7th Cir. 1985); *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 229 (D.C. Cir. 1986). Consider a partnership to practice law. The partners devote their time to the law firm and pool their revenues; that's a horizontal agreement. The partners also promise not to compete with the law firm by taking their own clients. That agreement is lawful because the promise to devote all legal time to the firm's business helps each law firm compete against its rivals; in antitrust jargon, the no-compete pledge is ancillary to the venture in the sense that it makes the partnership more effective when competing in the market for legal services. See *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 9 (1979).

The complaint alleges that McDonald's operates many restaurants itself or through a subsidiary, and that it enforced the no-poach clause at those restaurants. This made the arrangement horizontal: workers at franchised outlets could not move to corporate outlets, or the reverse. See *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212–13 (1959); *Interstate Circuit, Inc. v. United States*, 306 U.S. 208 (1939).

Still, the district court thought that the anti-poach clause is justified as an ancillary restraint. The court deemed the restraint ancillary because it appeared in franchise agreements—and each agreement expands the output of burgers and fries. (We need not consider the possibility that new franchises replace old ones, so that "new franchise" need not imply "more output," though this may need attention later.)

One problem with this approach is that it treats benefits to consumers (increased output) as justifying detriments to workers (monopsony pricing). That's not right; it is equivalent to saying that antitrust law is unconcerned with competition in the markets for inputs, and *Alston* establishes otherwise.

Another problem with using the appearance of a clause in a contract that, on the whole, increases output, is that the clause may have nothing to do with the output. A "restraint does not qualify as 'ancillary' merely because it accompanies some other agreement that is itself lawful." Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶1908b (4th ed. 2022). Is there some reason to think that a no-poach clause promotes the production of restaurant food? See *Polk Bros.*, 776 F.2d at 189. Maybe it just takes advantage of workers' sunk costs and helps each business's bottom line, without adding to output.

What we mean is this: People who choose to work at McDonald's or one of its franchises acquire business-specific (or location-specific) skills. Employees may choose to work for less than their marginal product in order to compensate the employer for the training. In a competitive market, workers recover these investments as their wages rise over time, in response to their greater productivity. But if McDonald's specifies a limited number of classifications of workers

(something the complaint also alleges), that may delay promotion and frustrate workers' ability to recoup their investments in training. One way to obtain a higher salary, after paying for one's own training through lower wages, is to seek employment at another similar business where the skills can be put to use at the market wage. Deslandes alleges that this is what she tried to do, only to be blocked by the no-poach clause. And if this is what the no-poach agreement does—if it prevents workers from reaping the gains from skills they learned by agreeing to work at lower wages at the outset of their employment—then it does not promote output. It promotes profits, to be sure, as franchises capitalize on workers' sunk costs. But it does not promote output and so cannot be called "ancillary" in the sense antitrust law uses that term.

Common training and job classifications could in principle justify restraints on poaching. Suppose Franchise **A** hires workers and pays for necessary training, rather than requiring the workers to cover their own training costs through lower wages. During training in this approach, the wage exceeds the worker's productivity, but after training the worker produces enough value to pay back the costs of training and allow **A** to recoup the "excess" wage during training time. **A** needs to keep the worker for this to pay off. If Franchise **B** offers no training but a higher wage, this will be attractive to the worker who was trained at **A**, and **B** can make a profit from free riding on **A**'s investment. **B** can do this because the restaurants have the same layout, tasks, and so on. In these circumstances a ban on poaching could allow **A** to recover its training costs and thus make training worthwhile to both franchise and worker. It would not imply monopsony. But eventually the cost of training will have been amortized, and

a ban on transfer to another restaurant after that threshold could be understood as an antitrust problem.

So what was the no-poach clause doing? Was it protecting franchises' investments in training, or was it allowing them to appropriate the value of workers' own investments? That question can't be answered by observing that any given franchise contract, viewed by itself, expands the output of food. Why did the clause have a national scope, preventing a restaurant in North Dakota from hiring a worker in North Carolina, when the market for restaurant jobs is local? Why did the restriction last as long as the employment (plus six months), rather than be linked to any estimate of the time a franchise would need to recover its investments in training? If the answer to some of these questions depends (as McDonald's asserts) on the fact that the system as a whole advertises for workers and wants to prevent some outlets from free riding on the contributions of others, how do the terms of the no-poach clause reflect this objective?

These are all potentially complex questions, which cannot be answered by looking at the language of the complaint. They require careful economic analysis. More than that: the classification of a restraint as ancillary is a defense, and complaints need not anticipate and plead around defenses. *Gomez v. Toledo*, 446 U.S. 635, 640–41 (1980); *Craftwood II, Inc. v. Generac Power Systems, Inc.*, 920 F.3d 479, 482 (7th Cir. 2019); Fed. R. Civ. P. 8(c).

Some language in the district court's opinions suggests that a complaint must contain enough to *win*, but that is not so. It suffices, *Twombly* holds, to make out a plausible claim, and this complaint does so. Nor need a complaint plead law or match facts to elements of legal theories. See *Johnson v.*

<mark>8</mark>　　　　　　　　　　　　　　　　Nos. 22-2333 & 22-2334

*Shelby*, 574 U.S. 10 (2014); *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002). Once a complaint has identified a plausible antitrust claim, further development requires discovery, economic analysis, and potentially a trial.

Plaintiffs sought class certification, and the district court said no. The court may think it wise to reconsider in light of the need for a remand and the analysis in this opinion.

The judgment is vacated and the case is remanded for further proceedings.

Nos. 22-2333 & 22-2334 9

RIPPLE, *Circuit Judge*, concurring. I join the opinion and the judgment of the court. The issue presented by this case is an important and timely one. I therefore write separately to make clear my understanding of what we decide, and do not decide, today.

Our opinion sends the ancillary restraint defense back to the district court for further analysis. It makes clear that, in further proceedings before the district court, the defendants bear the burden of establishing that the no-poaching clause in the franchise agreement qualifies as an ancillary restraint. It further suggests the sort of inquiry that the district court should undertake in considering this question. Our opinion's discussion of these perspectives hopefully will be helpful to the district court and to the parties. However, I do not understand the court's opinion to assess in any definitive way the merits of any of these suggested avenues of further economic analysis, nor do I understand the court to preclude other approaches that the parties believe pertinent and that the district court believes relevant.

Nor do I read the court's discussion as addressing the relative usefulness of the various considerations that it discusses. As I understand the court's opinion, it leaves the district court, with the assistance of the parties, to determine the relative importance of these considerations and to identify those issues worthy of its prime attention. For instance, the district court might determine that the scope and duration of the restriction in question reduces substantially the need for extended economic analysis of other "potentially complex questions." Op. 7. If the restriction cannot be justified because of its scope and duration, it is difficult to see how it can be reasonably necessary to the achievement of the

procompetitive objectives of the franchise agreement. *See, e.g., Blackburn v. Sweeney*, 53 F.3d 825, 828–29 (7th Cir. 1995) (concluding that the "infinite duration" of the restraint meant it had no "necessary relation" to the procompetitive arrangement and so was not ancillary); *Schering-Plough Corp. v. FTC*, 402 F.3d 1056, 1073 (11th Cir. 2005) ("[T]he restraint imposed must relate to the ultimate objective, and cannot be so broad that some of the restraint extinguishes competition without creating efficiency."). If we are to retain the benefits of applying a per se analysis to horizontal agreements, we need to ensure that our adjudication of possible defenses is a focused one. *Cf. Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 19 n.33 (1979) ("*BMI*") (cautioning against allowing the threshold inquiry to "subsume the burdensome analysis required under the rule of reason," which would effectively amount to "apply[ing] the rule of reason from the start").

Perhaps most importantly, I do not understand the court to question the continued vitality of the rule that the ancillary restraint defense requires that the defendants establish *both* that the restriction in question be "subordinate and collateral," *Rothery Storage*, 792 F.2d at 224, to a "legitimate business collaboration" among the defendants, *Texaco Inc. v. Dagher*, 547 U.S. 1, 7 (2006), *and* be reasonably necessary to achieve a procompetitive objective of the franchise agreement. See *Blackburn*, 53 F.3d at 828. This rule is well-established, and I do not understand this opinion to weaken surreptitiously a principle upon which the bench and bar rely.